**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

IN RE: **Cumberland Investment Corporation** **Bk No. 89-11051**
**Debtor(s)** **Chapter 7**

# POSITION OF CHAPTER 7 TRUSTEE JASON D. MONZACK TO RESPONSES (DOCKET NOS. 995 and 996) FILED BY HAROLD CHORNEY

This position of the Chapter 7 Trustee is filed pursuant to this Court's Order of May 1, 2008 ordering the Chapter 7 Trustee to file a written position regarding Responses (Doc. Nos. 995 and 996) filed by Harold Chorney.

The Chapter 7 Trustee respectfully refers this Court to his prior filings in response to Chorney's Motion to Clarify First and Final Application for Fees and Expenses of Edwards Angell Palmer & Dodge. That position of Trustee and Supplement to Position of Trustee appear as Docket Nos. 975 and 993. These prior submissions demonstrate in some detail how the issues which Mr. Chorney has sought to raise both in his prior filings (Docket Nos. 966 and 967) and in his most recent responses (Docket Nos. 995 and 996) were previously disposed of by prior final orders and judgments.

A cursory examination of Mr. Chorney's list of exhibits accompanying his offer of proof (Docket No. 996) clearly demonstrates Mr. Chorney's continued efforts of using any perceived opportunity to raise issues long ago disposed of by prior final orders and judgments. With the exception of a couple of excerpts from billing records submitted by the Trustee in 2007, Mr. Chorney submits documents dated between August 17, 1990 and July, 1995. Especially instructive is Mr. Chorney's statement in his offer of proof that he obtained the August 17, 1990 transcript in August, 1994. It is the August 17, 1990 transcript that serves as the basis for Mr. Chorney's claim of missing assets, a claim that Mr. Chorney has repeatedly made and that has been considered and disposed of on many occasions by a number of Courts. The Trustee's prior submissions (Docket Nos. 975 and 993) demonstrate this in greater detail.

In Chorney's response to the Trustee's position and supplement (Docket No. 995) Chorney states that the Trustee's "position" is "deployed" as "a smokescreen of quotations of prior orders against Harold F. Chorney." Quite to the contrary, it is Mr. Chorney's past and present conduct that is at the core of the matters that Chorney seeks to raise again and again.

Attached hereto as Exhibit A is the September 23, 1993 non published per curiam opinion of the First Circuit's affirmation of the district court's affirmance of the July 2, 1992 bankruptcy court order finding Chorney in civil contempt. The opinion of the First Circuit serves as a brief refresher of Mr. Chorney's conduct in this case. Mr. Chorney's allegations were variously described as "totally unsupportable", "fabricated" and "out of touch with reality".

Again, as a brief refresher of the prior conduct of Mr. Chorney, attached hereto as Exhibit B is a portion of Claim Number 19 filed in this case. Exhibit B summarizes Mr. Chorney's conduct with regard to one customer of the debtor and demonstrates the false "guarantees" and representations made to customers of the debtor.

Contrary to Mr. Chorney's assertation that his conduct is a "smokescreen", it is Mr. Chorney's past and present conduct in this case that is at the heart of this matter.

It is clear that Mr. Chorney has had his day in court over and over again. The issues that he has raised on numerous occasions have been decided against him by "prior final orders and judgments."

On the issue of standing, the unsupportable nature of Mr. Chorney's argument is demonstrated in his offer of proof (Docket No. 996) where Mr. Chorney states that "Despite the fact that Petitioner has presented pleadings concerning the missing assets to this court, the district court and the first circuit, Petitioner had argued his corporate ownership in the seized property and not argued the fact that some of the property seized, of significant value, either belonged to him personally or was non corporate property in which Petitioner has an interest." Based upon prior written submissions to this Court and by prior argument before this Court on March 27, 2008, it apparently became clear to Mr. Chorney that he did not have standing, so some eighteen and a half (18 1/2) years after this case was filed and some fourteen (14) years after he obtained a copy of the transcript of the removal of the assets by the Chapter 11 Trustee, Mr. Chorney now apparently asserts that he has a personal interest in "some of the property seized". This statement by Mr. Chorney is a transparent attempt to obtain "standing". This statement cannot be made in good faith. By making this statement Mr. Chorney demonstrates that he will make any statement and make any claim of misconduct to keep this case open. This statement by Mr. Chorney demonstrates that his allegations, characterized by the First Circuit in 1993 as "totally unsupportable", "fabricated", "out of touch with reality" and "frivolous",

continue to be so. Mr. Chorney's motion and response should be either denied or stricken and the Court should consider imposing additional sanctions on Mr. Chorney.

Respectfully submitted,

**/s/ Jason D. Monzack**
Jason D. Monzack, Esq.
KIRSHENBAUM & KIRSHENBAUM
Attorneys at Law, Inc.
888 Reservoir Avenue
Cranston, RI 02910
(401) 946-3200 Telephone
(401) 943-8097 Facsimile

Dated: May 6, 2008

## CERTIFICATION

I, the undersigned, hereby certify that on the 6th day of May, 2008, I electronically sent a copy of Position of Chapter 7 Trustee Jason D. Monzack to Responses (Docket Nos. 995 and 996) Filed by Harold F. Chorney to the U.S. Trustee, Edward J. Bertozzi, Jr., Esq. and by first class mail to Gary Donahue, Esq., U.S. Trustee's Office, 10 Causeway Street, Boston, MA 02222, John F. Cullen, Esq., 17 Accord Park Drive, Suite 103, Norwell, MA 02061 and Harold Chorney, 16 Spring Drive, Johnston, RI 02919.

**/s/ Jason D. Monzack**

[NOT FOR PUBLICATION]

# United States Court of Appeals
## For the First Circuit

No. 93-1094

HAROLD F. CHORNEY,

Appellant,

v.

MICHAEL WEINGARTEN, ET AL.,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Breyer, Chief Judge,
Selya and Boudin, Circuit Judges.

Harold F. Chorney on brief pro se.
Edward J. Bertozzi, Jr. and Edwards & Angell, on brief for appellee John F. Cullen, Trustee.

September 23, 1993

Exhibit A

_Per Curiam_. Harold F. Chorney challenges the district court's affirmance of a bankruptcy court order of July 2, 1992, finding him in civil contempt for a "continuous, deliberate, and unjustified interference with the orderly progress of this bankruptcy case," and ordering him to pay $200,000 compensation to the trustee. We affirm.[1]

The bankruptcy proceeding from which the instant appeal arises has a long and tangled history. The docket entries alone consume almost 79 pages as of the date of the contempt order challenged here. On this appeal we have been provided with a partial record consisting primarily of select materials generated in 1991 and 1992. The following background facts are culled from three earlier published opinions of the courts below. _In re Cumberland Inv. Corp._, 116 B.R. 353 (Bankr. D.R.I. 1990); _In re Cumberland Inv. Corp._, 118 B.R. 3, 4 (Bankr. D.R.I. 1990); _In re Cumberland Inv. Corp._, 133 B.R. 275 (D. R. I. 1991).

Debtor, Cumberland Investment Corporation ("CIC"), a wholly owned Rhode Island subsidiary of a Canadian corporation, Wescap Enterprises, Ltd., was in the business of buying and selling numismatic coins and stamps. Chorney was a principal

---

1. Chorney's notice of appeal refers to the district court's order of January 8, 1993 in the singular. There were two orders entered that day, one dismissing the appeal on the merits, the other dismissing a motion for reconsideration based on "new evidence." The issues designated show that only the first order is contested.

of CIC and chief executive officer of Wescap. Eastland Bank was the major secured creditor.

In November, 1989, Eastland and two other creditors petitioned CIC into bankruptcy. About a month later, CIC converted the Chapter 7 involuntary petition into a voluntary Chapter 11 proceeding. Judge Votolato initially denied an Eastland motion for appointment of a Chapter 11 trustee, instead authorizing appointment of an examiner. Pending the outcome of the examiner's investigation, CIC was restrained from selling any coins without court approval.

There ensued seven months of investigation, a series of five reports from the examiner, and at least 11 days of contested hearings and motions by both sides. On the basis of the evidence thus generated, which reflected a "pervasive, broad course of debtor misconduct" and the debtor's "repeated failure to respond adequately to an overwhelming amount of negative evidence," the judge reversed course. In re Cumberland Inv. Corp., 118 B.R. at 4-5, 6. He granted a renewed motion for appointment of a trustee, expressing regret that he had earlier denied it.

The court simultaneously ordered the immediate discharge of all CIC employees and three principals, including Chorney. In re Cumberland Inv. Corp., 118 B.R. at 7-8. Among the misdeeds leading to the discharges, the court found that Chorney and his agents had purposely delayed the bankruptcy

process through shifting misrepresentations about corporate assets, unauthorized and transparently fraudulent business operations, and circumvention of the court's injunction against coin sales. In re Cumberland Inv. Corp., 118 B.R. at 4-7.

Shortly before the decision to appoint a trustee, the court had also held hearings over a five-day period on a CIC motion to strike one of the examiner's reports. In that motion, Chorney had alleged examiner bias, conflict of interest, slander, a conspiracy between the examiner and Eastland to misrepresent CIC's affairs, and inventory switches by Eastland. From the evidence presented there, the court questioned the debtor's good faith, concluding that Chorney's allegations were "totally unsupportable," "fabricated," and "out of touch with reality." In re Cumberland Inv. Corp., 116 B.R. at 354. The district court affirmed both orders, finding the bankruptcy judge's analysis "well supported" by the evidence. In re Cumberland Inv. Corp., 133 B.R. at 279, 280.

In the nine months following the trustee's appointment, the bankruptcy court docket sheet shows 234 entries. Among them are a variety of motions brought by the trustee, examiner, and Eastland seeking orders directing Chorney to cooperate or to refrain from interference with the bankruptcy process.

The proceedings immediately precipitating this appeal began on May 21, 1991, when Chorney moved to adjudge the

examiner in contempt. The sole basis for this motion was an allegation that the examiner had failed to use his "best efforts" to obtain agreement among the parties on a method for sale of assets as required by an earlier court order. A hearing was held and testimony taken which showed the motion to be unfounded and wholly frivolous.

On July 3, 1991, in an order dismissing the examiner contempt motion, Judge Votolato observed that over the course of the bankruptcy proceedings Chorney had "deliberately and continuously acted in bad faith to obstruct and to hinder the efficient administration of the estate." He sua sponte ordered Chorney to show cause why he should not be adjudged in contempt for his "wilful interference with the orderly and economic administration of this estate and [his] unjustified waste of the time of this Court and of numerous parties."[2]

A hearing on the show cause order was held on September 17, 1991. Testimony at that hearing spans 80 transcript pages. Judge Votolato continued the matter without a finding in the hope that a change in Chorney's behavior or attitude might warrant further consideration. After a status

2. The order also barred Chorney from further participation or intervention in judicial proceedings relating to the disposition of the estate, except on the same basis as a general creditor.

conference on June 18, 1992 revealed no change,[3] the court issued the contempt order appealed here. In addition to the entire record as reflected in the docket entries, the court relied on the trustee's summary of recent events at the show cause hearing.

> [T]he Trustee, John Cullen, Esq., described what was unfortunately an already too familiar pattern of obstructionist behavior by Mr. Chorney [footnote omitted]. For example: he continued, post-petition, to advertise fraudulently after both agreeing to and being ordered to desist; to cure a glaring security problem, the Trustee moved for and obtained a Court order to physically eject Chorney from the Debtor's business premises (where he was actually living,[*] after repeated broken promises to vacate;[**] CIC records were allegedly concealed and/or destroyed; coin and other inventory values were grossly and fraudulently overstated to the

3. At the status conference the judge learned that in the intervening months Chorney, through Wescap, filed a state court lawsuit reciting the same alleged coin switches by Eastland which the bankruptcy court had earlier determined to be a fabricated charge. The suit was removed to federal court and Eastland advised that it was preparing a motion to dismiss the suit on collateral estoppel grounds. Hearing of June 18, 1992, Tr. at 2-4. Further, liquidation of the estate had been forced to a halt due to a pending criminal investigation into Chorney's conduct. Tr. at 6-8.

During the same period Chorney also took four appeals to the district court from bankruptcy orders. All four were dismissed with prejudice on the merits. Cumberland Inv. Corp., Nos. 91-0594, 91-0595, 91-0596, 91-0604, slip op. (D. R. I., June 5, 1992). Chorney then attempted to further appeal three of the orders to this court, which dismissed them as improperly taken from interlocutory orders. Chorney v. Eastland Bank, Nos. 92-1780, 81, 82, slip. op. (1st Cir. Feb. 5, 1993).

court, the Trustee, and to creditors; many frivolous pleadings were filed and extensively litigated, with the intent and effect of impeding the administration of an estate already left in shambles by Chorney; information concerning the identity of redemption coin holders was wrongfully withheld on the baseless ground of 'confidentiality,' even after disclosure was ordered by the Court, and so on.

The most damaging consequence of Chorney's incomprehensible behavior, however, is the incredible amount of needless expense that has been heaped upon the estate, and ultimately, of course, upon the creditors. The Trustee's and Examiner's duties (and their fees and expenses) have been increased; secured creditors, long-delayed in exercising their rights, have seen the interest part of their claims escalate; and the likelihood of a meaningful distribution to hundreds of unsecured creditors and redemption coin holders has been practically eliminated. All of this waste has been caused unnecessarily by Harold Chorney.

---

* Chorney's apartment was literally surrounded by inventory, allowing a real-life "fox-guarding-the-chicken-coup" scenario. His bed was literally within inches of the vault and its contents.

** The Court order was ignored, however, and the Trustee ended up, instead, moving the assets to another location, at a cost to the estate of approximately $95,000.

In re Cumberland Inv. Corp., No. 89-11051, slip op. at 2-3 (Bankr. D.R.I. July 2, 1992).

On the basis of time records submitted by the trustee, the examiner and Eastland Bank, showing "expenses directly attributable to unnecessary litigation and/or extra judicial

work generated by Mr. Chorney," the court ordered Chorney to pay $200,000 to the trustee as "partial reimbursement for the deliberate post-petition damage he has done to creditors." In re Cumberland Inv. Corp., No. 89-11051, slip op. at 4. The court said that its order was "purposefully crafted to be compensatory and not punitive in nature." Id. at 4.

Chorney's brief here denies the accuracy of the judge's factual conclusions and argues that he is the victim of retaliation for his criticisms of improprieties by the judge, trustee and examiner. In support of his denials and blame shifting, however, he points only to previous appellate briefs in this court and elsewhere which recite the same conclusions, and to selected excerpts from the record. We have read the briefs and the record references as liberally as possible in his favor, given his pro se status. However, the material he offers barely provides even a glancing basis for his factual denials and no concrete support for his accusations. The selectivity of his citations, incoherent or indistinct purpose for many record references, and his repeated blurring of temporally distinct events, only serves to confuse and obfuscate the issues.[4]

---

4. We also reviewed the videotape quoted in Chorney's brief, and conditionally accepted by this court on Chorney's motion to supplement the record. We are unable to determine from the scanty information given whether the tape was in evidence below and might thus be a proper part of this record. In any event, the tape does not support Chorney's assignments of error.

"We must uphold the factual findings of the bankruptcy court, as affirmed by the district court, unless they are clearly erroneous." In re Power Recovery Sys., Inc., 950 F.2d 798 (1st Cir. 1991). Based on a full review of the record before us, including transcripts of the hearings of May 7, 1991, May 22, 1991, September 17, 1991, June 18, 1992, and July 17, 1992, it clearly appears that the bankruptcy court had more than ample evidence to support the contempt order.

We also reject Chorney's procedural challenges to the hearing and order. While Chorney claims now that he was never notified of the order, nor given time to prepare a defense, the record shows that he received ample notice and specification of the issues in the court's Show Cause order of July 3, 1991. That order fully complied with Bankruptcy Rule 9020(b). Chorney had more than two months to prepare a defense, was present without objection at the September 17, 1991 hearing, represented by counsel, testified, and was well prepared on all the issues raised.

Equally meritless is Chorney's claim that he was unconstitutionally deprived of a right to a jury trial. Absent an express statute, there is no right to a jury trial in civil contempt proceedings. Shillitani v. United States, 384 U.S. 364 (1966); cf. United States v. Pina, 844 F.2d 1, 11-12 (1st Cir. 1988) (even in some classes of criminal contempt cases there is no right to a jury). And while it may not always be

easy to distinguish between criminal and civil contempt, there is no difficulty where, as here, the ultimate object is to compensate the injured party. See generally, In re Power Recovery Sys., Inc., 950 F.2d at 802-03 (defining criminal and civil contempt sanctions); Charles A. Wright et. al., 11 Federal Practice and Procedure § 2960 at nn. 59-60 (1973 & supp. 1992) (same).

At least two of the other issues raised in Chorney's brief merely reiterate arguments he raised in earlier appeals, which were dismissed by this court as improperly taken from interlocutory orders.[5] Chorney's remaining arguments are frivolous.

For the reasons stated, the judgment of the district court is affirmed. Appellee's request for sanctions is denied without prejudice to renewal of the request in the future should events so warrant.

---

5. See supra note 3. Chorney reiterates that he was denied due process when Judge Votolato both recused himself from hearing an Eastland motion to hold Chorney in contempt and ruled that there was no right to a jury trial on the Eastland motion. The Eastland motion was transferred to another judge, and eventually withdrawn. If by reasserting this argument Chorney is suggesting that Judge Votolato should have recused himself from the instant contempt hearing, the argument fails for want of any facts creating a reasonable doubt as to the judge's impartiality. United States v. Lopez, 944 F.2d 33, 327 (1st Cir. 1991). Chorney also attempts to reargue the contentions underlying his interlocutory appeal from denial of his motion to hold the examiner in contempt.

**HSA Consultants**
Investment, Tax & Financial Planning

April 6, 1990

United States Bankruptcy Court
380 Westminster Mall
Providence, Rhode Island 02903

RE: CUMBERLAND INVESTMENT CORPORATION
BANKRUPTCY CASE # 89-11051

The following is a summary of the events of my dealings with Harold F. Chorney and Cumberland Investment Corporation:

9-24-84: On the advice of Lewis J. Walker, a Certified Financial Planner in Atlanta, Georgia, I traveled to Boston, Massachusetts with my wife to discuss with Harold F. Chorney, President of Cumberland Investment Corporation, the possibility of my purchasing Morgan Silver Dollars from his company. I was assured by Lewis Walker that I would realize a 15% minimum return on an investment with Cumberland if I held the investment at least One (1) year. Cumberland brochures and other literature that I received from Walker confirmed, in effect, this policy. I specifically asked Chorney about this policy which he confirmed. He further stated that what I was actually doing was "loaning him money and holding the coins as collateral on the loan". I decided to proceed and purchased 187 Morgan and Peace Silver Dollars from his company for a price of $57,962.00.

5-19-86: Following a telephone conversation with Lewis Walker, I wrote Harold Chorney a letter stating that I wanted to have my coins graded by the Professional Coin Grading Service (PCGS) while at the same time maintaining my guarantee with Cumberland. I asked Chorney for his help and cooperation in this matter. Chorney stated that he would not pay to have the coins graded by PCGS and that it would be too expensive for me to have them graded.

9-17-86: I wrote Harold Chorney a letter and returned all 187 coins to him by Registered Mail for liquidation. A Cumberland Price List dated 6-20-86 showed my coins were worth $180,315.00.

3-18-87: Wrote letter to Chorney demanding payment of monies owed.

3-30-87: Received letter from Chorney stating money was not available to pay me.

7-10-87: Received check #5924 for $5000.00. This is sole payment made to me by Chorney/Cumberland.

P.O. Box 2436
Peachtree City, GA. 30269

350 Grooms Circle
Fayetteville, GA. 30214

(404) 461-5657

**HSA Consultants**
Investment, Tax & Financial Planning

8-27-87: Wrote letter to Chorney demanding remainder of monies owed to be paid.

4-19-88: Wrote letter to Chorney demanding payment.

7-20-88: Wrote letter to Chorney demanding payment.

8-22-88: Flew to Boston, Massachusetts, met with Hal Chorney, received six(6) Morgan Silver Dollars from him to take to the Atlanta Coin Show on Labor Day Weekend to shop for price and possibly help Chorney in the liquidation. Chorney told me the six (6) coins were worth: $435, $435, $435, $610, $700, & $725. I shopped the coins among more than a dozen Coin Dealers at the show and was offered, at best, $100.00 per coin.

9-6-88: Returned the coins to Chorney by Registered Mail and wrote a letter demanding payment.

4-27-89: Wrote letter to Chorney demanding payment and to arrange trip to Boston-Woonsocket to receive payment.

5-9-89: Telephoned Chorney to confirm date for my trip to Woonsocket.

6-7-89: Received Fax from Chorney regarding Audit.

7-19-89: Flew to Boston, rented car, drove to Woonsocket, and met with Chorney. He refused to give me the original coins I purchased. He offered me 187 coins of similar grade as my original coins. I told him the original coins were not MS65 Grade coins as per his guarantee, in the opinion of the Coin Dealers/Experts I had shown them to. I asked him if he knew how much money he owed me. He responded: "yes." He ran a tape on his adding machine and handed it to me with the total amount of $101,433.50. He arrived at this number by multiplying the purchase price of $57,962.00 by 1.75 to get $101,433.50. The number 1.75 is 15% appreciation for five (5) years. By doing this, Chorney acknowledged the debt to me. He offered me 187 coins plus 50 additional coins. I telephoned my attorney in Georgia who advised me to take as much as he would give me but not to acknowledge that the debt was paid in full. Chorney stated that he would not give me any coins unless I signed an agreement. I telephoned my attorney again and he advised that I should have Chorney arrested for theft by taking. We discussed this and other alternatives. My attorney again stressed that I should not sign any agreement acknowledging that the debt was paid in full. I told Chorney that I would take the 237 coins but that I would not sign anything. He stated that he would not give me any coins if I didn't sign some sort of an agreement. He then had his secretary draft an agreement. After reading the agreement, I said that it was unacceptable. We argued about the wording and Chorney redrafted the agreement with virtually no change in anything of substance. We argued again and Chorney said that was the best he could do. I signed the Memorandum under verbal protest, took the 237 coins, and departed the offices of Cumberland Coin.

P.O. Box 2436
Peachtree City, GA. 30269

350 Grooms Circle
Fayetteville, GA. 30214



(404) 461-5657

**HSA Consultants**
Investment, Tax & Financial Planning

9-27-89: Selected five (5) coins at random from the 237 coins and gave them to David Wiley of National Numismatic Associates to send to the Professional Coin Grading Service for me and have graded at a total cost of $175.00, or $35.00 per coin.

12-1-89: David Wiley telephoned me and said that my five(5) coins had come back from the PCGS; three coins were graded MS63 and two coins were graded MS64. The MS63 coins were worth $40.00 and the MS64 coins were worth $95.00-100.00, at present market value.

11-20-89: Received a letter from my attorney in Woonsocket stating that Harold Chorney/Cumberland Coin had been made an involuntary Bankrupt by a petition of Eastland Bank and others.

12-5-89: Sent two hundred (200) coins to Kent Gulley at Silver Towne, Winchester, Indiana for liquidation, by Registered Mail. Upon receipt of the coins, Kent Gulley called me and offered me $25.00 per coin, stating that most of the coins, in his opinion, were MS63 Grade or less. I asked him to shop them at the January 1990 "FUN" Show in Florida and try to get a better price. He did this, telephoned me after the show, and stated that he could generate no interest in my coins. He returned all 200 coins to me on January 31, 1990 by Registered Mail.

12-5-89: I hand-delivered 32 Coins to David Wiley at National Numismatic Associates for liquidation.

1-15-90: Received Liquidation Recap from David Wiley/NNA on the 32 coins along with a check for $1822.70. See attached receipt. This is an average price of $57.28 per coin.

2-5-90: I hand-delivered 200 Coins to David Wiley/NNA for liquidation.

3-13-90: Received Liquidation Recap from David Wiley/NNA on the 200 coins along with a check for $9425.43. See attached receipt. This is an average price of $47.24 per coin.

4-9-90: I sent the remaining 5 coins, PCGS graded, to Bob Harwell at Harwell & Company for Liquidation. Bob was able to quote me a price of $274.75 for all the coins which is an average of $54.95 per coin.

I have done everything that Harold Chorney has asked me to do. I have made three trips to Boston/Woonsocket to attempt to work this out with Harold Chorney. I have not done anything to void his guarantee. I have tried to help him with the liquidation. I have been patient and fair with him. He has not lived up to his written guarantee. I ask the Court to direct that Harold Chorney and Cumberland Investment Corporation fulfill their written guarantee to me when I purchased the coins and/or loaned them the money by paying me in full the money that they owe me: $106,589.23 plus all expenses incurred.

Kindest regards,
Howard S. Alford Jr.



P.O. Box 2436
Peachtree City, GA. 30269
(404) 461-5657
350 Grooms Circle
Fayetteville, GA. 30214

# SILVER DOLLAR INVESTMENTS



Cumberland Coin Investment Corporation

*Our guarantee means you risk nothing*

BEARER # 5204

# SILVER DOLLAR CERTIFICATE

## OUR GUARANTEE

*means you risk nothing*

- ALL COINS ARE GUARANTEED GENUINE.
- ALL COINS ARE GUARANTEED TO GRADE MS 65 OR BETTER.
- WE OFFER THE BEARER A FULL 12-MONTH MONEY BACK GUARANTEE ON ALL PURCHASES OF OUR GEM B.U. SILVER DOLLARS.
- 15% IS THE LEAST PAID PER YEAR TO THE BEARER ABOVE THE ORIGINAL PURCHASE PRICE.
- MISHANDLING OF COINS MAY VOID ALL GUARANTEES. WE STRONGLY RECOMMEND ALL ROLLS REMAIN SEALED AS DELIVERED FOR OUR PROTECTION AS WELL AS YOURS.

THE BEARER OF THIS CERTIFICATE WITH THE MATCHING SEALED CONTAINER OF SILVER DOLLARS IS ENTITLED TO THE FOLLOWING GUARANTEES:

- I HEREBY CERTIFY THAT EACH COIN HAS BEEN HAND SELECTED AND AUTHENTICATED PERSONALLY BY THE PRESIDENT OF CUMBERLAND COIN INVESTMENT CORPORATION.



HAROLD F. CHORNEY, A.N.A.
PRESIDENT, C.C.I.C.