April 18, 2008

Arthur N. Votolato
U.S. Bankruptcy Judge
380 Westminster Mall
Providence, R.I. 02903

In Re: Cumberland Investment Corporation 89-11051

**RESTRICTED DELIVERY**

In reference to the hearing on March 27, 2008, concerning standing, Petitioner requests permission to send this Offer of Proof to the parties on the service list.

Despite the fact that Petitioner has presented pleadings concerning the missing assets to this court, the district court and the first circuit, Petitioner had argued his corporate ownership in the seized property and not argued the fact that some of the property seized, of significant value, either belonged to him personally or was non corporate property in which Petitioner has an interest.

These arguments are contained in the enclosed OFFER OF PROOF.

Sincerely,

Harold F. Chorney

Harold F. Chorney
16 Spring Drive
Johnston, R.I. 02919
401 934-0536
hfchorney@earthlink.net

Enclosures: Offer of Proof concerning standing

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF RHODE ISLAND

IN RE: CUMBERLAND INVESTMENT CORPORATION

CA NO. 89-11051

## PETITIONER'S OFFER OF PROOF CONCERNING STANDING

Now comes Harold F. Chorney, pro se, a petitioner with property interests and an interested party in the above captioned matter and presents this instant OFFER OF PROOF as to why Petitioner has standing to participate in hearings and pleadings involving the FIRST AND FINAL APPLICATION FOR FEES AND EXPENSES OF EDWARDS ANGELL PALMER & DODGE LLP; THE FEE PETITION OF JOHN F. CULLEN; and the fees and expenses of other professionals in this case..

## OFFER OF PROOF CONCERNING PROPERTY INTERESTS OF PETITIONER

### A. TRAVEL AND FACTS

1. Petitioner, Harold F. Chorney, was the President of a company named Cumberland Investment Corporation (CIC). CIC obtained a series of loans from Eastland Bank ultimately totaling $2,500,000 in 1989. To obtain these loans, Cumberland pledged uncirculated Mint State Silver Dollars and other assets, stored in Eastland Bank vaults, as collateral. The number of coins held by Eastland Bank during this period was 7,826 silver dollars in May 1989.

2. On October1989, Eastland Bank, claiming an interest in all the assets of CIC,hired Sotheby's Auction House to appraise the collateral held by the bank. The Sotheby's appraisal was dramatically lower than the face value of the loan prompting an involuntary petition of CIC into bankruptcy and eventually criminal proceedings against Petitioner.

3. On December 1989, Judge Votolato appointed Michael Weingarten as Examiner in the bankruptcy case in which Petitioner was the Debtor in Possession.

4. In addition to the "possessory" collateral, stored at Eastland Bank in Woonsocket, R.I., non possessory assets were stored at 141 Main Street and 325 Main Street in Woonsocket, R.I. Petitioner also resided at 141 Main Street.

5. On August 17, 1990, Petitioner was fired and the business was taken over by a Chapter 11 Trustee, John F. Cullen. By *warrantless* search, the assets and documents of CIC, Wescap Enterprises Limited, Financial Privacy Consultants, Inc. and others were seized and removed from 141 Main Street, Woonsocket, R.I. and from 325 Main Street Woonsocket, R.I. on August 23, 1990. Also seized at this same time were assets and documents personally belonging to Petitioner.

6. Petitioner could not remember from memory each and every asset which belonged to him personally or to others which was seized.

7. Petitioner made several attempts to obtain copies of the yellow notebooks containing the inventory of Cumberland Investment Corporation, in part to assist him in finding out which assets were removed which were not part of the certified inventory of Cumberland Investment Corporation. Petitioner was unsuccessful in obtaining copies of the corporate inventory contained in yellow notebooks from the U.S. Attorney, Chapter 11 Trustee and Chapter 7 Trustee. Upon information and belief, documentary evidence of ownership of assets by Petitioner and others was seized by the Trustee.

8. On May 26, 1994, Mr. Monzack sent a letter to Petitioner stating,

> "As you requested, and as has been authorized by the FDIC, enclosed please find the 14 page inventory list previously supplied to me by FDIC.
>
> As we also discussed, should you have any documentation substantiating your claims that there may be assets of Cumberland Investment Corp. which are not currently stored at Fleet National Bank in Woonsocket, RI, you will provide me with copies of any such documentation so that I may further look into the matter." (See Exhibit 1.)

9. On June 10, 1994, subsequent to reviewing the 14 page inventory supplied by Mr. Monzack, Petitioner sent a letter to Mr. Monzack which included, from memory, a list of possible missing items , which included the

Pre Columbian amulets such as the gold frogs. (See Exhibit 2.)

10. Petitioner and others have sought an accounting of the assets of the estate of C.I.C. On August 26, 1994 JOHN F. CULLEN'S OPPOSITION TO THE MOTION OF WARREN TAFT AND OTHERS FOR COMPLETE ACCOUNTING BY JOHN CULLEN, TRUSTEE OF ASSETS WHICH WERE UNDER HIS CONTROL FROM AUGUST 1990 UNTIL THE SAME WERE TURNED OVER TO THE SUCCESSOR TRUSTEE, JASON MONZACK was made. In this pleading, Mr. Cullen states that,

> "The Movant, although alleging that there are questions concerning the whereabouts of certain valuable items which were allegedly in possession of the Chapter 11 Trustee, does not give any details as to what items are allegedly missing or what items were originally on the premises in 1990 that are not currently available." (See Exhibit 3.)

11. On or about August 1994, Petitioner had obtained, on his own from Allied Court Reporters, a transcript of the removal of the Cumberland Investment Corporation assets, by Mr. Cullen on August 17, 1990. The transcript describes Mr. Weingarten, court appointed Examiner stating that, "This would appear to be some expensive costume jewelry, maybe ancient, couple of frogs; the price on it says $1750, lots of frogs." TR 8/17/90, pg. 36. (See Exhibit 4.)

12. On September 13, 1994, a copy of the Allied Court

Reporters transcript of the removal of the assets (See Exhibit 4.) was sent to Jason Monzack, with a letter (See Exhibit 5.) in response to the May 26, 1994, letter from Mr. Monzack .

13. The September 13, 1994, letter lists possible personal and corporate items missing or sold but not accounted for. The September 13, 1994 letter refers to number 8 of the June 10, 1994 letter. The June 10, 1994 list, number 8., indicates that there were some 25 gold frogs and other pre-Columbian amulets. (See Exhibits 2 and 5.)

14. Mr. Monzack made no response to the June 10, 1994, or the September 13, 1994 letters.

15. On December 28, 1994, Mr. Nacu, Mr. Dunleavy and Petitioner met with Mr. Monzack at his offices in Cranston, R.I. It was at this meeting that Mr. Monzack admitted the following: (See Exhibit 6.)

a. Certain records, including the yellow notebooks could not be located by the U.S. Attorney.
b. Mr. Monzack was attempting to obtain the records, inventories, documents, videos and still photographs of the seized assets as they were being removed from the building.
c. Some $300,000 to $400,000 in assets seized by John F. Cullen, Esq., was missing.

16. On January 4, 1995, Scott Lutes, Esq., attorney for Petitioner contacted Mr. Monzack in order to obtain an inventory and detailed

disposition of the assets of the estate of C.I.C. (See Exhibit 7, page 8 from the billing records of Chapter 7 Trustee, dated October 9, 2007.)

17. On May 17, 1995, a letter was sent by Mr. Monzack to Mr. Cullen, Mr. Bertozzi, Mr. Weingarten, the Postal Inspector, the U.S. Attorney, the FBI, Fleet Bank, the FDIC and others, seeking inventories and other documents. (See Exhibit 8.) The production was virtually without success, with exception of the production of 19 videotapes of the removal of the assets on August 17 and August 23, 1990. Only Mr. Taft was "allowed" to view these videotapes. Petitioner and his attorney were forbidden to view these videotapes. (See July 21, 1995 letter from Mr. Monzack to Mr. Taft, Exhibit 9.) Petitioner did not obtain the 19 videotapes until October 1999, in response to an F.O.I.A to Executive Office of U.S. Attorneys.

18. On February 1996, Petitioner went to prison where on December 28, 1996, Petitioner sustained a traumatic brain injury resulting in both memory loss, and a reoccurrence of his service connected Post Traumatic Stress Disorder.

19. Subsequent to the December 1999, auction sales of assets of the estate, Mr. Monzack on 2/7/02 stated that there were no assets remaining. It was at this time that Petitioner finally realized that the gold frogs and other assets had totally disappeared without any accounting.

20. To date, Petitioner has not been able to obtain a copy of the yellow inventory books of Cumberland Investment Corporation.

21. To date, Petitioner has not been able to obtain any accounting of the assets of the estate which were taken, sold or remaining.

22. To date, Petitioner has not been able to obtain any accounting concerning the sale of the pre-Columbian gold frogs, other antiquities and gemstones, which Petitioner has an interest in.

**B. DISCUSSION:**

It is difficult for the Petitioner to prove all those items belonging to Petitioner or to others, which were removed from the premises of Cumberland Investment Corporation by the Chapter 11, Trustee because the Petitioner has never received a detailed listing of those items seized, those sold and those remaining. In good faith, Petitioner supplied Mr. Monzack, the U.S. Trustee and the Clerk of the Bankruptcy Court a listing of items which were conspicuously missing (See Exhibits 2 and 5) from those items allegedly sold from the estate.

In addition, the detailed inventory lists of corporate assets, compiled under the aegis of the corporate accountants of Thorne, Ernst and Whinney,

removed by the Chapter 11 Trustee, have disappeared. On June 7, 1995, Mr. Monzack is told by AUSA Posner that he cannot locate the yellow notebooks, the inventory records of Cumberland Investment Corporation. (See Exhibit 10., Jason Monzack Billing, dated October 9, 2007, page 14.)

Other copies of the inventory records of Cumberland Investment Corporation, in the possession of Ernst and Whinney, were claimed to be "owned" by the Chapter 11 Trustee in bankruptcy and Ernst and Whinney would not release them to Petitioner or to his attorney Scott Lutes when requested. A third set of these yellow notebooks was given to Special Agent Truslow by C.I.C. accountant, Peter Lockey. A copy of these records were supposed to be made and given back to Mr. Lockey, by the F.B.I. Mr. Lockey never received a copy back from the F.B.I.

Consequently, the Petitioner was at a "dead end" to reconcile assets using corporate records. Petitioner and others had to use and rely on lists made up by Bankruptcy Court parties versus those prepared over time by Thorne Ernst & Whinney. Consequently a corporate list of assets could not be used by Petitioner or others to reconcile those assets seized, those sold and those remaining either for the civil or criminal action.

## C. ARGUMENT:

It is difficult to prove a negative. How does Petitioner prove which assets were taken that were part of the corporate inventory? It is even more difficult to prove which assets, not part of the corporate inventory, were taken along with the corporate inventory when the copies of the corporate inventory have themselves disappeared and no listing of assets seized, sold or remaining has been supplied to Petitioner.

The Chapter 7 Trustee claims that Petitioner has no standing since he has not filed any Proof of Claim. But how could Petitioner file any claim when the information listed above to completely and accurately substantiate this claim is conspicuously missing? There is no doubt that gold frogs were removed from the premises of Cumberland Investment Corporation as listed in the transcript of the removal of the assets on August 17, 1990 on page 36. Yet, no documentation concerning the sale of these frogs and other items listed in the September 13, 1994, letter has been produced for Petitioner.

Petitioner has an economic interest in the gold frogs, gemstones, antiquities and other items not listed as part of the corporate inventory which were seized by the Chapter 11 Trustee, although he cannot specify what all those items are, or what they are valued at.

**WHEREFORE**, there can be little doubt from the information listed above that Petitioner has "property interests" in some 25 gold pre-Columbian amulets of significant value, and that the information concerning these and

other assets are missing to the extent that Petitioner cannot truthfully and accurately file a Proof of Claim. It is because of his property interests that Petitioner has standing to present his case and question the billing and other practices of Mr. Bertozzi, Mr. Cullen, Mr. Monzack and others.

Respectfully Submitted,

Harold F. Chorney, Pro Se
16 Spring Drive
Johnston, R.I. 02903
(401) 934-0536

**CERTIFICATION**

I hereby certify that on this ______day April 2008, I sent a copy of the above by first class mail to the following:

Arthur N. Votolato, Judge
380 Westminister Mall
6th Floor
Providence, R.I. 02903

Edward J. Bertozzi, Jr., Esq.
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, R.I. 02903

Jason D. Monzack , Esq.
Kirshenbaum & Kirshenbaum
888 Reservoir Avenue
Cranston, R.I. 02910

Leonard DePasquale, AUST
Office of the U.S. Trustee
10 Dorrance Street
Providence, R.I. 02903

John F. Cullen, Esq.
Law Office of John F. Cullen, PC
17 Accord Park Drive, Ste 103
Norwell, MA 02061

John Fitzgerald, III, Esq.
United States Trustee
Thomas P. O'Neill, Jr. Federal Office Bldg.
10 Causeway Street, Room 472
Boston, MA 02222-1043

John Boyajian, Esq.
Boyajian, Harrington & Richardson
182 Waterman Street
Providence, R.I. 02906

Matthew J. McGowan, Esq.
Salter McGowan, Sylvia & Leonard
321 South Main Street
Providence, R.I. 02903

Harold F. Chorney

HAROLD F. CHORNEY

## LIST OF EXHIBITS

Exhibit 1. May 26, 1994, letter from Mr. Monzack to Petitioner

Exhibit 2. June 10, 1994, letter from Petitioner to Mr. Monzack.

Exhibit 3. April 26, 1994, JOHN F. CULLEN'S OPPOSITION TO MOTION OF WARREN TAFT AND OTHERS FOR COMPLETE ACCOUNTING BY JOHN CULLEN TRUSTEE OF ASSETS WHICH WERE UNDER HIS CONTROL FROM AUGUST OF 1990 UNTIL THE SAME WERE TURNED OVER TO THE SUCCESSOR TRUSTEE, JASON MONZACK

Exhibit 4. August 17, 1990, Transcript of the removal of C.I.C. assets

Exhibit 5. September 13, 1994, letter from Petitioner to Jason Monzack

Exhibit 6. February 10, 1995, letter from creditor Traian Nacu to Office of Professional Responsibility

Exhibit 7. October 9, 2007, Billing records of Chapter 7 Trustee, page 8

Exhibit 8. May 17, 1995, letter from Mr. Monzack to parties and Agencies

Exhibit 9. July 21, 1995, letter from Mr. Monzack to Mr. Taft

Exhibit 10. October 9, 2007, Billing records of Chapter 7 Trustee, page 14

EXHIBIT 1

Kirshenbaum &
Kirshenbaum
ATTORNEYS AT LAW, INC.

red Factor
l J. Russo
arles A. Hirsch
ert J. Mainelli
n E. McCann, III
ymond J. Daniels
il P. Philbin
on D. Monzack
tthew J. Elliott
an G. Goldstein
lliam F. Holt
ristopher L. Russo
offrey A. Regan

May 26, 1994

Harold Chorney
P.O. Box 1211
Woonsocket, RI 02895

RE: Cumberland Investment Corp.
Bk No. 89-11051

Dear Hal:

As you requested, and as has been authorized by the FDIC, enclosed please find the 14 page inventory list previously supplied to me by the FDIC.

As we also discussed, should you have any documentation substantiating your claims that there may be assets of Cumberland Investment Corp. which are not currently stored at the Fleet National Bank in Woonsocket, RI, you will provide me with copies of any such documentation so that I may further look into the matter.

Very truly yours,

KIRSHENBAUM & KIRSHENBAUM
Attorneys at Law, Inc.

Jason D. Monzack

JDM:med

cc: Z. Hershel Smith, Esq.
with enclosures

888 Reservoir Avenue • Cranston, RI 02910 • 401 946-3200 • Fax: 401 943-8097

10 June 1994

EXHIBIT 2.

Jason D. Monzack
888 Reservoir Avenue
Cranston, R.I. 02910

Dear Mr. Monzack:

Thankyou for the listings from FDIC. Enclosed is a listing of assets that are missing, or misplaced or sold. If you have any questions concerning the items listed, I would be happy to discuss them with you.

If I had the following records, it would make it easier to pin point the assets. Consequently if you could obtain:

1. yellow inventory books of Cumberland's inventory that was allegedly given to the U.S. Attorney by Mr. Cullen believed to be with FDIC

2. Transcripts of assets removed from Cumberland's premesis on August 17, 1990 that may be with the U.S. Attorney or FDIC, since Cullen stated that these were done by Eastland

3. Videos taken of the assets removed from Cumberland on August 17, 1990, believed to be at FDIC

4. Sign in and out cards of the assets that were kept in Eastland Bank, Cranston, probably with FDIC

5. Videos of the assets and appraisers at the Cranston facility

6. Appraisals allegedly taken by Christies of the possessory and non possessory collateral which Mr. Weingarten probably has. Weingarten gave FBI a copy of CMG's "Inventory Summary Reprort" which contained the gradings of coins by Russell Augustin."

7. Any and all inventories taken by the Examiner, in long hand not just what they put into their computer

8. Private sale offer for the 31,000 silver dollars and other assets completed by Russell Kaye, consultant to Christies or others.

9. Post petition report containing beginning and ending inventory.

Sincerely,
Harold F. Chorney

Harold F. Chorney
P.O. Box 1211
Woonsocket, R.I. 02895
401 766-7808

E-120

List of possible items missing or sold but no accounting:

1. 170 coins from the Eastland Bank possessory collateral.

   Grand Jury testimony of John Truslow, FBI on July 14, 1992, pg 35

   "Now going back to that group that Chorney looked at, that 4,000 coins, of which Chorney pulled out 575 coins, Augustine looks at those coins, but at this point in time, there only exists 405 of them. Some of them were sold off."

   This group of 170 coins is part of the 7820 collateral coins at Eastland and part of what may be some missing 1100 coins according to the General inventory of FDIC.

2. 202 coin sample of the inhouse inventory of CIC at 141 Main Street, Woonsocket on or about March 1990. These coins were at Cambridge Trust Co, Harvard Square, Cambridge, Mass. These coins, some quite identifiable, were not sold by Bowers or Christies, nor are they part of the inventory recently appraised. See attached Exhibits.

3. Persia Ring--Evidence Locker at LCF, See PW #17 listing

4. Roman plate--Evidence Locker at LCF, See PW #16 listing

5. McCrystal lot--consigned to Christies, was not sold, still in their possession?

6. Lot #412, in Christies auction, not sold consisting of 84 silver dollars dated 1896 (1-1896-0)

7. Two lots of stamps collateralizing Eastland note last seen in box 16 Possibility that this collateral was sold by Christies on June 12, 1991, An inventory list taken by Peter Lockey of the Eastland Stamps exists.

8. Pre Columbian amulets (gold frogs etc.--some 25 pieces in inventory) June 5, 1991

9. Chineese coins including Tea Brick money June 5, 1991 report

10. Bonds, stock certificates and autographs, some copies mixed in with U.S. Attorney

11. Roll of Silver dollars--PW #4

12. Small size currency denominations of 1, 2, 5, 10, 20, 50, 100, 500, 1,000 stored in vault at 141 Main Street

13. 10K and 14K jewelry from 325 Mains Street Store. (Perhaps in box A-11)

14. Box of gemstones from 141 Main Street (Perhaps in box A-11)

15. bags of 90 percent silver coinage from 141 Main Street

16. Bars of bullion from 141 Main Street

17. Other antiquities like 3 & 4 above (Perhaps in box A-11)

E-121

UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF RHODE ISLAND

EXHIBIT 3.

| | |
|---|---|
| In Re:<br>CUMBERLAND INVESTMENT CORPORATION<br>Debtor | Case No. 89-11051<br>Chapter 7 |

**JOHN F. CULLEN'S OPPOSITION TO THE MOTION OF WARREN TAFT AND OTHERS FOR COMPLETE ACCOUNTING BY JOHN CULLEN, TRUSTEE OF ASSETS WHICH WERE UNDER HIS CONTROL FROM AUGUST OF 1990 UNTIL THE SAME WERE TURNED OVER TO THE SUCCESSOR TRUSTEE, JASON MONZACK**

TO THE HONORABLE ARTHUR N. VOTOLATO, JR., UNITED STATES BANKRUPTCY JUDGE:

Now comes John F. Cullen, the former Chapter 11 Trustee in the above captioned matter and opposes the motion filed by Warren Taft and other creditors ("Movant") on the grounds that the motion is vague, overburdensome, and that all records directly related to all items in the possession of the Chapter 11 Trustee were available for inspection and have been inspected on numerous occasions.

The Movant, although alleging that there are questions concerning the whereabouts of certain valuable items which were allegedly in possession of the Chapter 11 Trustee, does not give any details as to what items are allegedly missing or what items were originally on the premises in 1990 that are not currently available.

The history of this case is replete with duplicitous motions that lack specificity. On July 2, 1992, this Court entered a judgment against Harold Chorney finding him to be in contempt

E-113

and ordering him to pay $200,000.00 in costs to the Chapter 11 Trustee. That case was appealed to the United States Court of Appeals for the First Circuit and this Court's order finding Harold Chorney in contempt was upheld. In the opinion of this Court dated July 2, 1992, this Court spoke with particularity as to the environment the creditors found themselves in when this case began stating that:

> At the show cause hearing the Trustee, John Cullen, Esq., described what was unfortunately an already too familiar pattern of obstructionist behavior by Mr. Chorney. [2] For example: he continued, post-petition to advertise fraudulently after both agreeing to and being order to desist; to cure a glaring security problem, the Trustee moved for and obtained a Court order to physically eject Chorney from the Debtor's business premises (where he was actually living), [3] after repeated broken promises to vacate; [4] CIC records were allegedly concealed and/or destroyed; coin and other inventory values were grossly and fraudulently overstated to the Court, the Trustee, concealed and/or destroyed; coin and other inventory values were grossly and fraudulently overstated to the Court, the Trustee,

---

2 As the result of the many pleadings and ensuing hearings both during and after the debtor-in-possession period, the Court was already acquainted with much of what the Trustee had to say, and we find his testimony to be accurate, but by no means all-inclusive of Chorney's legal and ethical transgressions. A more complete recital of Chorney's misbehavior throughout this case is chronicled in the case docket, annexed as Appendix A.

3 Chorney's apartment was literally surrounded by inventory, allowing a real-life "fox-guarding-the-chicken-coup" scenario. His bed was literally within inches of the vault and its contents.

4 The Court order was ignored, however, and the Trustee ended up, instead, moving the assets to another location, at a cost to the estate of approximately $95,000.

E-114

> and to creditors; many frivolous pleadings were filed and extensively litigated, with the intent and effect of impeding the administration of an estate already left in shambles by Chorney; information concerning the identity of redemption coin holders was wrongfully withheld on the baseless ground of "confidentiality," even after disclosure was ordered by the Court, and so on.
>
> The most damaging consequence of Chorney's incomprehensible behavior, however, is the incredible amount of needless expense that has been heaped upon the estate, and ultimately, of course, upon the creditors. The Trustee's and the Examiner's duties (and their fees and expenses) have been increased; secured creditors, long-delayed in exercising their rights, have see the interest part of their claims escalate; and the likelihood of a meaningful distribution to hundreds of unsecured creditors and redemption coin holders has been practically eliminated. All of this waste has been caused unnecessarily by Harold Chorney.

All of the items in the constructive possession of the Chapter 11 Trustee were reported to the Court and the manner in which they were removed from the Debtor's premises and transferred by state police, local police and security personnel to a bank vault in Cranston, Rhode Island. The security surrounding the transfer of those items has been the subject of a previous report to the Court. When the assets were transferred from Cranston, Rhode Island, at the request of the FDIC, the FBI and other agencies supervised the removal and transfer of those assets by armored car. At no time since 1990 has Z. Hershel Smith ever alleged to this Court or to any other agency that there were missing assets. However, Mr. Chorney has blamed everyone else for his troubles and if there were any need for records, the numerous meetings that took place between myself and Hershel Smith in 1991 would have unearthed facts from Mr. Smith which would have caused either myself or this Court to look with particularity at any allegations.

The assets which were placed in the vault have been the subject of several reports to the Court by the examiner and my counsel in an effort to sell the unencumbered coins. Eastland Bank provided a complete accounting procedure the night the assets were taken from Mr. Chorney's premises. It is well to remember that prior to my entering the premises it was Mr. Chorney who was in charge of the premises with the assets and as Eastland Bank alleged to this Court, there was grave concern about the assets themselves.

On February 14, 1991, in compliance with a Grand Jury Subpoena, I presented to the Grand Jury all the books and records that I had in my possession other than the coins and other items that were located in the vault in Cranston, Rhode Island.

When the Movant speaks to video tapes or other reports, again he is vague and knows full well that those items, if any, are in the possession of the United States Grand Jury.

The Movant talks about the examiner culling through assets and separating them. All of this information is contained within the docket sheet and the records of this Court and has been subject to numerous hearings on the sale of the assets. The assets that were in the vault have been turned to the FDIC and transferred to a bank facility in Woonsocket, Rhode Island, and I filed a report with the Court when that transfer took place.

On February 25, 1994, at 5:40 p.m., I received a Criminal Subpoena to appear at 9:30 a.m., February 28, 1994, in the United States District Court for the District of Rhode Island

before the Honorable Raymond J. Pettine. The subpoena requested a variety of information from Mr. Chorney's sentencing hearing. On February 28, my counsel filed a motion to quash the subpoena and it was allowed. Judge Pettine ordered me to appear at 2:00 p.m., February 28, to testify as requested by the defendant, Harold Chorney, on the very items that are talked about in the Movant's motion. When I arrived at the Court at 1:45 p.m., February 28, I had a discussion with Mr. Chorney's attorney and provided him, orally, with what I had done and the accounting that I had filed with the Court. At precisely 2:00 p.m., Judge Pettine took the bench and called me to the stand. While I was approaching the bench to prepared to testify, Mr. Chorney's counsel asked for a fifteen minute recess so that he could discuss my testimony with his client. Judge Pettine made it absolutely clear that it was the defendant who wanted me to testify and that he had brought me down from Boston for that purpose to make sure that the hearing moved along with dispatch. At 2:15. p.m., Judge Pettine again entered the court room and defense counsel informed Judge Pettine that he did not desire to examine me on my activities. Judge Pettine apologized for bringing me down and I was dismissed.

It is the Movant's counsel, Z. Hershel Smith, who has been in this case since the very outset and has particular knowledge of all the events leading up to my appointment and after my appointment.

WHEREFORE, John F. Cullen, the former Chapter 11 Trustee of Cumberland Investment Corporation, respectfully requests that this Court deny the Motion Of Warren Taft And Others For

Complete Accounting Of Assets for the reasons stated above.

Respectfully submitted,
CUMBERLAND INVESTMENT CORPORATION

By its former Chapter 11 Trustee,

John F. Cullen, Esquire
CULLEN & RESNICK
Charlestown Navy Yard
Shipway Place, C-3
Boston, Massachusetts 02129
(617) 242-4860 (bma01750)

Dated: 4/26/94

EXHIBIT 4.

STATE OF RHODE ISLAND AND P[illegible] [illegible]NTATIONS

*****************************
PROCEEDINGS IN RE: *
*
CUMBERLAND INVESTMENT *
CORPORATION *
*****************************

POLICE BRIEFING:

Date: August 17, 1990 Time: 6:00 P.M.
Place: Woonsocket Police Station
Woonsocket, Rhode Island

REMOVAL OF ASSETS:

Date: August 17, 1990 Time: 7:00 P.M.
Place: Cumberland Investment Corporation
141 Main Street
Woonsocket, Rhode Island

ALLIED COURT REPORTERS
115 Phenix Avenue
Cranston, RI 02920
401-946-5500

E 307

(COMMENCED AT 6:00 P.M.)

POLICE BRIEFING AT WOONSOCKET POLICE STATION:

PERSONS IN ATTENDANCE: Ronald M. Ronzio, Allied Court Reporters; Gary Hallquist, Primetime Video Productions; Stephen Gardner, Primetime Video Products; Harry Brett, Image Photo Service, still photographer; Dana Sheehan, still photographer; Steven Dyer, East Greenwich Photo; John Doherty, Senior Vice President, Eastland Bank; Peter Furness, Counsel for Eastland Bank; John F. Cullen, Chapter 11 trustee; Douglas Anthony, LCF; Leo Blais, LCF; Richard Robin, No. 46, Woonsocket Police; Lt. William Shea, No. 72, Woonsocket Police; Roy Blakely, Jr., Meehan Armored; James F. Scott, Sr., Meehan Armored; Leslie G. Colomy, Meehan Armored; Norman LaChapelle, Sr., Meehan Armored; Michael Weingarten, court-appointed examiner; Diane B. Brown; Jeffrey Glasko; Brian J. Kane; Jack Marzini.

MR. BLAIS: Everyone's had an opportunity, hopefully, to read the plan we have here. Generally, the objective is to move a series of assets out of 141 Main Street, a former bank building, into the Marquette Credit Union vaults. The work is being

E308

done pursuant to order of the United States Trustee, Jack Cullen, here, who, basically, through a bankruptcy proceeding, has now been appointed by the court to deal with the assets of this business. What we are doing here is in the context of a whole series of investigations, some of them civil, some criminal in nature. The value of the assets in there is in controversy. That's one of the reasons for all the security and all the precautions taking place here, beyond whatever physical security problems there might be here, we're documenting this procedure so that there can be no allegations that anyone involved in this process has, in any way, tampered with the assets. The assets basically are in the form of coins, silver dollars, allegedly rare coins, paper money, stamps, a whole universe of stuff that's in that building of various kinds. So, we need to get it out of there and into the Marquette Credit Union operation. The general procedure is we are going to open one vault at a time. Once a vault is open, there will be a stenographer present, as he is here. He will record the individual who opens the vault, as he speaks, and indentifies the boxes as he takes them out. He will identify the box. For example, this is

E309

box number 12345, within the box there are such and such a contents. This individual, by the way, who will be doing this is Michael Weingarten, who is also the fellow who performed, on behalf of the court, the inventory of what was in here previously. He's the last person to have seen this stuff go into the vaults. He's also going to be able to express an opinion as to whether the condition of these assets are the same as when he saw them last. We are concerned about that, obviously, because there has been tampering with records over there. There has been some removal of records on the premises. You will see a search being conducted on the premises between the Woonsocket Police and investigators who are working for me on the premises while we're doing this. So, that's another operation going on concurrent with this. After the vault is open, Mike Weingarten is then going to have a particular unit with a box or whatever it happens to be. He will hand it to one of the Meehan people. We're going to use the rear door of this facility. We'll need one of you fellows to take the item, go down the stairs, and put it in your vehicle. You'll be escorted by a person, someone from my office, and also by one of the

E 310

security people for the Woonsocket Police. So, we're doing this as a double security operation. So, you guys do your normal thing. We're going to run a perimeter security operation behind you. Now, this also is going to work because I'm going to be the guy -- if there's any question as to what happened -- I'm the guy who's going to have to testify as to what the operations were, if any challenge to the operation. So, that's one of the reasons to run the secondary blind behind you, so we will be able to testify to that. Additionally, there are three sets of photographers, actually six sets, we have video and still, three pairs, total of six guys. They're going to be operating, photographing, the entire operation as these individual units move from the vault into your vehicles. So, you folks should deploy as you would normally do, in that sort of arrangement. I assume you're going to have some people moving in and out and somebody stationary at the truck, so we'll take care of the second line of security. We'll deploy all this before we open anything, once we get at the location. Now, once we're ready to go, there's going to be a detachment at Marquette Credit Union, in advance of any movement, to secure those premises.

E311

Once we're ready to move, we'll call ahead, the Commander has designated for radio communications the prefix 500 as being a code to communicate if anything's in jeopardy, something's gone wrong, there's problems, to stop the operation. Alternative location for delivery is the police station. Any difficulty in the delivery in transit, any problems whatsoever, any difficulty, any questions, the shipment goes to the police station, then we can get some indication of where, physically here, would be the best place. When you leave, before we leave, in addition to checking the advance premises, there'll be a lead car, with police officers and my folks, and behind it will be a chase car with the same situation, the same thing, we're going to run the same parameter type operation between here and here. Anybody who's going to approach the assets needs to be patted down prior to this. We'll do this as we deploy over there. The reason for this, we're going to avoid an accusation that anyone has taken anything out of there. I suggest that you do not carry any money in your pocket. There's a place to store it, because we're dealing with currency and we're dealing with coins, some of them are quarters, nickels, and dimes,

E 312

allegedly valuable. This is to avoid any controversy. It's suggested that you try to store that stuff somewhere else away from the operation. We'll do the patting down so that there's no issue, no accusation, later on as to whether any of this disappeared. Lastly, we all should have been given these white tags. They don't stick on cloth very well. You may have to put them on your belt. Anybody doesn't have one of these -- we all don't know each other here -- anyone that doesn't have one of those should not be considered to be part of this operation, including police officers. Uniformed, in this situation, does not make a police officer, necessarily. So, we need to be aware of that particular piece of identification as part of the operation.

MEEHAN SECURITY OFFICER: You're suggesting any money we have with us we leave in the truck?

MR. BLAIS: I would suggest that you keep it in the truck or wherever else you feel comfortable with. I think it would be a good idea just to avoid that as an accusation. This involves a very complicated case, involving a lot of allegations of money being moved out of the country, and this is a

E313

fairly exotic situation we're dealing with here. So, we want to make sure that we avoid any kind of problem or any screw up here. We're going to take this very slowly, obviously, particularly in the beginning, until we get the system all down. As you know, we may get a little smoother after we move on through the evening, particularly at the beginning. Do not take this lightly. This is not a situation, from what we can tell with this individual, he is not without associates to be able to try to get this stuff back. We don't want to be paranoid. Just be very, very careful. Mr. Cullen, would you like to address the gathering?

MR. CULLEN: I want to thank the Woonsocket Police for making themselves available tonight, Commander, I really appreciate it. I want to emphasize that if we have an incident involving firearms, those people who are not part of the so-called firearms team, disengage yourselves quickly and defer yourselves to the Commander who is in charge and get away from it. I want to tell you that they've had some past experiences with this gentleman in Boston with bombings and other incidents. So, there has been capacities where there has been situations

E 314

where people have been placed in personal apparent jeopardy. He estimates that the value of the coins are in excess of $46 million. So, between $46 million and $1 million, God only knows what we're dealing with. We don't know what else we're dealing with in the building, and who he's dealing with. So, I want everybody to know that, when we are leaving, that the two people involved who are going to make the decisions are Lee and the Commander. As it said in the paper, there are no discussions. This is going to be run tight. If the Commander or Lee finds that somebody's not, they're gone, they're history, they're out of here in thirty seconds. We can't afford any blemishes or any discussions. If the Commander says you're going this way or he says you going this way, that's the end of the story; and there's no right of appeal here. Every position that's assigned to is adhered to. I'm going to have to go through long court hearings on this, ultimately, on what has happened here tonight. So, I don't want any blemishes on what could possible happen. I'm trying to get Mr. Weingarten down here. So, you'll all know Mr. Weingarten; he's at the premises. Before we all leave, the Commander will tell you how he's going to

E315

use his people in conjunction with what Mr. Blais is going to do. Mr. Doherty, who represents the Eastland Savings bank, he's the senior vice president. Their bank is deeply involved in this case as part of that $3 million. Much of the funding for this operation tonight, those people that are here, are directly being funded by the bank of Mr. Doherty. That's been one of the problems of the case in the past is that all the money's gone. So, to fund this operation tonight, Eastland Bank has come foward with the money. All the attorneys of interest have been notified earlier this afternoon by Peter Furness of this operation. There's been no communications from them. Judge Votoloto, through his clerk, was notified at three o'clock of the trustee's intent to start the operation and the other agencies involved. At this point in time, just wait for the uniformed men. It'll be up to Mr. Blais and, myself, I will have nothing to do with the operations itself. It will be up to the Commander and Mr. Blais as to what takes place. You're not going to find me involved or giving the orders. I'm ultimately responsible for all of you; but because of the sensitivity and the nature, I want to work with as much military precision and

F 316

professionalism as we can possibly muster. Peter Furness represents Mr. Doherty and his institution, and he's here to protect the bank's interest; and he's also made the facilities with Mr. Doherty at the Marquette available to us. That's about it.

(SHORT BREAK)

MR. CULLEN: When an individual files for protection under the United States Code, Chapter 11, that individual seeks the protection of the United States of America. At some point in time, if the Court determines that there's been fraud, misappropriation of funds, or other misconduct on behalf of the debtor, Congress has designated that the United States Trustee's Office from an order from a Federal judge assumes and displaces the debtor forthwith. The debtor has no rights, no communications, he has no rights to anything -- properties of the corporation, records, or anything is the property of the United States of America, i.e., the United States Trustee's Office. The United States Trustee's Office, so you'll know, is a part of -- an adjunct of the United States Department of Justice. That's pretty much it. Judge Votoloto ruled, after a lengthy hearing, that this debtor has been involved in

E317

a series of transactions and conduct which is fraud in nature, and no longer will allow him to operate or have anything to do with the business. Judge Votoloto's order says he is not to be on the premises nor to have anything to do with it, and he's clearly aware of what a violation can do. That's pretty much it.

POLICE OFFICER: Jack, in case he's there and in case he approaches anybody, whether it's a uniformed or any one of these guys here, how should they deal with it?

MR. CULLEN: At this particular point in time, I don't want him on the premises until the operation is finished.

POLICE OFFICER: The police department has already indicated you're going to arrest Him based on the other violations?

MR. CULLEN: There's other violations which the local authorities have. With the authority of the trustee, which allow them to enter on a voluntary search, the Commander's detectives have uncovered certain evidence which they are processing now on a series of local violations. That will be up to the Commander and his people as to how they will

E 318

see fit to exercise their local authority.

POLICE OFFICER: Are we going to know what this guy looks like?

MR. CULLEN: No, I don't have a picture of him. You'll be inside so -- he's not going to get into the building because the Commander will have his deployment with his own people with Mr. Blais so that nobody gets into this property during this operation except those people authorized and participating.

(SHORT BREAK)

MR. BLAIS: My name is Leo Blais. I'm an investigator working with the United States Trustee on this case. The short version of all this is the trustee has seized the assets of Cumberland Investment Corporation, which are of an indeterminent value. There is some dispute as to the appraisal. It's anywhere from one to two million dollars with estimates going up to ten, twenty, thirty million dollars worth of mostly coins of various kinds, paper currency, stamps, other things of alleged value. Mike Weingarten, who was not here in the earlier briefing, is here with the tie and the blue shirt. Mike is the guy who did the inventory on behalf of the court the

E 319

first time around before the items were secured in the vaults. He is going to be the fellow who opens the vaults and identifies the various boxes that are in the vaults and describes, as best he can, in short form, what it is he's seeing, and is then handing those items off to one of the Meehan Armored Car people. The police function and the function of the LCF people, that's the name of my firm, Doug Anthony here, myself, and two other of my investigators at the location will be really to further security here. While they're moving the items into the truck, the Commander has designated some officers with our people at Marquette Credit Union, some at 141 Main Street. I'd like the Commander, just in a second, to fill us in on how that deployment will take place. We generally have some concern, not only for physical security, because of attempts in the last couple of days to remove records and other evidence out of the premises, but also because of the varying estimates of the value of the stuff and, in even some cases, differences of a number of things that are there. So, we're using a procedure tonight to try to prevent any accusation that there was any loss of inventory during the course of this operation. So, what we're going to

E-320

ask is anybody who is approaching the inventory, meaning the Meehan people, any of my people, Mike, anybody that's going to be anywhere close to that inventory, be patted down before the operation and again after the operation, so there'll be no allegation of movement of assets out here. We have three teams of photographers. Each team is a still photographer and a video photographer. So, the entire operation, in terms of the movement, is going to be still photographed and video photographed. So, there won't be an allegation of diversion of operation anywhere down the line. Everyone needs to have their little tags so that we can differentiate between the players and the nonplayers here in the situation. Emergency code, again, Commander, is what?

THE COMMANDER: Five hundred.

MR. BLAIS: That's the prefix of any new communication that indicates that there's a problem. We're indicating now that the advance car will be a marked police car. The chase car will be Doug Anthony and myself, or we can put one police officer in that car. We can do that so that we have radios in both cars, or, alternatively, Commander, can we put an officer with a radio in the armored car,

E 321

only because one of these gentlemen pointed out to me, we talked about an alternative location being the police station. There not going to know they need to go to an alternative location unless they have some sort of communication in order to deal with this situation. So, we can handle that just before we leave. We can work out those details. Okay, would you like to make the assignments, Commander?

THE COMMANDER: They're already made out. Initially, everybody is going to respond to 141 Main Street. When we make the transfer, a group will remain at Marquette.

MR. BLAIS: So, you're not going to have an advance crew over there?

THE COMMANDER: No, I don't think we should.

MR. BLAIS: Perhaps what we can do is to send an advance team over there, fifteen or twenty minutes before, to secure the premises and then move. Mr. Cullen, do you have anything to add?

MR. CULLEN: Everybody be careful. Follow the directions of the uniformed police officers if there's an incident, and we will give you instructions on how to proceed. Whoever the

E-322

supervisor is at the particular point in time, just follow their instructions. I don't want anybody to get hurt and, as I said in the paper, there's no discussion from anybody in the public. No discussion; and if they give you a problem, the police will take care of their problem instantaneously. If the debtor shows up, the police will take care of him with dispatch. Any questions, they go to Mr. Blais first.

POLICE OFFICER: My only question is when you talk about the debtor, that's Chorney, correct, is he allowed any place near there?

THE COMMANDER: No, in fact, earlier this evening, Lieutenant, I volunteered a lot of your department to come in and conduct a search. As a result of the search, there's been some evidence uncovered by your officers in terms of conduct violations of some Rhode Island laws and there is a sergeant and a detective, they have enough evidence, and they can explain it to you. So, I will go and let them deal with these Rhode Island Statutory violations that they are aware of. You can exercise whatever due authority that you have at that particular point in time to take care of it.

MR. BLAIS: There's a search

E 323

underway right now. Two of your detectives and two of our people are over there now. So, there's a search underway. You'll see four other people, also, who have tags who are not in this room, who should basically be the only other four people who are not part of this operation this evening who are not in this room.

MR. CULLEN: That's it.

POLICE OFFICER: Have there been any arrangements for 353 Main Street as part of this.

MR. BLAIS: We've asked -- the Commander said he'd make arrangements for special attention by the normal patrols at that location. I don't think we have enough personnel, given the value of the inventory there, to deploy --

POLICE OFFICER: The stamp place?

MR. BLAIS: Yes, relatively speaking, so they're going to do some special attention at that location.

MR. CULLEN: During the operation, the stenographer will be by the safes. As Mr. Weingarten opens them, they'll be photographed. He will be dictating whatever he sees, and making his observations, just like a pathologist conducting an

E324

autopsy; and it will be recorded, and, as I said in the memorandum, no discussions, because I don't want the record confused at all to the stenographer and Mr. Weingarten. So, no conversations at all. Follow the instructions. It will only confuse the record for the stenographer.

MR. BLAIS: The trucks are going to the back door, so you'll have two trucks. As we do this, you two gentlemen are going to stay in the trucks and the other two guys are going to come upstairs. In terms of the front of the building, we should have, it seems to me, the police car, Commander, the police car and the chase car, which will be one of our vehicles, in front of the building. So, the rest of the vehicles, if you could find another place down the street to park. There's a big parking lot across the street from city hall.

(BRIEFING ENDED AT 6:55 P.M.)

(GROUP PROCEEDED TO 141 MAIN STREET)

(OPENING OF FIRST SAFE AT 141 MAIN STREET)

(COMMENCED AT 7:25 P.M.)

MR. CULLEN: Everybody, for the

E 325

purposes of the record, will identify themselves and we'll begin this process:

Michael Weingarten, I'm the examiner; James F. Scott, Meehan; Leslie G. Colomy from Meehan Armored; My name is Lee Blais from LCF Associates; Sgt. LaMoine from the Woonsocket Police Department; John F. Cullen, the trustee; Jack Doherty, senior vice president of Eastland Bank; Douglas Anthony, LCF; Peter Furness, attorney for Eastland Bank; Commander Remblad; Detective Frappier; Ronald Ronzio, Allied Court Reporters.

(FIRST SAFE OPENED)

MR. WEINGARTEN: In general, this looks about the way I remember it. Jack, I guess I'll ask you, there are box numbers here, like this is box No. 1. If I open it and read off the contents of everything, do you want me to go to that level of detail?

MR. CULLEN: I don't think it's necessary.

MR. WEINGARTEN: I don't either.

MR. CULLEN: You have checked these boxes before.

MR. WEINGARTEN: Yes, we have a

E326

record on what's suppose to be in each box. What I think I might do, if you want, I can seal it so that no one opens it.

MR. CULLEN: Let's get some evidence tape and seal these boxes with evidence tape.

MR. WEINGARTEN: What's I'll do, I'll read, for the record, what the boxes are. What you should do is seal them up and, maybe initial it. That's box No. 1, this is box No. 39, box No. 40. There are approximately ten thousand coins in this vault, about five or six thousand in this and the remainder in the downstairs vault. Box No. 24, box No. 25, box No. 26, box No. 17, box No. 19, box No. 118, box No. 48. I'm going to open this just to see what it looks like inside. I'm looking at this and I'm noticing that these two are open, and I think what I'm going to do is to look at this in some more detail and just confirm that the count is the same. So, I'm going to keep this box 47 out and I will do a more detailed inventory. This is box No. 7 and I'm going to open it up for a second. Box No. 7, box No. 8. I want to do just a count, just to make sure that I'm looking at some of these things. All right, let's see here, 4208, seven in 4208. 5513 is empty. 5513,

E327

eleven; 5087, ten. I'm looking at box No. 8. I'm looking at another 5087, there are several things called 5087, ten in this one. Ten, is 5087; twelve in this one, 5164, five and six, 5367 is four; 5581, seven; 5516 is ten; this one is 5516, also. These relate to bearer numbers on redemption coins, the four-digit codes. I count 95 in here and on the top it says 104. I would have to look at our inventory records and see what we counted when the bank and my associate, Per Baverstan, looked at this. It might be I miscounted right now. Box No. 8, box No. 16, I'm just going to open it for a minute. I'm not going to count each one, we don't have time. I'll just look at one of these. Must be eleven coins in here, looks like ten actually. So, one that's suppose to have ten has eleven and the one that's suppose to have eleven has ten. Box No. 16. This is box No. 9, box No. 10, box 38. Incidentally, these are, for the most part, coins the customer sent back for redemption, that is why the four-digit codes. Box 20, box 35, box 37, box 36, box 21, box 11, box 44, box 34, box 31, box 29, box 45, box 32, box 33, box 42, box 27, box 23, box 14, box 15, box 13, box 12, box 6, box -- looks like 32 -- the consensus is 30, box 28, box 2, box 5, box

E 328

4, box 3, box 46, box 22. Could someone get Jack Cullin? We are about done with boxes that are sealed. The rest of the boxes look like this, with the covers open; and we have to talk about how we are going to transfer them.

(SHORT PAUSE)

MR. WEINGARTEN: This is one that has two rolls that are open. I think I'm going to look for covers to cover them before we send this off because the coins could get brused in shipment. My problem is that the other boxes look like this. So, we need to figure out some way to transport them properly. Let's see if there's anything else here I can ship. I think the answer is no. I'm thinking here, some of these, there may be some of these shoeboxes downstairs; and I might be able to take empty ones and cover them. I'm just going to go downstairs and see if I can find some covers. One of the problems is that if they get brused, the value goes down.

(SHORT PAUSE)

MR. WEINGARTEN: The ones here are pretty well self-contained. The problem I have from this point on is the inventory looks like this.

E 329

They're not closed boxes. I don't have a way of closing them. I went downstairs to see if I could find some covers. Any idea on how I can seal these?

MR. BLAIS: Maybe put a couple of pieces of tape around the top.

MR. WEINGARTEN: The trouble is we just can't stick them in a bag. I want them transported without flipping around. Some of these things are just loose. I see two covers; I'll just put them on. But, for the record, they seem to be 1921 Morgan Dollars that are open. There are ten in here, and it's loose. So, I'm just going to put that cap on. It didn't come that way; it was loose. In addition, there is another batch here of 1923 Peace Dollars that are also open, and I'm going to put a cap on it. I'll seal it now. This is box No. 47; and it's the one that had two caps off. Jack, the problem we are having is that we have gone through the vault and taken out all the boxes that have covers. I now have a lot of boxes that look like this. I need some way of sealing them. This, for example, has 49 loose coins in a box. I'd like to somehow cover it.

MR. CULLEN: Can we use something like that?

E330

MR. WEINGARTEN: Perhaps, let's see --

MR. CULLEN: Mike, what do you think about that? I don't think we have any other make shift --

MR. WEINGARTEN: Let's see what we can do here. Perhaps we could tape the bottom so that it would -- this is box 99. I would appreciate it if the armored car people would try not to flip them around. The next one is loose coins, basically 1935, various mint dates, 49 loose coins in flips. Box No. 59. This is box 74, it's one coin in an I.N.S. folder. It's an M.S. 85 grade Peace Dollar. Box 72, loose coins in individual flips. This is box 76, flipped coins with one roll of 1878 B.U. dollars in a holder. Box 85. Okay, I'm going to lock the vault.

(FIRST VAULT LOCKED AT 8:05 P.M.)

(SECOND VAULT OPENED AT 8:17 P.M.)

MR. WEINGARTEN: Box 68, box 83, box 81. This is box 88. I want to point out that there are two loose coins in flips. The rest are in the usual containers. This is box 90; it's all in containers, except I notice this one 1922 coin in a flip. This one is box 98, box 97, box 80, box 70.

E331

This is box 86. There are two flipped coins, both 1900. Box 84. This is box 77. This is box 78; I'm covering it with a new cover. Box 82. This is box 79, and I see four coins in flips. The four coins are 1902, 1903, 1902, and 1902. Box 65, it's a holder with five coins on it. Box 67, mostly coin rolls, two individual flips, both 1879. There are a few that are sealed. Box 5. Box 50, two coins in there. Box 55, box 52, box 53, box 54.

(SHORT BREAK)

MR. WEINGARTEN: This is box 61, there is one loose coin, and it's 1883. Box 58, box 69, box 93, box 62, box 100. Box 95 has two coins that are flipped, 1898 and 1884. Box 102, box 101. Box 57; this one has one roll that's open with eight coins in there. This is box 103; there is a single coin in a flip, which is 1881. This is box 92, box 56, box 89, box 96, box 104, box 91. Box 64, which contains five slabbed coins, a 1923 Peace Dollar, another 1923 Peace Dollar, three of them, and two 1978 coins. Box 87, which has some coins in flips, thirteen coins, which is what it says on the box as well. Box 41. Box 49, there are four rolls, and we have some coins in flips, eight coins in flips. Box

E332

109, there are two rolls here that are not covered. I'm going to cover this one and this one as well. This one has eight Peace Dollars, it seems. This is box 109, with the two rolls that I covered myself. Box 94. Box 66, this box is not marked. I'm going to mark it because I took it out of this small safe up on top, and I know that in the initial survey that the bank did with my associate, Per Baverstan, everyone forgot to look into it. When I came back the second time, I opened it and found there were some coins. So, I'll say it was from the upper left safe. I'll mark it that way, that small safe, upper left small safe. While we're taking a census of what's in there, I'll keep the workflow going. This is box 60. In this package there is a redemption customer, it says 1880X, seventeen silver dollars, purchase price $8,375, in a sealed container; and there is also some flipped coins, eight coins. Some of them have no markings at all, five of them have no marking, three of them bearer numbers indicating that they are redemption customers, 5099A is one of them, 5099A again, and 5983. So, some of these are redemption, some are not; they were just thrown in there. This is box 63, made up entirely of slabbed I.N.S. coins,

E 333

fourteen slabbed I.N.S. coins. Box 73, which is a collection of Morgan Dollars in a mounting of some sort, five coins. This is box 112, large number, I guess, 165 flipped coins. Box 128, including, I might add, some of the 1891 C.C. coins that were an issue in the case. Box 130, box 110. This is box 107; it has seven rolls of coins, and it has a number of individual flipped coins, box 107. Box 71, box 118, box 111. It is called box 134, but which is essentially three separate books of Liberty Head Silver Dollars. Box 43, which has all of these things with it. There is a holder with an I.N.S. slabbed 1880S coin. There is this registered mail envelope, it says bearer No. 5131. I'm not going to open the seal. There's another I.N.S. stamped coin on the inside. Then inside here I see ten individually slabbed coins for bearer No. 4277, and I see three rolls here, bearer No. 4340, two rolls, and another bearer No. 44X1. I'm going to fold this over and put it at the bottom. This is box 43. This is box 106, which is all slabs except for one roll of coins here. It looks like I have a small problem here. It looks like two labels got put on the same -- this box doesn't have a label. This box has two labels, 105

E334

and 108. This looks like it's legitimately box 105. I presume, by process of elimination, this is 108. We'll label it that way. This is what we think is box 108, by elimination. And that, essentially, finishes the first safe. You might, just for the record, take a close up of the safe to show that it is empty. Lee, I'm going to close this safe. It's empty. Maybe it would be a good time to move these out, and then we can start on the second safe.

(SECOND VAULT LOCKED AT 10:10 P.M.)

(SECOND SAFE OPENED AT 10:15 P.M.)

MR. WEINGARTEN: Let's get it going again, box 122, box 117, box 125, box 123, box 115, box 126. Box 132, containing five coins in a case. Box 120, box 121, box 124, box 116, box 113, box 114, box 119, box 127. This box, it says, "Not counted." There are four rolls of redemption coins that I had originally found in the cabinet over here that were not in the inventory. We pointed it out to the judge when he came and visited the offices here. I'm just looking to get all the silver dollars done before we deal with the rest of it. This is box 129, it has two rolls; the rest of them are slabs. I think

E 335

that does it for silver dollars in there. Now, we have lots of other things that have not been inventoried by me. So, we don't have box numbers, and I try to describe the contents as we go. I'm looking at much of this for the first time. Actually, this looks like these are silver dollars, box 133. It's a mixture here; let's just see what this is. This is a flipped coin. There's one coin roll of ordinary looking Eisenhower dollars, some old Morgan Dollars that are in individual flips. These are coins that have been graded by somebody, by the Independent Grading Associates, Inc., graded M.S. 64, 65. This is a professional grading association, also grade 64, 65. These are silver dollars, I see. It's box 131, in individual flips. This seems to be most of the currency. There is some paper money, and we'll get to that in a minute. Let's deal with these. This is, what is it? Let's see, South African coins, a Louis XIII, 1677 French coin; a Zyneer (phonetically) 1888 coin; Greece 1875, Phillipine 1944; Palistine 1939; Norway, 1820; a 1950 German Fenick (phonetically); a 1745 Russian Coin, just various coins, seemingly of low denomination. All of them are brass or aluminum. They're not gold or silver. Some of them are old;

E336

some of them are twentieth century; a real mix. This also is a mix. A Bavarian $2 piece from 1838, seems to be roughly in alphabetical order. Belgian coins from the 1800's. An Armenian coin from the time of Levon the First, 1199 A.D. Austrian coins from 64, 1979; Brazillian coin from 1812, just more coins seemingly in alphabetical order going back -- here's a coin, it's a Chinese coin from 1908, Irish coin from 1689. So, coins going back two/three hundred years up to modern times. Generally, not seemingly silver at all or gold. This seems to be coins minted in individual states of the United States, 1787. Looks like a state of New Jersey coin from 1787, Connecticut coins, U.S. Coins from the 1830's and 1840's. This one is all U.S. and individual states. This one only has one side filled. Half dimes, U.S. half dimes from 1830. Half dollars, cute little coin, from 1880, looks like it might be gold, a one-half dollar. This is a coin from 1863, U.S., with like a postage stamp put in the center. It's called "Encased Postage." Basically, it looks like there are a lot of -- there are some coins, this one says "Ayers Sarsaparilla, to purify the blood," "Bernett's Cooking Extract." Then, some plain Lincoln head pennies. This is a 1928S

E337

penny. Just various U.S. currency, most of them in 1800's. 1909 B.V.B.D. penny for $12. Basically, various U.S. Coins. This seems to be a real mixture. A 1945 quarter, U.S. quarter, followed by an 1834 half cent, followed by a Louis XIII 1677 coin, followed by an Indian Head penny, just a mixture. Most of it seems to be U.S. coins, though. A whole mixture -- quarters, dimes, half cents, old quality cents, a two-cent coin, just various nickels and no real discernable order. Generally, 19th and 20th century coins. Another Louis XIII which probably didn't belong in that box. This one is more interesting. This one is made up of ancient coins. Roman coins, a Vespation (phonetic) coin, ancient Judia, Lidian coins, Indosichian (phonetic) coins, Armenia salucids, Sidian (phonetic), Phoenician, just all sorts of old, ancient coins. There's also a cover on this. It says, "Ancient Coins" on it. This one seems to be 19th and 20th century coins from different countries, Vatican coins, Great Britian, Panama 1953, Hungary, Ireland, a Japanese coin from 1818 to 1830, a French coin 1731, a French coin from the reign of Charles V in 1364 to 1380. A whole mixture, therefore, coins of ancient and new dates. This is a cover on this.

E338

Okay, this is another group of ancient coins, Syrian, Roman, a lot of Roman coins, Caligular, Byzantine Empire, some that are just in slips that are not cataloged as to what they are. Clearly, ancient coins. This is a loose box with ancient coins, obviously, unidentified, but they look very much like some of the coins in the catalog. Looks like some expert would have to look through this and figure out what they are. This seems to be an odd lot of mostly foreign coins, Netherlands, 1925; Norway, 1924. There's an Eisenhower '72 silver dollar, for some reason; some more Eisenhower coins, about ten or fifteen; some silver, a silver U.S. dime, mixture of foreign, I guess, and American coins with no discernible rationale here, and then there are coins or metals in the bottom, just loose. This coin is here loose, it's an 1866 mirror coin from someplace, must be a Vatican coin, Pius IX. And this is an ancient coin of some sort that's just been sitting there. All right, this one is flips. By the look of them, they're ancient coins, but they're not identified. They have some identification. This one says A637 on the flip and this one say A644. So, perhaps the debtor has some catalog of what these

E339

mean, but they're not listed here. They all have an "A Number," "A" with three digits afterwards, and they're all clearly ancient coins. This bunch of coins would appear to be ancient Chinese coins, Han Dynasty, Soo Dynasty, very old. This one coin here is 179 BC, the Han Dynasty. We have some in a bag here that are just kind of loose, and some are just sort of sitting there unidentified, like this one. It looks old to me. This is made up entirely of dimes, U.S. dimes, of modern vintage, 1955, 1946; some quarters in there as well, some U.S. quarters. This seems to be made up, it seems to be all U.S. coins, seems to be, of various types. There are pennies from the 1800's, there are dimes from 1800's, nickels, all sorts of low denomination coins on the left-hand side, a lot of dimes, there are some quarters down on the right side, uncirculated quarters, half dollars, and then I see we get to something called a trade dollar, looks like they're silver dollars, really, 1875 trade dollar, old quarters, just U.S. coins, I see here there's something that been graded by somebody, an 1883 nickel, M.S. 63 is the grade. This is a set of coins from the Sovereigns, I guess they're British coins. I guess all of the Sovereigns from Victoria to

E340

Elizabeth, "Assembled by Cumberland Investment Corporation," it says. I guess they're gold, I guess. Some of them seem to be modern quarters, silver quarters as opposed to the new ones. There are some older half dollars, like from 1910, just a grab bag. More half dollars, half dollars of various types, some in good condition, 1944 dimes, more half dollars and dimes, Canadian quarters, and in here, Canadian dimes, 1952 vintage. This would appear to be a proof set of '86 Canadian coins. For those of you who would like to know what a mint state '70 coin would look like, that's what they look like, a perfect layout of the mint, sealed in plastic. That's what perfect is. Everything is an exception to that. Another '86 proof set. A set of Irish coins from seemingly 1964. There is one missing. Another set of coins of Ireland, '53, '59. They're all here. This seems to be various -- a mixture of coins, a Louis XIV coin, American coins, a United Nations coin from 1945 or medal. Some of these don't look like coins. There's a State of Rhode Island and Providence Plantations, 1636, I guess it must be a commemorative medallion, yes, 1776 to 1976, a one cent coin with a holder, medallions of various sorts and things like this. A tennis medal, I guess,

E341

in this case. This is a purportedly an M.S. '65 half dollar worth $295, it says, a Pope Paul VI medal, seems to be a grab bag of medals and some coins. There's a tie clip; several loose coins; an Abraham Lincoln souvenir from Nantucket; Crescent Gardens, Revere Beach, Massachusetts; a one peso gold coin from Mexico from the Maximillian period; just stuff. This looks like a deck of cards, "Coin Cards," it says. "Many games, once played, never forgotten." This would appear to be some expensive costume jewelry, maybe ancient, couple of frogs; the price on it says $1750, lots of frogs. Each thing seems to have a note saying $350, $200, looks like a calf of some sort. I guess this must be ancient Chinese or something. There's no marking on it. There are some inventory notations, AN30, AN29, somewhere there must be a listing of what this stuff is. "The class of the operation" is this thing, it says AN40, it's $1750; paper money. These are $500 bills, U.S. $500 bills. We know what they're worth, at least. There are four of them. They're series of 1934. There are some marking here, it says "Tom D. 4828477;" and I seem to recall that there was some testimony in court about Chorney buying these just before the bankruptcy and

E342



E342

paying a fair amount of money for these. They're suppose to be worth a lot of money. Some number like $5000 each. Fairly, it worth at least $2000, collectively. This seems to be a grab bag of various currency. This is some Oriental currency, Nippon; so, it's a hundred yen Japanese. Here's a five peso from Chile, a five something from Peru, a one something from someplace, oh, Finland. They don't seem to be sorted by any rationale. This one seems to be a variety of early currency from the United States from various banks, Mount Vernon Bank, a Confederate 50 cent thing, old U.S. currency, largely issued by individual banks. This, same deal, various, $10 issued by the Chace National Bank of the City of New York, American dollars of various types. This seems to be Continental American currency, Revolutionary War age stuff, Virginia Treasury note. Generally, older stuff it would seem. Miscellaneous coins, I don't know how to describe this. These seem to be empty, nothing in here. So, I'll put that off to the side. These are pictures of coins and stampings. These are old American stamps. These are old stamps, maybe these relate to these. It seems to be a -- these would seem to be high-grade American stamps. There is

E 343

no identification here, just put book No. 3, book No. 2, book No. 1, a typical page looks like this. There seems on top to be these photographs and on the back he identifies them. It says here what it is. I suspect we should put all of this in one box. We seem to have some very old plate blocks, a whole sheet of stamps, a whole sheet showing 5 cent errors. These are plate blocks as well. Let's see what these are. A letter, U.S. Tangible Investment Corporation, pictures of dollars but no coins. What's interesting is that they seem to have pouches as though you could put something in there but there's nothing in here. What they're doing there, I don't know. Just three albums of things; let's put it away I guess. Here are some more photographs of stamps. These are not the original stamps themselves. Coins in here, various coins, these are dimes, U.S. dimes, quarters, dimes and quarters, looks like a half dollar, a gold $20 piece, another gold coin, and a couple of silver dollars, something in here, is says, "Contact Jack Costello, 716-272-0610, pack that up, I guess. I'm going to stick some stamp things in here because I don't know where else to put them. This is a box of redemption coins that we saw over there. It's from a

E 344

Mr. Robert Shriner, and they were never inventoried or put in the safes. Redemption coins are coins that customers purchased and sent back to Cumberland to be redeemed. They were supposed to get back their original money and 15 percent per year profit, if they were purchased before 1986, prior to an S.E.C. consent order prohibiting that practice. The contents in here seems to be two rolls of coins bearer No. 5174, two rolls of ten, here, in this box; some individual pieces; ten individually flipped coins. Just put the whole thing back in here with the letter from the customer and deal with it later. That, I think, does it for this safe. You'll probably want the camera to take a close up to confirm we have emptied it.

(SECOND SAFE CLOSED AT 11 P.M.)

(THIRD SAFE OPENED AT 12:15 A.M.)

MR. WEINGARTEN: Box 47, box 8, box 6, box 7, box 4, box 5. These are all boxes of paper money. Box 2, box 1, box 3, box 18, box 17, box 15, box 14, box 13, box 12, box 11, box 10, box 9, box 21, box 39, box 31, box 30, box 34, box 20, box 43, box 42, box 41, box 19, box 23, box 22, box 37, box 29, box 28, box 27, box 46, box -- Greek box (unmarked), box 44, these don't seem to have any I.D.

E345

numbers, it says "1460/2" on this. It says "2013/6" on the front, A417, 20112/23, box 16, box 50, box 32, box 36, box 35, box 26, box 25, box 24, box 38, box 48, one that says "Greece 1960 to 1967, box 33, and box 40, the last one of the paper currency, J25, this is J26. Various Chinese coins, it says on the front. It looks like all denominations, no marking on it that I see, box 7, it says in handwriting, J33, paper currency of various types, J31, J34, J36, J35, J37, J22, seems to say Hungary, P117, J38, J40, I don't see a mark on it. It says, "Coins, China" on the top. I don't know what it is. J3, a small box, J30, J29, J27, J28, J24, J20, J21, J22, J17, J16, J18, J19, J12, J13, J14, J15, J8, J0, J10, J11, J1, J2, J3, J5, J46, J45, J6, J7, J43, J44, two bags which say "Cipo" on them. We have cleaned out the top shelf. Coins not sorted, J41, J42, Hungarian money P87, box 54, miscellaneous package, paper, one hundred Penges. We are now going to remove all the sacks of coins which are basically low-value foreign coins, uncirculated, in canvas bags or boxes. We don't know exactly what the value is, but the general value of the coins would appear to be relatively low. So, we are not going to inventory them; but, basically, we are just going to

E346

take them out and deal with them later. Box 214, some flipped coins, box 215, box 213. They're all I.N.S. slabbed coins seeming all M.S. 65, box without any marking that I can see with 14 rolls of coins, box 216 with flipped coins, box 212 with some holders and, I guess, there are about four or five flipped coins, box 211, also there are 33 flipped coins in there, box 209, all flipped coins, box 210, box 218, box 220, box 223, this is 221, box 203, box 207, it says again, box 204 with 207 coins, box 208, box 200, box 201, box 202, box 205, box 222, box 221, box 219, box 224, box 227, box 233, box 228, box 230, box 229, box 225, box 231, box 234, box 226, and finally, I think, 232. That does it for the silver dollars.

(INVENTORY OF THIRD SAFE ENDED AT 1:40 A.M.)

(INVENTORY OF STAMP ROOM COMMENCED AT 3:10 A.M.)

MR. WEINGARTEN: Files G16 through 30 in a wooden cabinet, G1 through 15 in a wooden cabinet, also individual library-type drawer. This is F12 through F23 in a yellow case, F1 through F6 in a green case, B1, B2, B3, B4, B5, B6, B7, B8, B9, B10, B11, B12, B13, B14, B15, B16, B17, B18, big black book

E347

with no marking, B19, B20, B21, B22, B23, B24, B25, B26, B27, B28, and B29. A1, A2, A3, A4, A5, A6, A7, A8, A9, A10, A13, A14, A15, A16, A17, A18, A19, A20, A21, A22, A23, A24, A25, A26, A27, A28, A29, unlisted number - green, A30, A32, A33, A34, A35, A38, C12, B25, B24, B23, B21, C4, C5, C6, C7, C8, C9, C10, C11, C12, C13, C14, C15, C16 and 17, C18 and 19, D3, D2 and 4, unlisted U.S. Jefferson stamp album, D6, D7, D8, D9, D10, D11, D12, D13, D14, D15, D16 is empty, D17, D18, D19, D20, D21, D22, D23, D24 and 25, E1, E2, E3, E4, E5, E6, E7, E8, E9, E10, E11, E12, E13, E14 and 15, J1, J2, J3, J4, J5, J6, J7, J8, J9, J10, J11, J12 and 13, no number on two books, F1, F2, F3, F4, F5, F6, F7, F8, F9, F10, F11, F12, F13, F14, F15, F16 and 17, F18 and 19, F20 and 21, F22, F23, F24, E6, E7, 8, 9, 10, E11, E12, 13, and 14, E15, E16, G6, G7 and 8, G9, G10, G11, E17, E18, E19, E18 empty, E20, E22, E23, E24, E26, unmarked modern postage stamp album, unmarked Great Britian album, H3, unmarked modern postage stamp album, B4, 5, 6, 7, B8, 9, 10, and 11, B12, 15, 16, 17, 18, 19, 20, 22, C2, J14, B1, 2 and 3, F9, 10 and 11.

(STAMP ROOM INVENTORY ENDED AT 5:15 A.M.)

E348

# C E R T I F I C A T E

I hereby certify that the foregoing is a true, accurate, and complete transcript of my notes taken at the time of the above proceedings.

Ronald M. Ronzio, Notary Public

RONALD M. RONZIO, NOTARY PUBLIC/CERTIFIED COURT REPORTER

DATE: August 17, 1990

E349

13 September 1994

EXHIBIT 5

Jason D. Monzack
888 Reservoir Avenue
Cranston, R.I.

Dear Mr. Monzack:

This is a follow up letter to the 10 June 1994 request that was sent to you.

Enclosed please find a copy of #2 from that list which is a Transcript of the assets that were removed on 17 August 1990. Upon reading this transcript it should be abundantly clear to you that #3 from the 10 June 1994 request, namely still pictures and videos of that 17 August 1990 asset removal exist. These pictures and videos will aid in resolving some of the inventory problems that definately exist.

In addition there can be little doubt of missing assets, like the $500.00 bills and the Pre Columbian art work that I have previously informed you as being missing.

The last time we had a conversation concerning taking an inventory of all the assets you indicated to me that you did not have the funds available to do this.

In light of the fact that you became Chapter 7 Trustee in December, and the fact that the Chapter 11 Trustee has not supplied a beginning inventory, what has been sold and an ending inventory, please inform me in writing what course of action you plan to take in relation to the above.

Sincerely,

Harold F. Chorney

Harold F. Chorney
P.O. Box 1211
Woonsocket, R.I. 02895
401- 766-7808

E-122

rea Code 401 769-4112

COPY

EXHIBIT 6,

# NACU enterprises, inc.

323 MAIN STREET WOONSOCKET, RHODE ISLAND 02895-3125, U.S.A.

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

February 10, 1995

MICHAEL E. SHAHEEN, Jr., Esq., Counsel
Office of Professional Responsibility
Department of Justice
Tenth Street and Constitution Avenue
Washington, D.C. 20530

RE: RI BANKRUPTCY
Chapter 11
No. 89-11051 (ANV)

Dear Counselor Shaheen:

I am writing in reference to the above stated Bankruptcy concerning missing records, documents, inventory lists and the unknown location of vital records and documents.

My name is Traian S. Nacu, a retired professional educator having attained the rank of Administrative Assistant Superintendent in a local Rhode Island School System. I am currently the landlord of a family owned building located at 323 Main Street in the City of Woonsocket, Rhode Island where we have been located for over sixty-five years. The Cumberland Investment Corporation maintained a retail store at street level in our building for some seventeen (17) years prior to being petitioned into Chapter 11 Bankruptcy.

We are a small family business and I am, at the present time, earnestly attempting to obtain BACK RENT DUE, as a creditor of the Cumberland Investment Corporation. At the onset of the Bankruptcy proceedings, I became a member of the Creditors' Committee to protect my interests. I possess no previous experience serving on a specialized committee in a Chapter 11 Bankruptcy proceeding.

On December 28, 1994, I attended a meeting concerning the above at the office of JASON MONZACK, the permanent receiver for Eastland Bank and the Cumberland Investment Corporation whose office is located at 888 Reservoir Ave. Cranston, Rhode Island. At that meeting, I was surprised to learn that Attorney Monzack represented both the Bank and Cumberland Investment Corporation which was petitioned into Bankruptcy by Eastland Bank which itself was closed by the FDIC.

COPY

Various discussions took place concerning redemption creditors and I was shocked to be informed that Counselor Monzack has been attempting to obtain all of the vital records and documents. He stated "NO RECORDS OR DOCUMENTS PERTINENT TO THIS BANKRUPTCY CASE WERE AVAILABLE AS THEY COULD NOT BE LOCATED BY THE OFFICE OF THE UNITED STATES ATTORNEY WHO HANDLED BANKRUPTCY NO. 89-11051 (ANV)."

Counselor Monzack also informed the group that he has repeatedly attempted to obtain these records - records, inventories, documents, videos and still photographs of the seized assets as they were being removed from the building. I also learned that several thousand dollars in assets belonging to Cumberland Investment Corporation that were seized by the Chapter 11 trustee, John F. Cullen, Esq. were missing. Attorney Monzack informed us that "it was only $300,000 or $400,000 dollars that was missing - not a hell of a lot of money we're talking about."

Consequently, I am requesting that someone in authority look into these vitally important missing assets, records. documents, videos and still photographs concerning this case as I am awaiting some five thousand dollars ($ 5,000) in back rent.

Following the December 28, 1994 meeting, I was informed by Mr. Chorney, a principal in the Cumberland Investment Corporation, that possibly - millions of dollars in assets may be missing due to the fact that all official records of the asset inventory have mysteriously disappeared from the protection of the United States Attorney.

I am currently attempting to obtain copies of various documents relative to this case. Finally, Counselor Monzack is also the permanent receiver for Eastland Bank, the Bank that petitioned Cumberland Investment Corporation into Chapter 11 Bankruptcy. The attorney has apparently also entered into an agreement with the FDIC (which took over Eastland B: NOT TO PERSUE OR FILE ANY CLAIM AGAINST THE BANK which I believe would not include any missing assets. Lastly, the United States Trustee, Sheryl Serreze, previously represented Eastland Bank during the Chapter 11 Bankruptcy proceedings against Cumberland Investment Corporation.

I would appreciate any assistance your office might render in locating all missing documents specifically delineated earlier.

Thank you for your time, cooperation and kind assistance in this most important matter.

Sincerely,

Traian S. Nacu

Traian S. Nacu

N.B. I finally located copies of some documents which I have enclosed.
EXHIBITS A, B, C, and D.

E-127

EXHIBIT 7

Cumberland Investment Corporation
JDM Trustee

vs.

| tty. | Date | Description | Hours |
|---|---|---|---|
| * | 09/30/94 | Telephone discussion with Z. Hershel Smith, Es.q, re: Notice of proposed settlement of redemption coin holders class action and review of document to be filed in court proposing settlement. | 0.30 |
| * | 10/07/94 | Telephone discussion with Z. Hershel SMith, Esq., re: notice of proposed settlement of class action. | 0.20 |
| * | 10/11/94 | Telephone discussion with John Fitzgerald of U.S. Trustee's office re: Eastland Bank/FDIC's application to compromise controversy with class action, claimants who opted out of the settlement. | 0.30 |
| | 10/12/94 | Telephone discussion with Joseph DiOrio, Esq., re: Fleet's super priority in Debtor's assets pursuant to Bankruptcy Court Order. | 0.35 |
| | 11/03/94 | Telephone discussion with Z. Hershel Smith, Esq., re: proposed settlement of certain administration expenses of proposals to liquidate certain assets of Debtor. | 0.25 |
| | 11/15/94 | Telephone discussion with Z. Hershel Smith, Esq., and Milton Lerman re: status of case and interest of Mr. Lerman to bid on remaining asses of estate. | 0.20 |
| | 12/02/94 | Telephone discussion with Steve Ciminelli, investor, re: status of case and if he can frile claim out of time, he has his coins. | 0.20 |
| | 12/16/94 | Telephone discussion with Z. Hershel SMith, Esq., re: issues related to alleged missing assets. | 0.15 |
| | 12/28/94 | Meeting with Z. Hershel Smith, Esq., Harold Chroney, Philip G. Dunleavey and Traian S. Nacu re: their claims of missing and unaccounted for assets from Chapter 11 administration. | 1.40 |
| → | 01/04/95 | Telephone discussion with Attorney Scott Lutes re: his attempts to get inventory and detailed description of disposition of assets during administration of Chapter 11 proceeding. | 0.30 |
| | 01/11/95 | Telephone discussion with Z. Hershel Smith, Esq., re: procedure to return coins to redemption coin holders pursuant to settled class action matter. | 0.20 |
| | 01/23/95 | Telephone discussion with David Hersey, redemption coin holder re: procedure by which he can make claim for | 0.35 |



E-158

# Kirshenbaum & Kirshenbaum

ATTORNEYS AT LAW, INC.

EXHIBIT 8.

Alfred Factor
Paul J. Russo
Charles A. Hirsch
Albert J. Mainelli
John E. McCann, III
Neil P. Philbin
Jason D. Monzack
Matthew J. Elliott
Brian G. Goldstein
William F. Holt
Christopher L. Russo
Geoffrey A. Regan
Robyn K. Cossack

May 17, 1995

**BY FAX AND THEREAFTER**
**BY REGULAR MAIL**

John F. Cullen, Esq.
Cullen & Resnick
Historic Navy Yard
Shipway Place C-3
Boston, MA 02129

Joseph M. DiOrio, Esq.
Hinckley, Allen & Snyder
1500 Fleet Center
Providence, RI 02903

Cambridge Meridian Group
ATTN: Michael Weingarten
50 Church Street
Cambridge, MA 02138

Seymour Posner, Esq.
U.S. Attorney's Office
10 Dorrance St., 10th Fl.
Providence, RI 02903

Stephen C. Rothemich
Postal Inspector
P.O. Box 2217
Boston, MA 02205-2217

John Truslow
Special Agent, FBI
10 Dorrance Street
Suite 900
Providence, RI 02903

RE: Cumberland Investment Corp.
Bk No. 89-11051

Gentlemen:

Please be advised that at a hearing held in the United States Bankruptcy Court for the District of Rhode Island regarding the above-captioned matter, a redemption coin holder, Warren Taft, requested that he be provided with certain documentation for the purpose of determining a chain of custody for Debtor's assets from the time those assets were taken into the possession of the Chapter 11 Trustee to today. Judge Votolato directed that I make written requests for that information. Judge Votolato has continued this matter for hearing to June 8, 1995 at 9:30 a.m. Judge Votolato has also stated that I may make written requests for Orders to compel a response should a voluntary response not be forthcoming promptly.

E-148

Accordingly, would you please provide me with a list of any and all documents which you have which would aid in the determination of the aforementioned chain of custody. I seek copies of any documentation which would show assets coming into the bankruptcy estate, the disposition of any assets (detailing what assets were sold or otherwise disposed of and what funds were received from the disposition of those assets and how these funds were disposed of), and the movement of any assets from location to location.

The documents I seek, include, but are not limited to the following:

1. All inventories taken by Per Baverstam and/or Cambridge Meridian Group.

2. All records of Ernst & Whinney regarding the inventories.

3. Complete accounting of superpriority loan previously approved by the Court, including all checks showing receipt and/or disbursement of funds.

4. Videos, photographs and stenographic records when inventory was removed from Debtor's premises to Marquette Credit Union.

5. Yellow notebooks (inventory books) containing lists of redemption coins.

6. Sign-in and sign-out cards for Eastland Bank in Cranston for the Debtor's inventory.

7. Videos of appraisals done at Eastland Bank in Cranston.

8. Documents regarding the private sale offer for 31,000 silver dollars and other assets completed by Russell Kayes, consultant to Christie's.

9. Transcripts of assets removed from Debtor's premises on August 17, 1990.

E-149

10. Any appraisals of possessory or non-possessory inventory.

11. Any and all inventories taken by the Examiner, including any inventories in long-hand and any computer inventories.

Should anyone receiving either an original or a copy of this letter have knowledge or information of the existence and/or the location of records not in your possession, which would aid in the determination of the chain of custody of the Debtor's assets, please provide me with a detailed description of those documents and where you believe these documents are currently located.

If anyone receiving an original or a copy of this letter wish that it be sent to anyone not receiving an original or a copy, please advise me of the name and address of that party, and I will forward the letter to that party.

Finally, if anyone receiving an original of this letter cannot substantively respond to me within ten (10) days, please advise when I may expect to be in receipt of your response with the copies requested.

Very truly yours,
KIRSHENBAUM & KIRSHENBAUM
Attorneys at Law, Inc.

Jason D. Monzack

JDM:med

cc: John P. Fitzgerald, Asst. U.S. Trustee
Frank M. Cadigan, Esq.
Z. Hershel Smith, Esq.
Edward J. Bertozzi, Jr., Esq.
Scott A. Lutes, Esq.
Harold F. Chorney

E-150

EXHIBIT 9

Kirshenbaum & Kirshenbaum
ATTORNEYS AT LAW, INC.

Alfred Factor
Paul J. Russo
Charles A. Hirsch
Albert J. Mainelli
John E. McCann, III
Neil P. Philbin
Jason D. Monzack
Matthew J. Elliott
Brian C. Goldstein
William F. Holt
Christopher L. Russo
Geoffrey A. Regan
Robyn K. Cossack

July 21, 1995

Warren Taft
P.O. Box 52
Mendon, MA 01756

RE: Cumberland Investment Corp.
Bk No. 89-11051

Dear Mr. Taft:

This letter will serve to acknowledge receipt of your letter of July 19, 1995, with enclosure, and I have noted same. I have no record of receiving your letter of July 12, 1995. This letter will also serve to confirm that the meeting has been rescheduled to Friday, August 11, 1995 at 10:00 a.m. at the U.S. Attorney's office. By copy of this letter, I am confirming this with Messrs. Posner and Cadigan. I have provided Seymour Posner, Esq., of the U.S. Attorney's office copies of your letters of July 12, 1995 and July 19, 1995. Mr. Posner has advised me that he will make available, to the best of his ability, those documents, and that information, requested in your July 19, 1995 letter.

To the best of my knowledge, those individuals referenced in my letter of July 17, 1995 will attend this meeting. You will have to make your own decision whether you wish to be represented by counsel; however, I am advised by Mr. Posner that he will cancel this meeting should anyone attend who has represented Mr. Chorney in his pending criminal matter.

Very truly yours,

KIRSHENBAUM & KIRSHENBAUM
Attorneys at Law, Inc.

Jason D. Monzack

JDM:med

cc: Frank Cadigan, Esq.
Seymour Posner, Esq.

E350

Cumberland Investment Corporation
JDM Trustee

EXHIBIT 10

vs.

| Atty. | Date | Description | Hours |
|---|---|---|---|
| | 06/01/95 | Telephone discussion with David Campbell, Esq., he has discussed Cumberland Investment Corporation matter with Irving Brodsky, Esq., Brodsky will retain coins for time being, he may replace Hershel Smith as Co-counsel. | 0.20 |
| | 06/05/95 | Telephone discussion with David Campbell, Esq,. as for as he is concerned, as Irving Brodsky, Esq., has taken possession of remaining redemption coins, Brodsky is now responsible for them. Campbell had prior telephone discussion with Brodsky, advising him of situation Campbell had offered to take coins for redemption coin holders, but Brodsky went ahead and took coins. Campbell will be at Thursday's hearing. | 0.30 |
| | 06/07/95 | Telephone discussion with Ed Bertozzi, Esq., re: status of requests for documentation and tomorrow's hearing in Bankruptcy Court, Bertozzi never had inventory or videos. | 0.30 |
| | 06/07/95 | Telephone discussion with Sy Posner, Esq., he will appear at tomorrow's hearing in Bankruptcy Court cannot locate yellow notebooks (inventory books), does have receipts has videos, some inventories, some sign in and out cards. | 0.65 |
| | 06/07/95 | Telephone discussion with Irving Brodsky, Esq., he will appear at tomorrow's hearing in Bankruptcy Court. | 0.10 |
| | 06/07/95 | Telephone discussion with (conference call) with Ed Bertozzi, Esq., and John Cullen, Esq., re: John's response to my letter of May 17, 1995. | 0.60 |
| | 06/07/95 | Telephone discussion with Joseph DiOrio, Esq., re: request for documents, documents are available once FDIC give permission to release them. | 0.25 |
| * | 06/08/95 | Preparation of (for) hearing in Bankruptcy Court, review correspondence from Cambridge Meridian Group, Joseph DiOrio, Esq., and John Cullen, Esq. | 0.40 |
| * | 06/08/95 | Attendance at Bankruptcy Court on status hearing re: Warren Taft's prior correspondence to Bankruptcy Court, conference in Judge's chambers, meeting in library prior to hearing to resolve outstanding issues and hearing in open Court, attending assistant U.S. Trustee, Attorneys Frank Cadigan, Irving Brodsky, David Campbell. Disclosure made to Court that no money for unsecured creditors but Trustee's efforts continue to respond to Warren Taft's requests and will reques tcourt authority to liquidate assets,. Chapter 7 Trustee and FDIC agree | 2.30 |



E-164