**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

**IN RE: CUMBERLAND INVESTMENT CORPORATION**

**CA. No. 08-189ML**

# BRIEF OF THE APPELLANT

**AN APPEAL OF BANKRUPTCY COURT ORDERS**

**IN CASE NO. 89-11051 ANV**

**DATED NOVEMBER 3, 2004 AND MAY 8, 2008**

**AND BENCH DECISION OF MAY 7, 2008**

**HAROLD F. CHORNEY, PRO SE**
**16 SPRING DRIVE**
**JOHNSTON, R.I. 02919**
**401 934-0536**

**DATED AUGUST 19, 2008**

# TABLE OF CONTENTS

Table of Contents i-ii

Table of Authorities iii-iv

Motion and Memorandum to Appeal and/or Amend Bankruptcy 1-4
Court Order, Dated November 3, 2004 And May 8, 2008

Jurisdiction 4-5

I STATEMENT OF THE ISSUES 5-6

II BACKGROUND 6

III STATEMENT OF THE CASE FOR FIRST ISSUE 6

A. TRAVEL AND FACTS 6-11
B. DISCUSSION 11-12
C. ARGUMENT 12-16
D. CONCLUSION 16

IV. STATEMENT OF THE CASE FOR SECOND ISSUE 16

A. TRAVEL AND FACTS 16-45
B. DISCUSSION 45-48
1. CIVIL AND CRIMINAL CASES INTERRELATED 45-46
2. ADMINISTRATION AND ACCOUNTABILITY OF THE ESTATE 46-47
3. NON PRODUCTION AND SUPPRESSION OF DOCUMENTS 47
4. APPELLANT PLEADS A FRAUD ON THE COURT 47-48
5. LACK OF DISCOVERY IS NO FAULT OF APPELLANT 48

C. ARGUMENT 48-54

1. EXTRINSIC FRAUD IN THE CRIMINAL CASE WAS COLLATERAL TO THE FRAUD IN THE 49-50

BANKRUPTCY CASE
2. EXISTENCE OF PERJURY 50
3. FRAUD ON THE COURT SUBVERTS THE INTEGRITY OF THE COURT 50-51
4. ONE CONTRADICTARY STATEMENT AFTER ANOTHER 52-53
5. MORE MISSING INFORMATION 53-54

D. CONCLUSION 54-55

V. STATEMENT OF THE CASE FOR THIRD ISSUE 56

A. TRAVEL AND FACTS 56-57
B. DISCUSSION 57-58
C. ARGUMENT 58-59
D. CONCLUSION 59

VI. STATEMENT OF THE CASE FOR FOURTH ISSUE 60

A. TRAVEL AND FACTS 60-61
B. NINTH AMENDMENT DISCUSSION 61-62
C. FINALITY OF THE JUDGMENT 62-63
D. ARGUMENT 63-64
E. CONCLUSION 64-65

VII. CERTIFICATION 65-66

APPENDICES WITH EXHIBITS (E1-E405)

A. NOVEMBER 1, 2007 PETITION TO CIRCUIT COURT
B. MARCH 13, 2008 RESPONSE TO SHOW CAUSE MOTION
C. APRIL 14, 2008 SUPPLEMENTAL RESPONSE

PART I E1-118
PART II E119-255
PART III E256-306
PART IV E307-405

## TABLE OF AUTHORITIES CITED


| CASES: | PAGE NUMBER |
| --- | --- |
| Anderson v. Cryovac, Inc., 862 F2d 910, (1st Cir. 1988.) | 5, 16, 48, 54, 63 |
| Commercial Ins. Co. v. Gonzales, 512 F.2d. 1307, (1st Cir.) | 54 |
| Cotto v. United States, 993 F.2d 274, (1st Cir. 1993.) | 63 |
| Henrick v. Avent, 498 U.S. 819 891 F.2d 583, (5th Cir.1990) | 5 |
| In Re: Citation Corporation, 493 F.3d 1313, (11th Cir. 2007.) | 58 |
| In Re: San Juan Dupont Plaza Hotel Fire Litigation 859 F2d 1007, (1st Cir. 1988.) | 63 |
| In Re: Thompson, 965 F2d. 1136, 1st Cir. | 2 |
| In Re: Troutman, 286 F. 3d 359, 6th Cir. 2002 | 2, 14 |
| Lubben v. Selective service System Local Board No. 27, 453 F.2d 645, 1st Cir. 1972. | 62 |
| Nation-Wide Check Corp. v. Forrest Hills Distributors, Inc. 692 F. 2d 214 (1st Cir. 1982.) | 53 |
| Reintjes v. Stoker, Ca No. 95-1552, (1st Cir. 1995.) | 49 |
| Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866 (5th Cir. 1988) (en banc) | 13 |
| U.S. v. Ayer, 857 Fed. 881, (1st Cir. 1988.) | 63 |
| United States v. Berenguer, 821 F.2d 19, 1st Cir. 1987 | 62 |
| U.S. v. Cowden, 545 F2d. 256, (1st Cir. 1976) | 64 |
| U.S. v. Zinner, No. 95-0048, E.D. Pa. Feb. 9, 1998, pages 2-3 | 47 |

V.T.A., Inc. v. Airco, Inc., 597 F.2d at 224 62

**RULES**

11 U.S.C. §327(f) 3, 57, 58, 59

11 U.S.C. §502 12

11 U.S.C. §704(1) 57
11 U.S.C. §704 (2) 57

11 U.S.C. §2014(a) 62

28 U.S.C.A. §157 4

28U.S.C.A. §158 4

28 U.S.C.A. §455(a) 64

F.R.C.P. Rule 60 (b) 5, 49, 63

F.R.C.P. Rule 60(b)2** 5, 23, 26,30, 33, 44, 48, 53

F.R.C.P. Rule 60(b) 3 5, 16, 48

F.R.C.P. Rule 60(b) 4 5, 61

F.R.C.P. Rule 60(b) 6 5, 6, 16

**CONSTITUTION OF THE UNITED STATES**

FIRST AMENDMENT TO THE CONSTITUTION 13, 63

FIFTH AMENDMENT TO THE CONSTITUTION 13, 14, 61, 62

NINTH AMENDMENT TO THE CONSTITUTION 60, 61, 62

FOURTEENTH AMENDMENT TO THE CONSTITUTION 60, 62, 64

**For purposes of this pleading Appellant claims the information used, where the Source is from the October 9, 2007 Billing, to be **Newly Discovered** evidence.

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF RHODE ISLAND**

**IN RE: CUMBERLAND**
**INVESTMENT CORPORATION**

**Harold F. Chorney**
**Appellant**

**v.** **CA 08-189ML**

**Jason D. Monzack**
**John F. Cullen**
**Appellee**

**APPELLANT'S MOTION AND MEMORANDUM**

**TO APPEAL AND/OR AMEND**

**BANKRUPTCY ORDERS,**

**DATED NOVEMBER 3, 2004 AND MAY 8, 2008**

Now comes Appellant Harold F. Chorney, Pro Se, with property interests and an interested party in the above captioned matter. In accordance with the ORDER, dated July 21, 2008, Appellant with the same concerns as though it were to the First Circuit Court of Appeals, requests this Court amend bankruptcy orders reliant upon court orders dated July 3, 1991 and July 2, 1992, including those dated November 3, 2004 and May 7, 2008. These Orders, whether final or interlocutory have had a final and irreparable effect on the Appellant's rights, resulting in preclusion to access to the courts and spotlight and illuminate methods by which

Appellant is being denied evidence necessary to establish facts in dispute.

> Courts have widely agreed that the person aggrieved doctrine limits standing to appeal a bankruptcy court order to those individuals who have a financial stake in the order being appealed. A person has a financial stake in the order when that order "diminishes their property, increases their burdens or impairs their rights." **<u>In re Troutman,</u>** 286F. 3d 359 at 364, 6th Cir. 2002. See **<u>In re Thompson</u>**, 965 F.2d 1136, 1142 n. 9. 1st Cir. 1992, where standing is granted when the challenged order directly and adversely affects an appellant's pecuniary interests.

Appellant avers that it is because of these very same Bankruptcy Court orders, upheld by both the District Court for the District of Rhode Island Ca. No. 92-044T and the Circuit Court of Appeals in the September 23, 1993 decision in Ca. No. 93-1094, which demonstrate that Appellant has standing. Appellant is an aggrieved party. Motions brought by the trustee, examiner, and Eastland Bank seeking an order directing Chorney to cooperate or refrain from interference with the bankruptcy process involved issues beyond just credibility. The July 1991 and 1992 court orders state that "Chorney's allegations were "totally unsupportable", "fabricated" and "out of touch with reality." Based upon the time records submitted by the trustee, the examiner and Eastland Bank, Appellant was ordered to pay $200,000.

The time records referred to in the First Circuit Court ruling of September 23, 1993, include Appellant Exhibit U and Exhibit V concerning the Trustee's billing dated September 26, 1991 and Exhibit W, concerning the "missing" Bertozzi billing from August 31, 1991 to December 22, 1993. These billings are inconsistent with each other as well as with other billings made by Mr. Cullen and

Mr. Bertozzi and are contested by the Appellant. This is one of the bases for Appellant's claim of a pecuniary interest to challenge the court's orders.

Appellant cannot be silent and be confronted with one lie after another. Despite the fact that Appellant has not been able to obtain discovery or obtain the testimony of these court officials, Appellant will show that a 'fraud upon the court' has been perpetrated by officers of the bankruptcy court and will show that these billings are fraught with inconsistencies while Mr. Bertozzi and EAPD, represented both the Examiner and the Trustee simultaneously, contrary to statute 11 U.S.C. §327 (f), despite their "specialized expertise" in this area.

These are the same parties who have dragged this case out for nineteen years, denied Appellant evidence necessary to establish facts in dispute in both civil and criminal cases. These are the same parties who have impaired Appellant's rights by denying him due process. Other claims and information provided by these same court appointed officials should now be deemed questionable at best because they are fruits of the fraud and presumed "unreliable".

As a direct result of these events Appellant seeks to recuse Bankruptcy Judge Arthur N. Votolato for engaging in conduct prejudicial to the effective and expeditious administration of this case..

Finally the fairness of the criminal trial of Appellant should be questioned in light of the information contained in the four arguments presented to this court.

**BRIEF EXHIBITS**

Appellant in the interest of uniformity and orderly presentation has identified Exhibits heretofore sent to the Circuit Court in Ca. No.07-8038, with an Exhibit Letter and/or an "E" numbered page number. Other Exhibits designated as D.R. are from the Supplemental Designation of the Record submitted to the Bankruptcy Court on June 13, 2008. Appellees have been served these "E"

numbered page numbered exhibits contemporaneously with the filing of these exhibits with the First Circuit Court of Appeals. In addition "E" numbered page numbered exhibits will be attached as an Appendix to the Brief of Appellant and with Appellant's pleadings in CA. No. 07-8038 served upon Appellees.

## Jurisdiction

**Title 28 §158. Appeals**: The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees; and with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of Title 28, Federal Rules of Civil Procedures.

A. The May 8, 2008, Court Order is Final, but a Question of Finality Exists for the November 3, 2004, Court Order

There is some question concerning the finality of the November 3, 2004, Court Order in this instant case, but there is no question concerning the irreparable effect on the rights of the parties in this eighteen year old case. According to the docket [914a], dated 10/05/2005, allegedly the bankruptcy court modified the November 3, 2004, Order allowing Appellant to file objections to Trustee's Motion for Examination. This was *after* ordering Appellant to testify in court on October 5, 2005. On October 28, 2005, Appellant filed objections to Trustee's Motions for Examination. However, Appellant never received any written notification of a modified Court Order.

B. Challenges to the Bankruptcy Order

> "The finality of the bankruptcy order mandates that ...any future challenges to that order will be either in the form of appeal or amendment of the judgment." Cert. denied, 498 U.S. 819, 111 S. Ct. 64, 112 L.Ed. 2d 39 (1990), an appeal of **Hendrick v. Avent**, 891 F.2d 583, Fifth Cir.

According to F.R.C.P., Rule 60(b), "Upon motion and upon such terms as are just, the court may relieve a party ...from a final judgment, order, proceeding for the following reasons...Rule 60(b)2 newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); Rule 60(b)(3)fraud....misrepresentation, or other misconduct of the adverse party; Rule 60(b)(4) the judgment is void; Rule 60(b)(6)any other reason justifying relief from the operation of the judgment. Appellant avers that the untimely request for relief is justified and in the public interest and will argue these reasons in the following four issues.

## I. STATEMENT OF THE ISSUES

A. Whether the sanctions of the November 3, 2004 order as applied fall within the purview of F.R.C.P. Rule 60(b)(6) in that the imposition of sanctions preclude Appellant of access to the courts.

B. Whether the history of failure by officers of the court to disclose or produce materials in civil and related criminal discovery so that Appellant can present his case, can constitute misconduct within the purview of Rule 60(b)(3). See **Anderson v. Cryovac, Inc.**, 862 F2d 910, 923. (1st Cir. 1988.)

C. Whether Judge Votolato has engaged in conduct prejudicial to the effective and expeditious administration of the case thus committing wrongs against the institutions set up to protect and safeguard the public.

D. Whether Appellant can obtain a fair hearing and be granted due process and equal protection under the law with Judge Votolato presiding over this case.

## II. BACKGROUND

Appellant has been involved with two related groups of proceedings before this court. There have been appeals related to a civil bankruptcy case, 89-11051ANV, and a related criminal case 92-099P. A lengthy Designation of the Record was presented to this court in relation to the last appeal, Ca. No. 02-1976, which Appellant wishes to incorporate into this pleading.

Appeal No. 02-1976 was denied by the Circuit Court and an appeal of this decision was not granted certiorari by the Supreme Court of the United States.

Many of the events, related to the sanctions of November 3, 2004, imposed upon Appellant and the court order of May 8, 2008, refer to events ruled upon in these past appeals.

## III. STATEMENT OF THE CASE FOR FIRST ISSUE

Whether the sanctions of the November 3, 2004 order as applied fall within the purview of F.R.C.P. Rule 60(b)(6) in that the imposition of sanctions preclude Appellant of access to the courts.

### A. TRAVEL AND FACTS:

1. On November 3, 2004, the Bankruptcy Court for the District of Rhode Island issued an order: ORDERS: (1) GRANTING MOTION TO STRIKE AND (2.) IMPOSING ADDITIONAL SANCTIONS. (See Exhibit A.) This order refers to ORDER,

dated July 3, 1991. (See Exhibit B.) and ORDER, dated July 2, 1992. (See Exhibit C.)

2. On July 26, 2007, Appellant received a 38 page document entitled FIRST AND FINAL APPLICATION FOR FEES AND EXPENSES OF EDWARDS ANGELL PALMER & DODGE LLP. (See Exhibit D.) The certificate of service is dated July 20, 2007. The other two parties serviced electronically were Jason D. Monzack, Trustee and Leonard DePasquale, U.S. Trustee.

3. On July 30, 2007, Appellant received Notice of final application for fees and expenses of Edwards Angell Palmer & Dodge LLP, a one page document, dated 7/23/07, which was sent to all creditors and interested parties. (See Exhibit E.) See Docket [931-932.] According to this document, "PURSUANT TO R.I. LBR 1005-1(d), within TEN (10) days of service of this NOTICE, *any party* who objects to the fees and expenses sought in the referenced Application shall serve and file with the Clerk of Court, with copies to the local office of the United States Trustee and interested parties, an Objection/Response to said Application.

4. On August 3, 2007, Appellant sent a package (See Exhibit F.) to the Judge which included a letter to Judge Votolato, with two attachments –PETITIONER'S MOTION TO CLARIFY FIRST AND FINAL APPLICATION FOR FEES AND EXPENSES OF EDWARDS ANGELL PALMER & DODGE LLP, AND PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CLARIFY FIRST AND FINAL APPLICATION FOR FEES AND EXPENSES OF EDWARDS ANGELL PALMER & DODGE LLP. Certification to Mr. Monzack, Trustee, Mr. DePasquale, AUST, and to Edward J. Bertozzi, Jr. was included with the Motion and Memorandum to Clarify the First and Final Application for Fees and Expenses of Edwards Angell Palmer & Dodge LLP. The package containing the letter to

the court requesting authorization to send the attachments to the appropriate parties. The package was sent by certified mail.

5. Several times per day Appellant would check online to see when the package was signed for. Even though Appellant was out of town, he still checked to see if anyone had signed for the package. When Appellant returned to town he went to the Providence Post Office to find out what had happened. Virtually everyone said that if the package was not returned, that they probably received it. Appellant met with John Clark, Consumer Affairs Representative, who contacted the court and then issued a letter to Appellant, dated August 20, 2007.

6. On August 20, 2007, Appellant picked up the letter from Mr. Clark in person and then sent a second package to Judge Votolato, by Restricted Delivery that same day. (See Exhibit G.) The package was signed for on August 21, 2007.

7. On September 6, 2007, a hearing was held at the bankruptcy court in which Mr. Monzack, when asked the status of the case, said he was waiting for the professionals to file their billings. Mr. Monzack said that Mr. Bertozzi is revising his billing and Mr. Cullen is on the verge of filing. Mr. Monzack asked for a 30 day continuance to file the final report, which was granted. Judge Votolato stated to file the final report regardless of receiving the Bertozzi or Cullen billings. The next hearing was scheduled for October 4, 2007.

8. On October 4, 2007, a hearing was held in the bankruptcy court in which Mr. Monzack and Mr. Cullen testified. Mr. Cullen said he was going to file a Supplemental Billing and that he had not filed a billing for the last two years he was trustee because he did not think there was any money in the estate.

The judge gave Mr. Cullen until October 26, 2007, to file the Supplemental Billing. (See EXHIBIT V, Billing, E-247 to E-255 with Chronological Detail, dated 9/26/91.)

9. No notice to the creditors or other parties was given that Mr. Cullen would be testifying on October 4, 2007, nor as to the nature of the hearing.

10. No mention was made of the billing of Mr. Bertozzi at the October 4, 2007. hearing.

11. On October 11, 2007, Appellant received Notice of Final Report of Trustee, Jason Monzack.

12. On October 11, 2007, Appellant prints copy of the Chapter 7, Trustee billing, a 47 page document from his Pacer account.

13. On October 16, 2007, Appellant, who was reviewing the billing records of Trustee, Monzack, telephoned Mr. Monzack's office and spoke to Crystal, Monzack's secretary to obtain a copy of Mr. Monzack's billing because there are areas in the printout which are blank or incomplete. Crystal said she would mail me a copy of the billing.

14. On Oct. 22, 2007, having not received a copy of the billing, Appellant telephone Mr. Monzack's office at 401 946-3200 at 10:00 A.M. Crystal told Appellant, "I have to look at the pleading first, I have not sent it yet."

15. As of Oct. 26, 2007, Appellant has received no response to the contents of this August 20, 2007, package, Exhibit G.

16. On Oct. 26, 2007, Appellant received copy of Monzack Billing of 10/11/07. Incomplete areas still existed in this billing.

17. On Feb. 14, 2008, Letter to Judge Votolato and Motion to Clarify, dated August 3, 2007, appear on the Bankruptcy Court Docket stating, "Filed Feb 05'08 12:40 USBCRI CAL [965][966][967], (See Designation of the Record (D.R.) #25.)

18. On Feb. 14, 2008, Notice of Hearing on 3/6/2008 [968] re: Motion to Clarify [966-967] Application for Final Compensation of E.A.P.D. [931] (See D.R. #24.)

19. On March 27, 2008, a Hearing was held concerning the First and Final Application for Fees & Expenses of E.A.P.D. (See D.R. #14 for Transcript of Hearing. Hearing was continued.)

20. On March 27, 2008, Appellant presented 5 Exhibits to Judge Votolato concerning the First and Final Application for Fees & Expenses of E.A.P.D. as contained in D.R. #19. The November 16, 1993, (See D.R. #19 1. A) Affidavit of Donald C. McQueen, Vice President of Eastland Bank was not presented to the court at that time because Appellant wished to use this exhibit in examination of Mr. Bertozzi and/or Mr. Cullen.

21. On April 18, 2008, Appellant presented to Judge Votolato an Offer of Proof Concerning Standing as a result of his property interests, indicating that personal property of significant value had been removed by the trustee in August of 1990 and that property was missing and/or unaccounted for. Said Offer of Proof contained a letter from a member of the Creditors' Committee, Mr. Nacu, now deceased, concerning a meeting on December 29, 1994. Present at this meeting was Mr. Monzack, Appellant, Mr. Nacu and Mr. Dunleavy. It was at this meeting that Mr. Monzack admitted that certain records, including the yellow notebooks could not be located by the U.S. Attorney; Mr. Monzack was attempting to obtain the records, inventories, documents, videos and still photographs of the seized assets as they were being removed from

the building; some $300,000 to $400,000 in assets seized by John F. Cullen, Esq. was missing. (See D.R. #11.)

22. On April 24, 2008 Appellant presented to Judge Votolato comments on Position and Supplemental Position of Chapter 7 Trustee to Chorney's Motion to Clarify First and Final Application for Fees and Expenses of E.A.P.D. (See D.R. #10.)

23. On 1 May, 2008 Judge orders position of U.S. Trustee, Chapter 7 Trustee and Mr. Bertozzi on written position of Appellant on D.R. # 10 and #11. (See D.R. #9.)

24. O n May 7, 2008 the continued Hearing from March 27, 2008, was held. The Court Docket Sheet listed three items. The Fee Application of John F. Cullen; the Fee Application of Monzack; and Appellant's Motion to Clarify. (See D.R. #5.)

25. On May 7, 2008 the U.S. Trustee, Chapter 7 Trustee and Mr. Bertozzi hand deliver written positions to Appellant in the Bankruptcy Court about one hour prior to the actual hearing of the Cumberland case. Mr. Cullen for reasons unknown was not present. The order of the docket was significantly changed. (See D.R. #4, Transcript of this hearing.)

26. On May 7, 2008, Bench order denied Appellant standing. (See D.R. #4 for Transcript of this hearing.)

27. On May 8, 2008, the Court issued an order denying Appellant's Motion to Clarify the First and Final Application for Fees of E.A.P.D. (See D.R. #3.)

**B. DISCUSSION:**

Appellant, who has presented documentation to this Court concerning his service connected stress disorder, cannot recall why the Nov. 3, 2004, Order

was not appealed, although he felt overwhelmed with the situation subsequent to the Supreme Court not granting certiorari. However, by not appealing the Nov. 3, 2004 Court Order, Appellant should have no expectation that the court would ignore and/or not respond to his motions submitted to chambers, thus precluding him from access to the courts.

> Under §502 of the bankruptcy code, unless a party in interest objects the claim is deemed to be allowed. Appellant had reserved the right to object to Mr. Bertozzi's billing claims based upon the information received as a result of his Motion to Clarify.

Appellant as a party of interest has the right to be heard and should have no expectation that the August 3 and the August 20, 2007 packages sent to Judge Votolato (See D.R. #27 and #28 would not be docketed and then mysteriously appear some 6 months later as being filed on February 5, 2008.

Appellant was in good faith seeking clarifications of the Bertozzi billings. Some of the information in the Bertozzi and Monzack billings have not been previously available to Appellant in the last 18 years.

**C. ARGUMENT:**

1. Due to the lack of response to the August 20, 2007, package from Appellant, the repeated denial of discovery, the inability to confront professionals in the case as witnesses and then the Denial of the Motion to Clarify, Appellant is now precluded from asking and receiving a clarification of the billing of Mr. Bertozzi and other professionals, like Mr. Monzack, and possibly the billings of Mr. Cullen and Mr. Boyajian. (The Court approved the Monzack and Bertozzi billings on May 7, 2008.)

2. A legal standard for granting Appellant's Motion to Amend the November 3, 2004, court order is contained in a Fifth Circuit decision where "the imposition of sanctions must *not* result in total, or even significant, preclusion of access to the courts".

**<u>Thomas v. Capital Sec. Servs., Inc.</u>**, 836 F.2d 866, 882 n.23 (5th Cir. 1988) (en banc)

3. There can be little doubt that the November 3, 2004, Court Order, as applied, had denied Appellant preclusion of access to the courts, since Appellant had received no response to his letters dated August 3, 2007, and August 21, 2007, that is up until some 6 months later when the Motion to Clarify appeared on the docket.

4. Subsequently, the Hearings held were hearings in name only and Appellant was not allowed to examine either Mr. Bertozzi or Mr. Cullen concerning their billings. (Mr. Cullen's billing is still pending, however Mr. Bertozzi's billing has been approved while denying Appellant due process.)

5. Preclusion of access to the courts, not only results in an unlevel playing field, but also the lack of response has had a chilling effect upon Appellant, fearful to participate in any manner in this case.

6. To tie and gag one of the few parties with the knowledge and ability to question the billing of professionals in this 18 year old case, because of his adversarial position and overall continuity of events, seems manifestly unfair, unjust and in violation of Appellant's protected power of "Redress of Grievance" as guaranteed by the First Amendment to the Constitution of the United States of America.

7. As a direct result of not being able to fully participate in the hearings, the Bankruptcy Court has denied due process to the Appellant by allowing the unfair taking of his personal property in violation of the Fifth Amendment to the Constitution of the United States of America and has implemental unfair procedures and decisions preventing Appellant from discovering what happened to his personal property.

8. The Bankruptcy Court has erred in not granting Appellant, an aggrieved party with a pecuniary interest, his rightful standing to participate and question "professionals" on this case concerning an accounting of the assets of this case and the billings submitted by said "professionals". The due process clause of the Fifth Amendment to the Constitution of the United State of America, guarantees Appellant the right to be heard in these circumstances.

9. Courts have widely agreed that the person aggrieved doctrine limits standing to appeal a bankruptcy court order to those individuals who have a financial stake in the order being appealed. A person has a financial stake in the order when that order "diminishes their property, increases their burdens or impairs their rights." **Troutman,** 286F. 3d at 364, 6th Cir. 2002.

   Appellant has standing as an aggrieved party with a pecuniary interest to question the billings of those who claimed their services have been made necessary by the actions of Appellant when the Bankruptcy Court ordered Appellant to pay $200,000.00 in financial compensation, currently with interest totaling in excess of $500,000.00. Appellant also has a pecuniary interest in that his personal property, seized by Mr. Cullen, is missing and unaccounted for.

   While Appellant is burdened with court officials trying to collect a $200,000 plus judgment, he is subjected to numerous citations of previous orders prejudicial to Appellant. This seems especially unfair in light of the fact that these billings contain numerous and serious discrepancies. These discrepancies illuminate problems with the veracity and accuracy of those claims made by Mr. Cullen and Mr. Bertozzi. (See D.R. #19, which contains a list of some 20 different discrepancies.)

10. Appellant has standing because his due process and other rights have been impaired. Appellant was denied due process when a full

and fair hearing was denied to Appellant after he was presented with the "position" papers (See D.R. #6, 7, 8) of the other parties shortly before the hearing and the docket was manipulated to favor the presentation of those positions, depriving Appellant the opportunity to respond adequately to the arguments presented.

11. Appellant was denied due process when a full and fair hearing was denied to him after the docket was manipulated in a manner designed to deprive Appellant the opportunity to present his case and to examine Attorney Bertozzi and Attorney Cullen concerning some 20 discrepancies in their billings and other relevant matters.

12. Appellant was denied due process when full and fair hearings were denied and discovery concerning Appellant's Motion to Clarify, prior to the March 27, 2008 and May 7, 2008 Hearings were not allowed by the court.

13. Appellant was denied a full and fair hearing when he could not ask through discovery or at the hearings on March 27, 2008 and May 7, 2008, whether payments were made to Attorney Bertozzi or Attorney Cullen as stated in the Court Order dated December 12, 1990. (See D.R. #19, Exhibit 1, page 8, which states, "The Trustee shall cause such funds to be distributed in the order and manner as follows: 1. $70,000 to the Examiner and $14,000 to his Counsel to pay previously approved administrative claims…" and page 13, which states, "(e) Excepting payment to Eastland of approximately $75,000 and payment to Examiner and Edwards & Angel of approximately $84,000 of fees and expenses already approved, the Trustee will……"

14. Appellant was denied a full and fair hearing by the unexplained absence of Attorney Cullen at the Hearing on May 7, 2008. Attorney Cullen's absence deprived both Appellant and the Bankruptcy Court of the ability to compare his billings to the

billings of Attorney Bertozzi to possibly uncover evidence as to the location of Appellant's personal assets.

**D. CONCLUSION:**

This court should grant Appellant's Motion within the purview of F.R.C.P. Rule 60(b)(6) and amend the November 3, 2004, and May 8, 2008 court orders and any other remedy that is just.

## IV. STATEMENT OF THE CASE FOR THE SECOND ISSUE

Whether the history of failure by officers of the court to disclose or produce materials in discovery so that Appellant can present his case, can constitute misconduct within the purview of Rule 60(b)(3). See **Anderson v. Cryovac, Inc.**, 862 F2d 910, 923. (1st Cir. 1988.)

There are two distinct areas of non disclosure. One area involves the non disclosure of evidence in preparation for a criminal trial, including ongoing discovery, and the other involves the non disclosure of evidence at all stages of a civil bankruptcy. The civil area involves a history of failure to disclose billing information of the financial professionals, and secondly involves a history of failure to provide documentary and other evidence, related to an accounting of the assets of the estate of Cumberland Investment Corporation. Both civil and criminal areas are interrelated and the chronology of events is being presented together.

### A. TRAVEL AND FACTS

1. Appellant, Harold F. Chorney, was the President of a company named Cumberland Investment Corporation. (CIC) CIC obtained a series of loans from Eastland Bank ultimately totaling $2,500,000 in 1989. To obtain these loans, Cumberland pledged uncirculated Mint State Silver Dollars and other assets as collateral. The number

of coins held by Eastland Bank during this period was 7,826 silver dollars in May 1989.

2. In 1989, Eastland Bank, claiming an interest in all the assets of CIC, hired Sotheby's Auction House to appraise the collateral held by the bank. The Sotheby's appraisal was dramatically lower than the face value of the loan prompting an involuntary petition of CIC into bankruptcy and eventually criminal proceedings against Appellant.

3. On December 1989, Judge Votolato appointed Michael Weingarten as Examiner in the bankruptcy case in which Appellant was the Debtor in Possession.

4. On August 17, 1990, Appellant was fired and the business was taken over by a Chapter 11, Trustee, John F. Cullen. By *warrantless* search, the assets and documents of CIC were seized and removed. (See Par. 33, 115 below.)

4A. On August 24, David N. Cicilline, send a letter to Mr. Cullen concerning the search and seizure of assets, documents and the personal property of Appellant. This letter was not answered. A September 13, 1990 follow-up letter to Mr. Cullen from attorney Cicilline was not answered either. (See Exhibit GG, pages E401-402 in Appendix IV. These letters were set aside to examine Mr. Cullen, and were not presented to the court.)

4B. On December 12, 1990 Judge Votolato signed an Order Granting [206-1] Amended Motion re [196-1Motion to authorize borrowing pursuant to Section 364(c)(1) and for nunc pro tunc authorization by John F. Cullen…" (See Exhibit X) (See D.R. #19 1.)

5. At a bankruptcy court hearing dated May 7, 1991, Appellant, represented by attorney Oster, was seeking information concerning the billing practices of Michael Weingarten, Examiner in the

Cumberland Investment Corporation case. (See Exhibit B-1.) Mr. Oster had taken the deposition of Mr. Weingarten, indicating that there were some double billings between Mr. Weingarten's other cases, where he served as Examiner or Trustee, and the Cumberland Investment case. Mr. Oster had requested documents, which were not produced by either Mr. Weingarten or his attorney Mr. Bertozzi for deposition.

6. A proposed order, related to the May 7, 1991 Hearing, was drawn up by Mr. Bertozzi concerning the production of documents. (See Exhibit B-2, Letter dated June 20, 1991 and ORDER.)

7. At hearing of May 22, 1991, MOTION OF PEOPLE'S LOAN & TRUST TO ADJUDGE TRUSTEE IN CONTEMPT OR TO COMPEL TRUSTEE TO COMPLY WITH PRIOR COURT ORDER OR FOR RELIEF FROM AUTOMATIC STAY MOTION OF EXAMINER TO SELL MOTION OF HAROLD CHORNEY TO ADJUDGE EXAMINER IN CONTEMPT BEFORE THE HONORABLE ARTHUR N. VOTOLATO, JUSBC, Judge Votolato vacates the order concerning production and no further discovery concerning billing was received by Appellant. (See Exhibit B-3, pages 17-19 of May 22, 1991.)

8. On June 5, 1991, Letter from Weingarten of Cambridge Meridian Group to Bertozzi, his attorney at Edwards and Angell, on page 5 states that an employee of the Examiner, "Per Baverstam has already largely sorted through the remaining inventory with stamp and coin experts, and we have removed most, if not all, of the high-value inventory."

8A. On October 1, 1991, Edward Bertozzi signs Affidavit [Docket 414] Billings to Trustee and Examiner. (See Exhibit W, Missing Bertozzi Billing, Aug. 31, 1991 to Dec. 22, 1993.) (See page 1 of D.R. 19 3 for Affidavit.)

9. Subsequently, Appellant is criminally indicted on referrals from the Examiner and Eastland Bank. The U.S. Attorney supplied a handwritten list of items in his possession.
   **NOTE: Handwritten list of 78 items supplied by US Attorney to the Defendant did not include the yellow inventory notebooks.**

10. On January 8, 1992, Mr. Posner testifies at a bankruptcy court hearing attended by Appellant, Trustee Cullen and his attorney Mr. Bertozzi. Appellant had been enjoined from contacting witnesses by the bankruptcy court. Mr. Posner tells Judge Votolato,

    "I don't think, from a criminal standpoint, legally it would be appropriate for Mr. Chorney to be precluded from contacting potential witnesses in a criminal case.. . . I think it would almost be unconstitutional."

    "THE COURT: Okay. Before we leave this, if you decide, for whatever reasons, that there's no more U.S. Attorney or grand jury involvement and we're back to strictly civil, let me know, because then we'll go back to civil—..."

11. On July 14, 1992, FBI Agent Truslow tells the Grand Jury that 170 coins from the possessory collateral had been sold.

"Now going back to that group that Chorney looked at, that 4,000 coins, of which Chorney pulled out 575 coins, Augustine looks at those coins, but at this point in time, there only exists 405 of them. Some of them were sold off." (G.J. Testimony, July 14, 1992, pg 35.)

12. On December 12, 1992, Eastland Bank fails and is taken over by FDIC, which also asserts an interest in all the assets of CIC.

13. On January 14, 1993, Donald Etnier and Barbara A. Quinn, of FDIC inspected the collateral being held in the 9 Safe Deposit Boxes at the Woonsocket office of Eastland Savings Bank and

made an "approximate count" of the silver dollar inventory. According to a partial release from the FDIC, dated December 29, 2000, in response to an FOIA from Appellant.

14. April 7, 1993, Memo from John F. Brophy, FDIC to Barbara Quinn and Frank Cadigan, FDIC that states, "Barbara: I have just received a very strong call from Assistant U.S. Attorney Sy Posner relative to the scheduled coin appraisals, and stated that he was going to federal court to seek a Protective Order against FDIC of his evidence…Sy was very explicit, once again, that coins are sealed and must stay sealed. . . Sy asked that the appraisals would be postponed until after the trial…"

Yet on April 26, 1993, Memo's between Barbara Quinn and John F. Brophy in Legal FDIC Franklin says: Brophy, Subject Chorney/Cumberland: Any FDIC Inventory Ever Performed? Monday, April 26, 1993 7:55:44 EDT "B: As above; was there ever any Inventory of the coins ever performed by FDIC at closing: No appraisal as yet, of course; but ever an inventory?"

"John, **An inventory of the coins was done both in Woonsocket and Cranston.** Not every coin was counted. Our numbers are approximate. I have a copy if you would like to see it. Barbara" dated Monday, April 26, 1993 8:00:09 EDT (FOIA from FDIC, dated December 28, 2000.)

15. On May 14, 1993, a subpoena was issued by Scott Lutes, defense attorney to FDIC requesting inventories of collateral and non collateral coins held at Eastland Bank, Woonsocket, R.I.

16. In response to the subpoena, FDIC produced a one page undated EASTLAND SAVINGS BANK, GENERAL INVENTORY OF SAFTEY DEPOSIT BOXES, indicating that 7 separate Safe Deposit Boxes, 960, 853, 946, 16, 606, 849, and 12 contained 6,721 silver dollars instead of 7,826 silver dollars from the possessory

collateral. Also that box 945 contained 1,755 silver dollars instead of 2,066 silver dollars. Another box contained currency. (*If FDIC inventory count was exact, the possessory collateral would be short by over 1,100 coins and box 945 would be short some 311 coins prior to and at the time of trial.)*

17. At trial government represented that the possessory collateral was intact. The Examiner, Michael Weingarten and his employee, Per Baverstam both testified to that affect. Mr. Leidman, government appraiser also testified that the collateral coins for the bank loan were in Woonsocket. (See Exhibit H, CR. NO. 96-1187, Brief of Appellant, June 14, 1996 pages 16-17.)

18. Subsequent to his criminal conviction of a false statement to an FDIC insured institution, on May 26, 1993, Appellant discovered several items which, according to his trial attorney, Scott Lutes, if known at the time of trial, would have radically altered the theory of defense and may very well have resulted in an acquittal. One of these items was a transcript of the removal of the assets of the estate under the direction of John F. Cullen. (See Exhibit H), CR. NO. 96-1187, Brief of Appellant, June 14, 1996.

19. **The 8/18/93 entry by Barbara Quinn, FDIC is whited out.** The 8/17/93 entry states that arrangements have been made to relocate the contents of the vault located at 1000 Park Avenue, Cranston, RI to 25 Cummings Way, Woonsocket, RI. The inventory will be moved to the vault on the 2nd floor of the building at Cummings Way...FBI Agent (redacted) will also be on hand to oversee the move. (FDIC FOIA, 12/28/00.)

20. "8. …Nine hundred fifty-three (953) possessory collateral coins that were held up until August 18, 1993, in Cranston had been moved earlier to Cranston from the collateral in Woonsocket by the bankruptcy examiners, Mike Weingarten and Per Baverstam, in order to test the value of the collateral by having them examined

and graded….On August 18, 1993, these 953 collateral coins were returned to Woonsocket." Aff. Truslow 11/8/95.

The Truslow affidavit is contrary to all trial testimony, stating the possessory collateral was intact at Eastland Bank in Woonsocket prior to trial in May 1993.

21. The 8/15 Inventory (undated as to year, upon information and belief is August, 15, 1993.) It indicates that 1,113 silver dollars from the possessory collateral was located at Eastland Bank in Cranston. **The 8/15/93 inventory shows the possessory collateral as co-mingled prior to trial. Note: 1,113 coins is 160 coins more than the 953 coins sworn to by Agent Truslow in his 11/8/95 Affidavit. With 1,113 coins at Cranston and 6,877 coins from the possessory collateral at Eastland Bank, for a total of 7,990 coins instead of 7,826 coins.** (See EXHIBIT B-5.)

21A. September 23, 1993, First Circuit Decision in Case No. 93-1094. (See Exhibit Y.)

22. On September 30, 1993, Frank Cadigan, attorney for FDIC sent letter to Mr. Lutes stating,

> "The items used as evidence in your client's criminal case have been segregated and is under FBI seal. These items have not been inventoried or appraised by the FDIC and we have no plans to appraise these items."

23. On October 13, 1993, letter from John Brophy, FDIC to Dennis Jenkins, Probation Officer states, "None of the collateral has been liquidated….."

24. On December 10, 1993, FDIC MEMO TO TINA L. BEAUCHEMIN:

"We were previously under the impression that the coin inventory list produced to criminal defense by subpoena was composed by the account officer at the closing of NESB (Don Etnier) from an original document in a safe deposit box; that Don just extracted coin inventory and grading info from the original list and produced a clean copy for the closing records.

It now appears that this is NOT the case. We finally got in touch directly with Don and he advises that HE created the inventory and graded the coins.

I have asked Don to contact Assistant U.S. Attorney Sy Posner in Providence without delay, and have confirmed that Don has called Sy (… that Sy can avoid submitting an erroneous motion to the Court.)
UPDATE: Don has now advised us that he has talked with the prosecutor (AUSA Sy Posner) and corrected the earlier data….."(FOIA Dec. 28, 2000, FDIC.)

25. On December 13, 1993, Government Memorandum, in response to Mr. Lutes questioning the possessory collateral being intact, states that when Mr. Etnier, took the inventory at Eastland Bank with another employee of FDIC, that he did only an approximate count in 2-3 hours and that he could easily have been off by 1100 coins or so.(*Yet it was a not a " he" that took the count but a " they", and a video of this probably exists and would be in the possession of Jason Monzack.)*

**Newly discovered: Fredrick Fishe, attorney for FDIC, FOIA Section indicated to Appellant that the count was supposed to be exact when the assets of a bank are taken over.**

26. On March 18, 1994, discussion between Monzack and Lutes about availability of inventory records, according to October 9, 2007 billing.

27. Attempts by Appellant and others to obtain copies of seized corporate inventory records, including yellow inventory notebooks, and an accounting of the assets and other discovery from parties in the bankruptcy case were mostly denied. The court upheld the trustee's objection of April 26, 1994, where John F. Cullen, filed an objection to providing an accounting of estate assets. (See Exhibit I.) In this motion on page 4, Mr. Cullen states of records to G.J. on 2/14/91:

> "When the Movant speaks to video tapes or other reports, again he is vague and knows full well that those items, if any, are in the possession of the United States Grand Jury."

> At a Hearing in the bankruptcy court on October 4, 2007, **Mr. Cullen reiterates that boxes containing videotapes were given to the Grand Jury.**

The Billing Records of John F. Cullen, dated October 26, 2007, do not show any involvement with the Grand Jury on February 14, 1991, or that Mr. Cullen, Mr. Blais and Mr. Daugherty of Eastland Bank were at 141 Main St. Woonsocket with Appellant and removed the yellow notebooks and other records on either Aug. 15 or Aug. 16, 1990. However, the October 26, 2007, billing records do show that Mr. Cullen was in the possession of the videotapes, and stenographic copy of the removal of the assets from CIC on August 17, 1990. Yet, in Exhibit I, on page 1. Trustee Cullen states that the motion is "vague,. . . and that all records directly related to all items in the possession of the Chapter 11 Trustee were available for inspection and have been inspected on numerous occasions." Mr. Cullen then states:

"The Movant, although alleging that there are questions concerning the whereabouts of certain valuable items which were allegedly in the possession of the Chapter 11, Trustee, does not give any details as to

what items are allegedly missing or what items were originally on the premises in 1990 that are not currently available."

28. On May 9, 1994, Monzack discussion with FDIC for OK to release inventory to Chorney. (Source: October 9, 2007, Billing.)

29. On May 26, 1994, Mr. Monzack, in a letter states that FDIC has authorized him to disclose a 14 page inventory list previously supplied to him by the FDIC. (See Exhibit I-1.) This inventory list was produced one year after Appellant was convicted. (See paragraph 15 above, where FDIC produces only a one page listing.)

The billing of October 9, 2007, indicates that there was no billing for May 26, 1994. However, on May 25, 1994, Monzack dictates correspondence as to what he classifies as "what assets may be unaccounted for and what documents are in the possession of the U.S. Attorney's office."

30. On June 8, 1994, comment: Postal Inspector had inventories no one knows where they are now, according to October 9, 2007, Billing.

31. On June 10, 1994, Appellant sent to Mr. Monzack a listing of assets believed to be missing or unaccounted for from memory. (See Exhibit J.) On September 1994, a follow up letter to the June 1994 letter, concerning assets unaccounted for and missing assets was sent to Mr. Monzack. (See Exhibit K.) A copy of the June and September correspondence was sent to the Clerk of Courts to go into Appellant's case file (See Exhibit L.), and other copies were sent to the U.S. Trustee in Providence(See Exhibit M.), and the U.S. Trustee in Boston (See Exhibit N). Appellant supplied Mr. Monzack with a copy of a transcript of the removal of the assets, a post trial discovery obtained through the efforts of Appellant, indicating that the assets Appellant claimed were missing in June 1994 were on the premises when Mr. Cullen, the then Chapter 11 Trustee, removed them in 1990.

32. On July 12, 1994, Monzack requested appraisals from Joseph DiOrio, Esq. representing Fleet National Bank, successor to Eastland Bank, according to October 9, 2007, Billing.

**NEWLY DISCOVERED:** *This is the first indication to Appellant that Fleet National Bank had conducted any appraisals.*

33. On or about August 1994, Appellant had obtained, on his own from Allied Court Reporters, a transcript of the removal of the Cumberland Investment Corporation assets by Mr. Cullen on August 17, 1990. The transcript that the removal of the assets was conducted "in the context of both civil and criminal investigations. TR 8/17/90, pg. 3. (See Exhibit Z.)

33. A. On September 1, 1994, Attorney Lutes sent a letter to First Assistant U.S. Attorney at the U.S. Attorney's office in Providence concerning evidence requested from the U.S. Attorney which he had received from the Trustee Cullen. Reference was made to the Allied 8/17/90 Transcript. Also stated was "I (Mr. Lutes) contend that the statements contained in the videotape, from government witnesses John Cullen, Lee Blais and Michael Weingarten constitute statements that should have been provided to me under the Jencks act. Despite future efforts by Appellant to obtain this letter and a response to same through F.O.I.A.'s to the Executive Office of U.S. Attorneys, no letter or response was ever produced. (See Exhibit HH, pages 403-405. This Exhibit, not yet presented to this court, is part of Appendix IV.)

34. On September 13, 1994, a copy of the Allied Court Reporters transcript of the removal of the assets was sent to Jason Monzack, with a letter.

35. On December 28, 1994, Mr. Monzack held a meeting at his office in Cranston, Rhode Island. It was at this meeting that he admitted

that over $300,000 in assets was indeed missing. (See Exhibit O), the Nacu Letter and Attachments.) and (See Exhibit P.)response from the Office of Professional Responsibility.

36. Sometime after the December 1994 meeting, Judge Votolato ordered Mr. Monzack to obtain missing documents and other items for Mr. Taft. Mr. Taft was a shareholder of Wescap, the parent company of Cumberland. He was also a client of Cumberland Investment Corporation. His assets were removed by Mr. Cullen in 1990, and were missing. As a result of Mr. Taft complaining about his missing assets, a letter was issued by Mr. Monzack on May 17, 1995, to various parties involved in the bankruptcy case concerned with finding different documents and videotapes. (See Exhibit Q.)

37. January 12, 1995, Brief of Appellee, "1. The prosecutor asked the bankruptcy trustee (private attorney John F. Cullen) for any videotapes, and gave defendant the only videotape that Mr. Cullen produced."

38. January 19, 1995, Amended Brief of Appellee, "The videotapes were made solely at the direction of the bankruptcy trustee, John F. Cullen….Defense counsel claims he "was orally informed that this tape constituted the only videotape of which the Trustee or anyone on his behalf were aware" (Br. 26)…"on or about January 15, 1993, AUSA Seymour Posner, in the presence of FBI Special Agent John Tuslow, telephoned defense counsel Scott Lutes and told him that a paralegal at Eastland's private law firm had just provided several additional videotapes that the trustee had made regarding the coins seized from Cumberland. Pg 26, Mr. Lutes did not take advantage of this opportunity. Should defendant file a new trial claim, AUSA Posner and Agent (sic) Lutes are prepared to give affidavits to this effect." Pg 26.

39. "On April 21, 1995, the possessory collateral now belonging to FDIC was removed from the bank premises in Woonsocket to FBI

premises by myself and two other employees of the FBI, at my direction. I had the collateral removed for security purposes in order to do a physical inventory of the collateral....." Aff. Agent Truslow 11/8/95.

40. May 15, 1995, **missing section in billing, on page no 11. Sequence would suggest that Christina DeCellio from the Monzack's office** witnessed a physical inventory by the FDIC, and/or FBI Agent Truslow, which may have included the possessory collateral, according to October 9, 2007, Billing. Possible that something here contradicts par. 39 above.

41. May 17, 1995, Monzack drafts letters to Chapter 11 Trustee, AUSA, Fleet, Examiner, Postal Inspector and FBI concerning documenting the chain of custody of Debtor's assets, according to October 9, 2007 Billing.

42. May 17, 1995, Monzack drafts letter to FBI agent Truslow concerning assets in his possession, according to October 9, 2007 Billing.

43. May 17, 1995, letter, the U.S. Attorney's office notified Mr. Monzack concerning some video tapes and that a viewing of these tapes in the U.S. Attorney's office would be arranged and that Mr. Taft could bring counsel.

44. On June 7, 1995, Mr. Monzack is told by AUSA Posner that he cannot locate the yellow notebooks, the inventory records of Cumberland Investment Corporation. (See Exhibit Q-1, Billing of Jason Monzack, dated October 9, 2007.)

45. On June 14, 1995, the redemption client coins of John D'Angelo, seized by the Examiner on August 17, 1990 and subsequently opened, were inventoried and appraised by Robert Moffatt. One of the rolls listed under bearer number 5143 should have contained 20

coins dated 1880-S. Instead Mr. D'Angelo's roll now contained 17 coins dated 1880-S and 3 coins dated 1887. The coins sold to Mr. D'Angelo were sealed in the presence of Mr. D'Angelo, Mr. Timmons and Appellant at the date of purchase.

46. On July 21, 1995, Mr. Taft received a letter from Mr. Monzack stating that Mr. Posner will cancel any meeting to view documents and or videotapes should anyone attend meeting at U.S. Attorney's Office who has represented Mr. Chorney in his pending criminal matter. (See Exhibit Q-2.)

47. On August 11, 1995, Mr. Taft attends meeting at the U.S. Attorney's office in Providence, R.I. The only items produced by A.U.S.A. Posner were of videotapes of the August 17, 1990 and August 23, 1990, removal of the assets from Cumberland Investment Corporation.

48. Despite all these parties allegedly looking for documents and videotapes, no other party produced another single item requested by Mr. Taft.

49. On November 8, 1995, government files an objection to Appellant's Motion for a New Trial. Attached is the Affidavit of Agent Truslow, dated 11/8/95. It states that he is thoroughly familiar with records from case, including those subpoenaed by the Grand Jury from Eastland Bank, John Cullen, U.S. Trustee in Bankruptcy, various banks in the state of R.I. Yet on page 3, Agent Truslow admits that, "This is the first I learned of the existence of such stenographic records."

Mr. Truslow, states that the yellow notebooks "have been available to defendant in the United States Attorney's office since the CIC records were obtained from the United States Trustee." (See EXHIBIT R, page 4.)