Although the objection, signed by A.U.S.A. Posner states, on page 5 that, "Neither the prosecutor nor Agent Truslow was aware until defendant filed his motion for a new trial that a stenographic transcript had been made of the removal of the CIC assets on August 17, 1990." Nevertheless, part of Mr. Posner's conclusion in his Memorandum, pg. 25, was, "The videotapes, the stenographic transcripts, and the still pictures which defendant claims were unknown and unavailable to him at the time of trial were in fact known to him and available to him before trial, particularly the videotapes."

50. On January 4, 1996, a Hearing was held concerning a Joint Petition for Instructions concerning the Notice of Intended Sale filed by Jason Monzack Trustee and Frank Cadigan, Attorney for F.D.I.C. Mr. Monzack made representations that, .. "We have a detailed inventory from Christie's by year and mint mark as to every coin that they have." TR pg. 15. At this hearing Phil Dunleavy, creditor, objected to the sale of the 8,600 silver dollars because the inventories of the coins shipped to Christies did not match the inventories that were made by Ramapo Coin Exchange only one year earlier. TR pg. 31.

51. On January 12, 1996, the Affidavit of Agent Truslow, FBI indicates that 953 coins from the possessory collateral moved to Cambridge, MA for grading purposes were then moved to Eastland Bank in Cranston, R.I.

52. On February 12, 1996, newly discovered, a **61 coin appraisal discrepancy** according to Frank Cadigan, FDIC. "Christies does show 61 more coins than Ramapo…." Billing Oct.9, 07.

53. The Affidavit of Theresa Ryan Tosches, FDIC dated February 13, 1996 indicates in paragraph 4. That "In totaling up the number of silver dollars listed in the RAMAPO appraisal against the total

number of silver dollars listed in Spink America manuscripts, there is a 14 coin discrepancy. It appears at this time that Spink America is showing 14 additional coins in its inventory."

54. On February 15, 1996, a Hearing was held. Mr. Taft presented evidence that the coins offered for sale by Christies contained major inconsistencies with the coins inventoried by Ramapo. The FDIC admitted that there was a 14 coin count difference. TR. pg. 87. Rather than the court demanding that the inventories be reconciled prior to any auction, the sale was approved over the objection of Mr. Taft and others. Even though Monzack and FDIC compiled a list prior to shipping the coins, the only list available to Mr. Brodsky and Mr. Taft is the list of coins in the possession of Christies according to Christies auction lists. MR. MONZACK: …. "We gave Mr. Taft the complete list of coins in the possession of Christie's. That's what he uses the basis for his objection he filed with the Court. Nobody's trying to hide anything from anyone." See TR pg. 71.

55. At the February 15, 1996 Hearing, Mr. Monzack represented that, "nobody knows if the coins that were originally in there were matched up with the description." TR pg. 17. This is not true. Mr. D'Angelo's coins were sealed in the presence of Mr. Timmons, Mr. Duggan, Mr. Cadoret and Appellant. (See par. #45 above.) Upon information and belief, there were many CIC clients, whose coins were sealed in the presence of multiple parties.

56. At the February 15, 1996 Hearing, Mr. Monzack states, "….so-called yellow pad that admittedly was in the hands of the U.S. Attorney at one point, and the U.S. Attorney can't find it anymore. That's part of—of—we went over there and met with the U.S. Attorney, and probably Mr. Lutes is more familiar with that than I am, but there are certain documents that existed that were in the possession of, for instance, the U.S. Attorney. ……….I'm told—it's all hearsay, but I'm told that this yellow pad that Mr. Chorney

had was at one time in the possession of the U.S. Attorney and at the present time they have been unable to locate it." THE COURT: Yeah, but do they acknowledge that they ever had it? MR. MONZACK: I think they do." TR pg. 18. The Truslow Affidavit of November 8, 1995 in paragraph 49 above is contradictory to the fact that the yellow notebooks were not available in response to the May 17, 1995 letter from Monzack, in par. 36 above and contradictory to par. 44 above.

57. At the February 15, 1996 Hearing Mr. Monzack states, "We have a list that was done jointly by myself and FDIC before we let Christies take the coins." TR pg. 68

58. At the February 15, 1996 Hearing Attorney Brodsky, Special Master appointed by Superior Court in R.I. appeared to oversee Mr. Smith's cases. Mr. Brodsky states that he "had on two occasions had to prod FDIC for a list of names with corresponding bearer number, never got the response from Mr. Monzack when I wrote to him during this interval between January 4 and today." TR pg 27.

59. On February 23, 1996, Appellant goes to prison.

60. On March 25, 1996, Mr. Monzack sends a FAX to the U.S. Attorney, Seymour Posner requesting an inventory of the records of Cumberland Investment Corporation. Monzack references a March 11, 1996 letter from Mr. Posner.

61. On March 26, 1996, Mr. Monzack sends another FAX to Mr. Posner concerning picking up the records on April 5, 1996.

62. On March 26, 1996, Mr. Monzack sends another FAX to Mr. Lutes, Attorney for Appellant, asking Mr. Lutes if he wants the records.

63. On various dates in April 1996, attempts are made by Mr. Lutes, Mr. Searles and others to pick up the records from Mr. Monzack. There is no meeting to pick up the records after numerous attempts.

64. On April 18, 1996, Monzack meets with *someone for 4.5 hours* (source, Oct 9, 2007, billing.)

65. On May 2, 1996, Monzack talks with Cadigan, FDIC, re: indemnification of Trustee by FDIC, with limit of $1,500,000 in the sale of silver dollars. Source, October 9, 2007, Billing records.

66. On May 20, 1996, Mr. Lutes requests a list of the coins (as stated on page 68 of the February 15, 1996 hearing) that Monzack and Cadigan had inventoried prior to shipping them to Christies. Mr. Monzack did not respond.

67. May 24, 1996, A.U.S.A. Posner receives records from Postal Inspector. Source, October 9, 2007, Billing records.

68. On June 14, 1996, Appellant, through his attorney Scott Lutes filed Brief of the Appellant, an appeal from a denial of a Motion for New Trial upon the grounds of newly discovered evidence. (See Exhibit H.)

69. The government had objected to the appeal in District Court in Case No. 92-099P. The GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION FOR NEW TRIAL states: "Defendant argues that he sent a letter to the prosecutor on January 5, 1993 seeking videotapes of August 17, 1990…. . The prosecutor was unaware of any videotapes at the time the letter was sent." Pg. 3

"Bear in mind that the possessory collateral held by and in the bank was never part of the assets removed by the Trustee on August 17, 1990. Those coins were in the bank vault and with the exception of

coins they were removed to the Cranston office of the bank by the Examiner for testing and grading purposes and later returned to the bank vault in Woonsocket, the possessory collateral was never in the care, custody or control of the United States Trustee." Pg 13.

"In addition, representatives of the FDIC inventoried the bank's collateral on January 27, 28, and February 4, 1993. . . The FDIC inventory did not contain the coins that were auctioned off by Christies and Bowers & Merena, Inc. ..long before the FDIC inventoried CIC's assets." Pgs.20-22.
(Par. 13 above indicates an inventory on 1/14/93, unless others were done.)

70. June 20, 1996, Monzack meeting with computer expert Peter Lawson re: retrieving information on computer disk provided by U.S. Postal Inspector via Sy Posner at U.S. Attorney's Office. Source, October 9, 2007, Billing records.

71. July 5, 1996, records from Postal Inspector contain names, addresses and bearer numbers of redemption coin clients given to Irving Brodsky, special master. (Appellant was accused of concealing these records by the Examiner and others.) Source, October 9, 2007, Billing records.

72. On July 25, 1996, Mr. Lutes made additional requests to pick up the records and a second reminder concerning the list of coins made by Monzack and Cadigan. Mr. Monzack did not respond to this letter either.

73. On September 1, 1996, Appellant requested an accounting of the assets from Mr. Monzack. Mr. Monzack did not respond to this letter.

74. November 19, 1996, Christies coin appraiser, Russell Kaye, backs out of purchase of miscellaneous items at private sale. Source, October 9, 2007, Billing records.

75. On October 17, 1998, Appellant sent a letter to Mr. Monzack concerning pickup of the records in his possession. This letter was never answered.

76. On November 23, 1998, Trustee Monzack filed a STATUS REPORT that states, "Additional coins which were held by the U.S. Attorney regarding the criminal prosecution of Harold Chorney are now being prepared for turnover to the Chapter 7 Trustee for their sale at auction, pursuant to an agreement with the FDIC whereby the bankruptcy estate would sell the coins and share in the proceeds upon the same terms and conditions as the previous sales. Pursuant to previous discussions with Frank Cadigan of the FDIC it is expected that the remaining coins would be turned over to the Chapter 7 Trustee within the next thirty (30) days.

77. On December 4, 1998, Mr. Lutes sent a letter to Mr. Monzack concerning pickup of the records in his possession. This letter was never answered.

78. On January 8, 1999, Agent Truslow receipts coins and currency to Frank Cadigan at FDIC. The receipt shows two listings of silver dollars, one for 7,809 U.S. Silver Dollars and a second for 183 Silver Dollars. Mr. Monzack gave Appellant this receipt subsequent to bankruptcy court hearing April 6, 2000. Mr. Taft and Appellant questioned the number of silver dollars from possessory collateral, which supposed to have contained 7,826 silver dollars in proposed sale, instead of the 7,992 number of silver dollars listed for sale. (See par. 21 above.)

79. On August 27, 1999, Trustee Monzack filed a STATUS REPORT that states, "Coins which were held by the U.S. Attorney regarding criminal prosecution of Harold Chorney have been turned over to the Chapter 7 Trustee for their sale at auction. Coins are presently held by Christies/Spink's in New York and are being prepared for

sale at auction subject to terms to be agreed upon by FDIC and subject to approval of the Bankruptcy Court. Upon sale of the remaining coins Trustee's Final Report and Account Before Distribution will be prepared. Expect sale at Christies/Spinks next major sale of coins which is Dec. 1999. Projected date for filing TFR: 1/00-3/00.

79A. On September 21, 1999, letter from Martha Davis to Appellant concerning no report of missing assets to Executive Office of U.S. Trustee. (See Exhibit CC, E383.)

79B. U.S. Trustee's Manual, Volume 5, Section 5-7 lists procedures for investigating and reporting of missing assets. (E384-386.)

80. On October 19, 1999, subsequent to serving 19 months in Federal Prison, Appellant obtained 19 videotapes, each two hours long, of the removal of the assets on August 17, 1990 and August 23, 1990, from the Executive Office of U. S. Attorneys (EOUSA). These videotapes, which corroborate the transcript of the removal of the assets on August 17, 1990 and confirm different items that Appellant claimed were missing were indeed there on the premises when the Trustee removed them. Videos were specifically requested prior to trial and not produced.

81. On October 29, 1999, Jason Monzack filed a MOTION FOR ORDER AUTHORIZING SALE NOTICE FOR APPROXIMATELY 7,491 SILVER DOLLARS (the collateral coins.) This is 501 coins less than the aggregate of the 7,809 and 183 silver dollars.

82. On November 17, 1999, Mr. Taft objected to the sale stating that the sale had not been in any numismatic publications and since he had not seen any catalog, he could not tell if the coins were being

offered in large group lots in a commercially unreasonable manner or not.

83. On December 1, 1999, just six days prior to the sale, there is a court hearing. Taft indicates to the court that he does not want to stop the sale, but he is concerned on how the items are being cataloged for sale and that the items are being grouped together and that this may not be a "commercially reasonable" sale. The court overrules Taft's objection and orders the sale to continue.

84. On December 3, 1999, Appellant receives copy of auction catalog.

85. On December 7, 1999, the auction contains 8,004 silver dollars and not 7,491 silver dollars according to the auction catalog.
This is 12 more than the 7,992 and 513 more than the 7,491 silver dollars.

86. On December 14, 1999, Frank Cadigan of FDIC states that "I talked to FBI agent John Truslow in Providence. All records connected with Cumberland Investment, including video tapes, inventory lists and everything Chorney is seeking is with the Office of the United States Attorney at 50 Kennedy Plaza, Providence, RI. We have none of that stuff. Some video tapes are with Hinckley, Allen in Providence. Jason Monzack may have some video tapes of inventories we did after the bank closed but FDIC has nothing." (Response to FOIA to FDIC, Dec. 2000.)

87. On March 9, 2000, Warren Taft files MOTION TO COMPEL TRUSTEE TO PROVIDE ACCOUNTING OF ESTATE PROPERTY SOLD ON 12/7/99 AND REQUEST FOR CLARIFICATION as to why the sale contained some 8,000 silver dollars instead of 7,491 silver dollars.

88. On March 14, 2000, the FDIC files a RESPONSE BY FDIC TO PETITIONER'S REQUEST FOR CLARIFICATION AND

ACCOUNTING OF ESTATE PROPERTY SOLD ON DECEMBER 7, 1999 BY SPINK AMERICA.

89. On April 3, 2000, Warren Taft seeks a Continuance of the Hearing Scheduled for April 6, 2000 since more questions are being raised than answered in RESPONSE OF CHAPTER 7 TRUSTEE TO PETITIONER'S REQUEST FOR CLARIFICATION AND ACCOUNTING OF ESTATE PROPERTY SOLD ON DECEMBER 7, 1999. In addition, Mr. Taft was seeking to obtain a copy of the inventory performed by Mr. Cadigan and Mr. Monzack prior to the coins being shipped to Christies as stated on page 68 of the Transcript of the February 15, 1996 Hearing.

90. On April 6, 2000, there is a Hearing concerning an accounting of the assets sold on December 7, 1999. As a result of this hearing, Mr. Taft did not get any explanation as to why there were 8,004 coins in the December 7, 1999 sale, nor did he get any breakdown of the 1128 silver dollars. The 1128 silver dollars were grouped in a manner so that a reconciliation of the inventory could not be done. See TR pg. 8.

NOTE: Silver dollars are not of equal value. It is possible to have 500 coins that are valued at $10.00 each as Christies evaluated the 1128 coins, be worth less that just one silver dollar like an 1896-0 that was missing from the inventory of Cumberland Investment Corporation.

91. On April 6, 2000, Mr. Monzack states,

"...a third group of coins was that group of coins that were separately segregated at the insistence of Eastland Bank when they had some doubts about the financial stability of Cumberland Investment, and it was set aside in a separate vault taken control of by the U.S. Attorney's office. That group of coins that were shipped directly to Christies." Tr. Page 12 of April 6, 2000. See paragraph 4, above.

92. At the April 6, 2000 Hearing Mr. Taft states that Mr. Monzack does not respond to his letters. "He could have—we wouldn't even be in court. I asked him to just send me some documentation in January, we wouldn't be wasting the Court's time at this point. Unless he wants to send me a letter saying I'm not going to do anymore, if he wants to, that's fine, and I won't bother him anymore, Your Honor." Basically, the court found that Mr. Monzack had clarified Mr. Taft's questions and would give Mr. Taft the response from Christies when he got it. TR. pg. 15.

93. On April 20, 2000, after receiving a copy of the transcript of April 6, Warren Taft writes to Jason Monzack concerning the assets in the December 7, 1999 sale. Mr. Monzack did not reply.

94. On May 23, 2000, Mr. Burgess of F.D.I.C. indicates to Appellant that Mr. Monzack may have videotapes of the appraisals conducted when Eastland failed.

**If Mr. Monzack, who was the receiver for Eastland Bank as well as the Chapter 7, Trustee in the Cumberland Bankruptcy case, has the videotapes in his possession, Eastland Bank and their successors FDIC, who accused Appellant of a crime that he was convicted of, are the same parties that withheld evidence concerning the alleged crime itself in order to cover up the fact that some assets of Cumberland that were stored at Eastland as collateral, were missing or tampered with.**

95. On June 7, 2000, Mr. Taft wrote to Mr. Monzack concerning the assets of the estate in the December 7, 1999 sale. Mr. Monzack did not respond.

96. On June 12, 2000, Appellant was the sole sworn witness at a hearing. Appellant asked the Trustee about whether or not he had videotapes of the assets of Eastland Bank being inventoried when

the bank failed. **Judge Votolato stated that Appellant could raise those issues at another time.** Mr. Monzack indicated that when the criminal matter was over the U.S. Attorney gave him the records and videotapes concerning Cumberland Investment Corporation.

97. On July 3, 2000, Mr. Monzack filed MOTION TO STRIKE MOTION TO COMPEL CHAPTER 7 TRUSTEE TO PROVIDE ACCOUNTING OF ASSETS AND TO PRODUCE REQUESTED DOCUMENTS AND VIDEOTAPES.

98. On July 14, 2000, Appellant sent a letter to Mr. Monzack requesting a time to get together to go through the records in Mr. Monzack's possession in order to locate documents that Mr. Monzack requested at the July 6, 2000 Hearing.

99. On September 8, 2000, the court issued an order denying as moot Appellant's MOTION TO COMPEL CHAPTER 7 TRUSTEE TO PROVIDE ACCOUNTING OF ASSETS AND TO PRODUCE REQUESTED DOCUMENTS AND VIDEOTAPES.

100. On February 6, 2002, Mr. Monzack signs for FIRST REQUEST FOR ADMISSIONS by Appellant.

101. On February 7, 2002, Mr. Monzack at a hearing stated that there were actually 20 videotapes and not 19.

102. On November 14, 2003, A STATUS REPORT, docket #759, was issued by the Chapter 7 Trustee, Jason Monzack stating,

""The trustee has not received notification from the U.S. Supreme Court regarding its disposition of Chorney's petition for Writ of Certiorari. All funds to be paid to secured creditors have been disbursed. There remains $258,108.27 to be disbursed to

unsecured creditors and for administrative expenses. The Trustee expects that disputes regarding claims will be resolved within the next sixty (60) days and this case may be closed within six (6) month, provided that there are no legal proceedings pending in the U.S. Supreme Court."

103. At a Hearing dated February 24, 2004, Jason Monzack reported to the court that certiorari in the Supreme Court case was denied and that there was a settlement in a class action lawsuit against Sotheby's and Christies six months ago and that subsequent to a submission of a claim, $11,000 was awarded to the estate as well as a certificate usable up to May 2007, and that this was the last asset in the estate.

104. On March 8, 2004, Appellant filed a MOTION AND MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION TO CLARIFY THE CLASS ACTION AWARD FROM THE LAWSUIT AGAINST CHRISTIES AND SOTHEBYS AND REQUEST CHAPTER 7 TRUSTEE PROVIDE A COMPLETE AND DETAILED ACCOUNTING OF ESTATE ASSETS.

105. At March 18, 2004, Hearing, Judge Votolato asked Mr. Monzack, "Are you looking into the standing of Mr. Chorney to file such motions at this point?" The Judge then asked Mr. Monzack when he was going to object to Appellant's motions and was told by Mr. Monzack that day or the following day.

106. On March 19, 2004, MOTION TO STRIKE MOTION TO CLARIFY CLASS ACTION AWARD, by Trustee Monzack.

107. On April 9, 2004, Appellant filed MOTION AND MEMORANDUM IN SUPPORT OF MOTION IN OBJECTION TO MOTION TO STRIKE BY THE CHAPTER 7 TRUSTEE, JASON D. MONZACK

108. On April 30, 2004, a SECOND REQUEST FOR ADMISSIONS was sent by Appellant to Mr. Monzack. (See Exhibit S.)

109. On May 7, 2004, the Trustee filed a MOTION TO STRIKE SECOND REQUEST FOR ADMISSIONS.

110. At a May 13, 2004, Hearing Appellant was prepared to call Mr. Monzack to the witness stand and present documents to him concerning the REQUEST FOR ADMISSIONS, but was unable to do so. At the Hearing, while Appellant was on the witness stand:

CHORNEY: "..but the jurisdiction that you do have, your honor, is over the trustee to respond to Request for Admissions concerning these assets….."

COURT: "Not from you, not from you sir…and I'm referring you to the proper authorities"

111. On July 28, 2004, MOTION TO STRIKE SECOND REQUEST FOR ADMISSIONS is filed by Trustee.

112. On November 3, 2004, court grants MOTION TO STRIKE CLARIFICATION OF LAWSUIT AGAINST CHRISTIES & SOTHEBYS and grants MOTION TO STRIKE SECOND REQUEST FOR ADMISSIONS.

Additionally, Appellant is sanctioned:
"EFFECTIVE IMMEDIATELY, THE CLERK OF COURT SHALL DECLINE TO ACCEPT ANY FILINGS FROM HAROLD CHORNEY, UNLESS SUCH FILING HAS FIRST BEEN PRESENTED TO CHAMBERS AND IS SPECIFICALLY AUTHORIZED BY THE COURT FOR FILING."

113. On July 26, 2007, Appellant received a 38 page document, FIRST AND FINAL APPLICATION FOR FEES AND EXPENSES OF EDWARDS ANGELL PALMER & DODGE LLP. (See Exhibit B.)

This document states that,

"EAPD is not seeking payment for $35,921.36 in fees for services rendered to the Trustee during the period August 30, 1991 through December 22, 1993 because, due to a glitch in transferring data to a new computer, EAPD cannot recover the data as to individual time entries for that period, although the computer does show the data to the aggregate amount of fees for said period."

114. Mr. Monzack testified at 9/6/07 Status Hearing that he was waiting for the professionals to file their billings. When queried by the court about the professionals,

Mr. Monzack said, "Mr. Bertozzi, is revising his billing, and Mr. Cullen is on the verge of filing." (Mr. Cullen has not been a Trustee on this case since December 22, 1993, when replaced by Mr. Monzack.) The Judge continued the hearing until October 4, 2007, and said to Mr. Monzack to file the final report regardless of receiving the Bertozzi or Cullen billings. (1.)

Upon information and belief, the only parties, who Appellant saw present at this hearing other than himself were attorneys Monzack, Chapter 7 Trustee; John Boyajian, representing Cumberland Investment Corporation; and Matthew McGowan, representing the Creditors' Committee. No one other than Mr. Monzack testified.

**NOTE:**

(1.)Mr. Monzack has testified at several hearings concerning completion of The Final Report. On August 27, 1999, he said, "Projected date for filing TFR: 1/00-3/00." On February 7, 2007, Mr. Monzack stated that he would have The Final Report in two weeks.

For one reason after another Jason Monzack, the Chapter 7 Trustee, on the Cumberland case, with approval of the court and apparently with the blessings of the U.S. Trustee's Office, continued not to present the required submission of the Trustee's Final Report. It goes back a lot further, but check this pattern over the last two years: back on May 2005, according to Docket #904, dated 05/31/2005, "Notice to Trustee re: Case's Appearance on 6 month Inactivity Report Status Check Due by : 6/30/2005 followed by Docket #907, an Order Requesting Updated Status Report, dated 7/7/05. Subsequent to the Trustee's unsuccessful attempt to collect the $200,000.00 contempt of court fine against Chorney, Docket #919 states, Notice to Trustee re: Case's Appearance on 6 month Inactivity Report Status Check Due by: 9/25/2006.

Despite continuous case inactivity, The Final Report to close this case was never filed. For instance Docket #922, is an ORDER FOR UPDATED STATUS REPORT, dated 10/2/06, from the Court which states, "…Jason D. Monzack, is hereby ORDERED to submit an updated status report and is also hereby ORDERED to file said report no later than 11/1/2006 with proper certification to all interested parties."

115. On October 26, 2007, Appellant obtained a copy of FINAL APPLICATION OF FORMER CHAPTER 11 TRUSTEE, JOHN F. CULLEN FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSE from his Pacer account. This billing shows that Mr. Cullen "utilized three video and still photographers, as well as a stenographer, each of whom assisted the Trustee in keeping detailed records Memorializing the transfer of estate assets."

"The Applicant also coordinated two other transfers of estate assets in the same manner above-described." (This paragraph is newly discovered. No video or transcript of other transfers have ever been produced to Appellant.)

116. On October 29, 2007, Appellant discovers that the Billing of Mr. Cullen on October 26, 2007 does not match the billing of Mr. Cullen on Sept. 26, 1991. (See EXHIBITS T, U & V.)

117. On February 28, 2008, the First Circuit Court of Appeals issued a Show Cause Motion as to why Appeal 07-8038 should not be dismissed.

118. On March 13, Appellant made a Response to the Show Cause Motion. In said Response, Appellant showed that a 'fraud upon the court' resulted when the Circuit court relied upon spurious information in the underlying court order, dated July 3, 1991, resulting in a $200,000 fine to the Appellant, in a decision of the United States Court of Appeals for the First Circuit in case No. 93-1094, dated September 23, 1993. (See D.R. #16, #17.)

119. On April 14, 2008, Appellant made a Supplemental Response as to why the appeal should not be dismissed. In the Supplemental Response, Appellant shows that he has been denied access to the Bankruptcy Court by orders that were based on either ignorance of or presentation to said court of fraudulent misrepresentations. An offer of proof was presented concerning Appellant's property interests.

**B. DISCUSSION:**

**1. CIVIL AND CRIMINAL CASES INTER-RELATED**

On or about August 1994, Appellant had obtained, on his own from Allied Court Reporters, a transcript of a *warrantless* search, involving the removal of the Cumberland Investment Corporation assets and documents by Mr. Cullen, Chapter 11 Trustee, on August 17, 1990. The transcript stated that the removal of the assets was conducted "in the context of both civil and criminal investigations. TR 8/17/90, pg. 3. Mr. Cullen was represented by Attorney Bertozzi at that time.

At Hearing, January 8, 1992, Judge Votolato stated to Mr. Posner, A.U.S.A. in the presence of Mr. Cullen, "..if you decide, for whatever reasons, that there's no more U.S. Attorney or Grand Jury involvement and we're back to strictly civil, let me know, because then we'll go back to civil--, MR POSNER: Understood." At one point Judge Votolato speaks of modifying a bankruptcy court order saying, "I'll leave the amended language up to the parties, the U.S. Attorney, the Trustee and Mr. Chorney, all right?" TR January 8, 1992, pgs 24-6. (See Exhibit B-4.)

The 10/26/07 "sanitized" Billing by Mr. Cullen, mostly references 10/90 to 12/92, and states Cumberland Farms Investment Corporation instead of Cumberland Investment Corporation. Part B pages E-225 to E-238, has no mention of target of probes or of investigations or meeting with Eastland Bank officials.

However in the 9/26/91 Billing, contemporaneously done during the same time period, there is mention of conferences Re: investigation and target of probe; trips to Washington DC, re: investigation of background and schemes; as well as meetings with U.S. Attorney, Postal Inspector, D.E.A., I.R.S. and Grand Jury and meetings with Eastland Bank officials, executives and chairman of the board. See E-247 to E-255.)

**Note:** *The "missing" Bertozzi Billing, overlaps the same time period. (See paragraph 113 above.)*

## 2. ADMINISTRATION AND ACCOUNTABILITY OF THE CIC ESTATE

Appellant and/or his counsel from the onset of the bankruptcy in 1989, has filed motions and appeals concerning the administration of the bankruptcy estate and an accountability of the assets of CIC. One area questioned was the double billing of the estate by the Examiner, Michael Weingarten, who was also represented by Mr. Bertozzi. Discovery was eventually denied by the court, questioning the motives of the Appellant, subsequent to a showing of the double billing practices of Mr. Weingarten. (See Exhibit B-1.) where the court states, "...let's be blunt and call it a waste of the Court's time, parties, expense to the estate. I was not disappointed......It is my intention right now to terminate Mr. Chorney's

participation..from now on he's an alleged general creditor…his standing is nothing more than a general creditor in this case..the Trustee is representing the interest of general creditors in this case..any prior orders that I've signed inconsistent with what I'm saying..are vacated as of right now." This was all followed by a court Order. (See Exhibit C, the July 2, 1992 Order.)

### 3. NON PRODUCTION AND SUPRESSION OF DOCUMENTS

Disclosure and production of materials from the Examiner and Chapter 11, Trustee, John F. Cullen were requested for both criminal and bankruptcy matters. Incomplete production occurred in the criminal case, while there was little production of documents requested by Appellant in the bankruptcy case. Virtually all motions to obtain documents were Denied. Appeals of these motions to the District Court in R.I. and First Circuit were then further Denied. The results being that Appellant lacked the information necessary to present his case.

### 4. APPELLANT PLEADS A FRAUD ON THE COURT

Appellant and others have requested disclosure and production of materials from Mr. Cullen's successor, the Chapter 7 Trustee in Bankruptcy, Jason D. Monzack on several occasions, virtually without success. The corruption of the Bankruptcy Court's impartiality, perpetrated by officers of the court, have resulted in a situation where the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication. See **United States v. Zinner**, No. 95-0048, 1998, E.D. Pa. Feb 9, 1998, pages 2-3.

For example, on May 17, 1995, a letter was issued to court officers, governmental agencies and to the other *parties* in the case for the production of documents, virtually without any success. (See EXHIBIT Q.) Despite these requests for videotapes, photographs and yellow notebooks (containing company inventories) sign in and out cards from the bank vaults, no one has produced them, at least not to Mr. Taft or Appellant. It appears that during the entire process, there seems to be constant doubt in the mind of the court that events and evidence, claimed by Appellant to be true are indeed true. Finally, at the February 15, 1996, Hearing,

the Judge infers the non existence of the records sought, despite Mr. Monzack stating that he believes the records were there. (See Par. 54 above.)

### 5. LACK OF DISCOVERY IS OF NO FAULT OF APPELLANT

Appellant continues to seek documents in both cases. To date he has obtained through efforts of his own, a transcript of the removal of the assets, under the direction of John F. Cullen, performed on 8/17/90.

On October 19, 1999, Appellant obtained 19 videotapes of the removal of the assets by John F. Cullen on August 17, 1990 and August 23, 1990, through an F.O.I.A., some six years subsequent to his criminal trial, 92-099P, and three years subsequent to the BRIEF OF APPELLANT, An Appeal from a denial of a Motion for New Trial upon the ground of newly discovered evidence in CR NO. 96-1187. In addition, Appellant filed F.O.I.A.'s to the EOUSA, FBI, EOUST and others.

### C. ARGUMENT:

Both the criminal case and the bankruptcy case are interrelated and replete with examples of non production of materials requested. The non production or lack of acknowledgment of the existence of evidence hamstrings Appellant in presenting or even preparing his case. The lack of information and evidence prevented counsel for Appellant from preparing a defense based upon Appellant's claims of missing, switched and mishandled assets in the criminal case.

The history of failure to disclose or produce materials in discovery can constitute misconduct within the purview of Rule 60(b)(3). See **Anderson v. Cryovac, Inc.**, 862 F2d 910, 923. (1st Cir. 1988.)

"Where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party." **Anderson v. Cryovac, Inc.** 925.

> ***In this instant case, the misconduct is being conducted by officers of the court, who are failing to disclose or produce materials in discovery so that Appellant can present his case.***

Fed.R.Civ.P. 60(b). The Rule requires that motions pursuant to the above grounds "shall be made within a reasonable time, and . . . not more than one year after the judgment, order, or proceeding was entered or taken." Id.

At the same time, the Rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, . . . or to set aside a judgment for fraud upon the court.

See **Reintjes v. Stoker**, Ca. No. 95-1552, December 13, 1995, 1st Cir. Appellant avers that the information in paragraphs 1-119 above show that the fraud in the criminal case is "extrinsic" or collateral to the fraud in the bankruptcy action and justify an untimely relief, especially since billing documents in an eighteen year old case are still coming to light. The result of continuous and substantial fraud on the court is that "a wrong to institutions set up to protect and safeguard the public" has and continues to occur.

1. **EXTRINSIC FRAUD IN THE CRIMINAL CASE WAS COLLATERAL TO THE FRAUD IN THE BANKRUPTCY CASE**

One fact in dispute, in both cases involving the Appellant, the bankruptcy case 89-11051 and CR 92-099P, deals with the inventory of the assets in the estate. Contested was the value of the assets of the estate of Cumberland Investment Corporation as well as the content of the assets both prior to and subsequent to Mr. Cullen removing the assets. Appellant has continuously maintained that there was enough value in the assets to cover all debt of Cumberland Investment Corporation but that something happened to these assets.

Evidence necessary to establish the disputed fact(s) could have been obtained by an accounting of the assets seized, those sold and those remaining or missing at various stages of the bankruptcy. A lengthy history of Appellant and others, requesting documents and receiving little or no production in the criminal and civil cases are documented, in part, by paragraphs 1-119 listed above. Documents

sought in both the civil case and the criminal case concerning an accounting of the assets of the estate were not supplied or even responded to by the Chapter 11 Trustee. Minimal, incomplete, and possibly misleading information was supplied by FDIC, all further complicated by perhaps the perjured information from government.

## 2. EXISTENCE OF PERJURY

Either the U.S. Attorney and the FBI Agent or the court officers in the bankruptcy court committed perjury. Regardless as to whether the perjured information comes from court officials in the criminal case, the civil case or both (See paragraphs 11, 17, 20, 21, 23, 76 concerning the collateral intact, or paragraphs 14, 16, 25, 30, 37, 38, 86, 115 concerning production of documents both prior to and subsequent to the criminal trial) the Chapter 7 Trustee, as did his predecessor the Chapter 11 Trustee, continued this pattern of non disclosure in bankruptcy court. In addition it can easily be established that Appellant and others have been refused these documents. The bankruptcy court ironically refused to give Appellant documents under the guise of "willful interference with the orderly and economic administration of the estate…".

## 3. FRAUD ON THE COURT SUBVERTS THE INTEGRITY OF THE COURT

As troublesome as the Appellant seeking documents and not receiving any production is the fact that court officials, seeking information on the case also failed to produce the documents sought thus producing a species of fraud which actually subverts the integrity of the court.

On May 17, 1995, Mr. Monzack issued a letter to the parties concerning missing documents, allegedly without any response. (See Exhibit Q.) One document sought was the yellow inventory notebooks. They not only contained lists of redemption coins, but also a detailed list of all of the assets of Cumberland Investment Corporation. Without these specific records, Appellant could only use memory to indicate which assets of the estate were missing in letters to the Trustee on June and September 1994.(EXHIBITS J & K) In addition, any asset taken

which was not part of the corporate inventory may have been personal assets of the Appellant, removed with corporate assets by the Trustee. (See D.R. #11, which mirrors the Offer of Proof Concerning Property Interests of Appellant in Supplemental Response to Show Cause Motion, dated April 14, 2008; See paragraph 4A. on page 17 of this pleading, letter from Mr. Cicilline to Mr. Cullen.)

No copies of these yellow notebook CIC records were available to Appellant, once removed by the Trustee. Copies in the possession of CIC accountant Peter Lockey were taken by the FBI and not returned, and the Trustee in Bankruptcy, claiming ownership, would not allow the accountant firm of Thorne, Earnst & Whinney to produce these documents for Appellant.

The significance of the disappearance of the "yellow covered notebooks" is that they would indicate that the in-house assets have been tampered with since they were seized by the Trustee in August 17, 1990 and that assets of CIC under custody and control of John Cullen, Trustee and Eastland Bank were missing. Without these yellow notebooks, both cases became reliant upon the production of counts and inventory produced under the direction of FDIC, the Examiner and Trustees in Bankruptcy, Eastland Bank and their successor Fleet Bank versus those conducted under the certified audit conditions of a big eight accountant firm.

This May 17, 1995, letter (See Exhibit Q.) went to the U.S. Attorney, the FBI and other parties involved with both the criminal and the civil aspects of the Cumberland/Chorney cases. Not one party found any of the documents listed, except the videotapes produced by the U.S. Attorney's office.

*The recent Monzack Billing of October 9, 2007, entry dated 6/7/95, states, "Telephone discussion with Sy Posner, Esq., he will appear at tomorrow's hearing in Bankruptcy Court* ***cannot locate yellow notebooks*** (emphasis added)*, does have receipts has videos, some inventories, some sign in and out cards." Yet six months later, the FBI Agent states that these yellow notebook records are at the U.S. Attorney's office in boxes that Defendant failed to see them. See Affidavit of Mr. Truslow, dated November 8, 1995, page 4 where Mr. Truslow states that the yellow notebooks "have been available to defendant in the United States Attorney's office since the CIC records were obtained from the United States Trustee."*

## 4. ONE CONTRADICTARY STATEMENT AFTER ANOTHER

Back in 1994, Mr. Cullen stated on page 4 of Exhibit I that "When Movant speaks to video tapes or other reports, again he is vague and knows full well that those items, if any, are in the possession of the Grand Jury." As recently as October 4, 2007, Mr. Cullen stated to the Bankruptcy Court that he was going to file a Supplemental Billing for the last two years he was Trustee. In addition he stated that he delivered 100 and possible 200 boxes of documents to the Grand Jury and that these boxes included boxes of videotapes.

Both the 1994 statements and the 2007 statements contradict the Government's Brief of January 19, 1995 at pg 25-6, which states how the videotapes were obtained in the first place.

> "On or about January 15, 1993, AUSA Seymour Posner, in the presence of FBI Special Agent John Truslow, telephoned defense counsel Scott Lutes and told him that a paralegal at Eastland's private law firm had just provided several additional videotapes that the trustee had made regarding the coins seized from Cumberland….." (See paragraphs 37, 38 above.)

>> The Posner/Truslow rendition can only be fabricated if as Mr. Cullen states that the videotapes were all given to the Grand Jury on or about February 14, 1991 even if Eastland Bank or their successors may have had a second set of videotapes. It appears as if the G.J. and/or the prosecutor may have been mislead when Mr. Cullen on Feb. 14, 1991 testified that, "During the process, we used a photographer, still photographer and a video camera to trace the process of leaving the vault, to the armored cars and then to Marquette." TR. 2/14/91 page 3. (E-214) When contrasting the information in the October 26, 2007 billing, it shows that Mr. Cullen "utilized three video and still photographers, as well as a stenographer, each of whom assisted the Trustee in keeping detailed records Memorializing the transfer of estate assets. The Applicant also coordinate two other transfers of estate assets in the same

manner as described above." (See D.R. #26.) *Videotapes of two other transfers is newly discovered.*

Either way, it is possible that the second Grand Jury, which indicted Appellant, never saw or even knew of the existence of all 19 videotapes.

Appellant could never obtain a chain of custody of these tapes, when requested in an F.O.I.A. with the Executive Office of U.S. Attorneys. The reason for this is either Mr. Cullen lied in that these videotapes were never given to the Grand Jury, or that the FBI and US Attorney lied as to when and how they were acquired.

Either way, if Eastland bank and or their successors FDIC had the videotapes in May 1995, they ignored the bankruptcy court order dated May 17, 1995 asking for (4.) video, photographs, stenographic records....plus.

**5. MORE MISSING INFORMATION:**

The detailed billing of EADP's involvement with both the criminal and civil cases concerning Appellant are conspicuously missing, regardless as to whether the entries are a result of computer glitches or the failure to disclose is the result of an accidental omission or otherwise. See **Nation-Wide Check Corp. v. Forrest Hills Distributors, Inc.** 692 F.2d 214, 217-219 (1st Cir. 1982)(deliberate nonproduction or destruction of relevant document is "evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him.")

Appellant avers that discovery material, such as inventories and appraisals, has been deliberately suppressed and has inhibited the unearthing of further admissible evidence adverse to the withholder and that this evidence substantially interfered with trial preparation in both the criminal and civil arenas.

Attorney for Appellant in the criminal action stated, "The Defendant contends that this information was within the control of the United States Government, that it was improperly withheld from him, that the information constitutes exculpatory evidence and that had the existence of this information been known prior to trial

much more attention would have been paid by Counsel to client's claim that the assets of his company had been altered, switched or mishandled."

According to **Commercial Ins. Co. v. Gonzalez**, 512 F2d. 1307, 1314 (1st Cir.) as stated in **Anderson v. Cryovac, Inc.** pg. 925, "It seems equally logical that where discovery material is deliberately suppressed, its absence can be presumed to have inhibited the unearthing of further admissible evidence adverse to the withholder, that is to have substantially interfered with the aggrieved party's trial preparation." For instance, Videotape #2, once in the possession of Mr. Cullen and then allegedly in the possession of the FBI and U.S. Attorney would have had a substantial influence on the jury during the criminal trial.

When the "non possessory" assets were being removed from Appellant's store at 325 Main Street, Woonsocket to Eastland Bank in Cranston, Mr. Weingarten was asked the value of the silver dollars on one of the armored trucks. Mr. Weingarten's response, recorded on videotape, "two to three million." August 23, 1990, 9:57 tape 2. This statement would have been contrary to all of the government witnesses' testimony concerning the value of CIC inventory from a court appointed official charged with valuing the inventory.

> **Note:** On May 30, 1990, the Criminal Referral Form to Executive Office of U.S. Trustees was made by Mr. Weingarten, who upon information and belief was advanced money by Eastland Bank. No accounting of the 11 U.S.C. §364 Agreement has been made available to Appellant, a signatory to this Agreement, despite several requests. (See D.R. #19 1.)

In light of the argument that Eastland Bank was claiming a security interest in all the coins and other assets of Cumberland Investment Corporation, the information contained in the videotapes and the fact that the stenographic record shows both the context of criminal and civil investigations, would certainly have changed the strategy used by Appellant at trial.

**CONCLUSION:** The aggregate of the information withheld from the Appellant at all stages of the criminal and civil proceedings was deliberate, continuous and substantial. Appellant, who was C.E.O. of a public entity with certified audits by

big-eight accounting firms, was blamed for concealing records in the possession of those who removed the records from his premises. It is now seventeen years since the Trustee in bankruptcy has removed the records of the company and all copies of said records in the possession of others have fallen under the custody and control of the government. Critical information was withheld concerning the possessory collateral, when it was inventoried by Barbara Quinn and Don Etnier, of FDIC, after Eastland Bank failed; the removal of assets by the Examiner; and the disappearance of the inventory records of Cumberland Investment Corporation subsequent to Mr. Cullen removing them from the CIC premises.

Appellant concludes, and the record supports, that **Mr. Monzack, who was the receiver for Eastland Bank as well as the Chapter 7, Trustee in the Cumberland Bankruptcy case, has the videotapes of when the Eastland Bank was taken over in his possession. Eastland Bank and their successors, FDIC, who accused Appellant of a crime that he was convicted of, are the same parties that withheld evidence concerning the alleged crime itself in order to cover up the fact that some assets of Cumberland, that were stored at Eastland as collateral, were missing or tampered with.**

The record will show that the Appellant was denied a myriad of information in both the civil and criminal cases necessary to defend himself and to best present his case, thus being denied due process and equal protection under the law by the suppression of these records and other information. For example, this strategy of denying discovery by court appointed officials denied Appellant full and fair hearings on March 27, 2008 and May 7, 2008 when he could not ask either through discovery or at the Hearings whether payments were made to Attorney Bertozzi or Cullen as stated in the Court Order dated December 12, 1990.

Furthermore, the record will show that officers of the court, including Judge Votolato, have engaged in conduct prejudicial to the effective and expeditious administration of this case.

## V. STATEMENT OF THE CASE FOR THE THIRD ISSUE

Whether Judge Votolato has engaged in conduct prejudicial to the effective and expeditions administration of the case thus committing wrongs against the institutions set up to protect and safeguard the public?

### A. TRAVEL AND FACTS:

1. On or about November 5, 1989, the Cumberland Investment Corporation bankruptcy case was filed in the District of Rhode Island. It has been nearly eighteen years since this filing.

2. The November 3, 2004, court order both grants the Trustee's motion to strike Appellant's requests for discovery from the trustee and an accountability of the assets of the estate, it also sanctions Appellant stating, "....instant filings are frivolous and are hindering the Trustee in performing his duty to conclude this case...."

3. It has been over three years since the November 3, 2004, court order, and over eight years since the last of the assets of the estate were sold in 1999, yet there appears to be no sanctions against any party, for hindering the administration of the case, except the Appellant seeking an accountability of the assets, in this case.

4. The lack of response to Appellant's motions to chambers has had a chilling effect upon Appellant, seeking information and clarifications concerning the October, 2007 billing of Mr. Monzack and Mr. Cullen.

5. A lack of response from the court in addition to a lack of access to an accounting of the assets of the estate as contained in other court orders (See Exhibit B), court order dated July 3, 1991, where Appellant (seeking an accounting of the assets of the estate) is

accused of "willful interference with the orderly and economic administration of this estate…." makes Appellant fearful.

**B. DISCUSSION:**

The record will show that Judge Votolato's beliefs that Appellant is willfully interfering with the orderly and economic administration of the estate, may be due in part to representations and misrepresentation from officers of the court. As a direct result, Judge Votolato has engaged in conduct prejudicial to the effective and expeditious administration of the case. Judge Votolato should be recused for the length of time it has taken to close this case and his lack of impartiality as evidenced by no response to motions made to chambers. This case has dragged on for eighteen years while many of Judge Votolato's decisions have been contrary to statute. Despite the fact that it has been pointed out to the court on several occasions, the bankruptcy court judge has allowed an administration of this case which violates the following statutes:

1. The Trustee according to 11 U.S.C.§327(f) may not employ a person that has served as an examiner in the case. Yet the court has allowed Mr. Cullen to hire Mr. Weingarten to assist him in the sale of the assets of Cumberland Investment Corporation.

2. The Trustee according to 11 U.S.C.§704(1) shall collect and reduce to money the property of the estate for which such trustee serves and close such estate as expeditiously as is compatible with the best interests of parties in interest. Yet the court has allowed the CIC case to remain open and the unsecured creditors unpaid for eight years after the sale of estate assets and 18 years after the case has commenced.

3. The Trustee according to 11 U.S.C.§704(2) shall be accountable for all property received and is responsible to furnish such information concerning the estate and its administration as is requested by a party in interest. Although Appellant is a party in

> interest, being a 95 percent owner of Cumberland Investment Corporation, he has been unable to obtain an accounting of the assets seized, those sold and those which were not sold, but cannot be located because the court is denying him this information on the basis that Appellant is interfering with the orderly and economic administration of this case.

## C. ARGUMENT:

The conduct of Judge Votolato is prejudicial to the effective and expeditious administration of the case. Although some of the professionals on the CIC case knew of their conflicts of interest, it is the court which must determine the actual conflict. Judge Votolato abused his discretion by acting contrary to 11 U.S.C.A. 2014(a). It is for the bankruptcy court, not professionals, to determine whether professional's prior connection with a party in interest rise to level of an actual conflict, or pose threat of potential conflict so that professionals must disclose all of its previous contacts with any party in interest. (See **<u>In Re: Citation Corporation, Debtor vs. Valrey W. Early, III, U.S. Bankruptcy Administratior, Northern District of Alabama, Defendant</u>**, 493 F3d 1313, 1314-5, 11th Cir, 2007.) In **<u>In Re: Citation Corporation</u>**, the matter arising out of a fee application filed by professional, who had violation of his disclosure obligations under Bankruptcy Rule.

In the C.I.C. case, the abuse of discretion is blatant. There is some room for error if one is deciding if Mr. Monzack, receiver for Eastland Bank can act without a conflict by being Chapter 7, Trustee in the CIC case, or whether Mr. Bertozzi and his firm represented Eastland Bank at various stages had a conflict by representing the Examiner and Chapter 11 Trustee. However there can be no doubt of an abuse of discretion to ignore the following statute.

> The Trustee according to 11 U.S.C.§327(f) may not employ a person that has served as an examiner in the case. Yet the court has allowed Mr. Cullen, Trustee to hire Mr. Weingarten, who served as examiner in the case, to assist him in the sale of the assets of Cumberland Investment Corporation.

The decisions of the court contrary to statue, 11 U.S.C.§327(f) as listed above also subverts the integrity of the court itself and thus commits wrongs against the institutions set up to protect and safeguard the public. The inability of the Trustee to close this 18 year old case eight years after all the assets of the estate were sold is in itself proof of the lack of expeditious administration of the estate.

The administration of the case cannot be effective when the system as administrated is corrupted with contradictions. The integrity of the system is broken when a Trustee has been placed in the inevitable situation where in addition to representing the interests of the estate, he allegedly represents the interest of the Appellant by court order, the interests of other creditors, the interests of Eastland Bank, F.D.I.C., Republic Credit Corporation I, and his predecessor, Mr. Cullen.

As successor to Mr. Cullen, Mr. Monzack becomes the transferee or assignee of the Chapter 11, Trustee, who had custody and control of the documents and assets of CIC in both criminal and civil aspects of two collateral cases. Mr. Monzack also inherits custody and control of documents confirming claims of Appellant that the assets of the estate have been switched, mishandled and are missing.

**D. CONCLUSION:**

Appellant was denied due process by failure of the court to administer this case by enforcing its fiduciary responsibility to have the Trustee provide an accounting of the assets of the case as required by statute. The repeated reference to prior court orders and sanctions of Appellant by Judge Votolato and Judge Votolato's conduct and continued participation in Appellant's hearing on the Motion to Clarify the billings of Edward Bertozzi and EAPD deprived Appellant of due process and the right to a full and fair hearing. For the aforementioned reasons, the Judge should recuse himself and the Chapter 7, Trustee should be replaced and the billings of the professionals as well as The Final Report facts and figures should be scrutinized by independent parties appointed by this court and/or any other remedy this court meets just and fair.

## VI. STATEMENT OF THE CASE FOR THE FOURTH ISSUE

Appellant cannot obtain a fair hearing and be granted due process, a Fifth Amendment Right, with Judge Votolato presiding over this case. The end result, being that the Appellant is denied "equal protection under the law" as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

### A. TRAVEL AND FACTS

**Appellant incorporates the travel and facts of Issues I-III inclusive.**

There is a long history in bankruptcy case no. 89-11051 of violations of fundamental constitutional rights in which Judge Votolato has usurped the rights of Appellant. When Judge Votolato, appointed the Trustee in bankruptcy to represent Petitioner's interests in this case, and this judge continuously represents that,

"I don't think you [Appellant] have an interest here that's not represented in other ways…." Tr. 2/7/02, Hearing pg 18. And that……..

"….you [Appellant] don't have standing to start looking for discovery at this point on anything." (Tr. 2/7/02, Hearing pg 19),

"…..And that's the point that I'm trying to make now on your issue of I am—you know, I have standing here because I have property rights in items that are still out there and unaccounted for. I don't see anything that is not accounted for that hasn't been dealt with. Maybe improperly, in your view, but done with. Do you get it?" (See D.R. #14., Tr. 3/27/08, Hearing page 21.)

The judge basically usurped powers belonging to Appellant. (See TR. 5/7/08 for a myriad of due process violations.) He usurped the same protected power at the 2/7/02 hearing as in the July 3, 1991, court order, and in the August 23, 1990, court order, enjoining Petitioner from contacting former clients, while a criminal case was in progress. The Judge usurped the protected power of Petitioner to defend himself in accord with the Ninth Amendment, both pre and post conviction, while estate assets and personal assets, in which Petitioner has a

property interest, removed and remaining under the custody and control of court appointed Trustees have seemed to 'disappear'.

Because Judge Votolato clearly usurped a power belonging to Petitioner, the judgment is void, and therefore subject to relief under Rule 60(b)(4). See **V.T.A., Inc. v. Airco, Inc.**, 597 F.2d 220 at 224, where the court states, "A judgment is void, and therefore subject to relief under Rule 60(b)(4), *only* if the court that rendered judgment lacked jurisdiction *or* in circumstances in which the court's action amounts to a plain usurpation of power constituting a violation of due process.

**B. A NINTH AMENDMENT DISCUSSION**

The Petitioner, a 'convicted' criminal defendant, claims that he has a constitutional right, namely the Ninth Amendment, protected by his First and Fifth Amendment right to due process, to defend himself by gathering evidence to overturn his conviction. The right to defend oneself is a basic fundamental right and even though it is not enumerated in the Constitution, it is a right like privacy that is retained by the people.

Pre-trial, Petitioner was impeded and deprived of evidence that he was seeking, as evidenced by the production, nearly six years after his trial, of 19 videotapes of the removal of the assets on August 23, 1990, by the Trustee in bankruptcy. Petitioner, for lack of corroborating evidence concerning assets that were switched and/or missing, was convicted. Petitioner claims that he is currently being deprived of the right to defend himself and overturn his conviction by obtaining more evidence crucial to his arguments. Many of the obstacles to Petitioner obtaining this evidence lie in the bankruptcy 'arena'.

The officers of the Bankruptcy Court have usurped the rights of the Appellant by utilizing an order, dated July 3, 1991, appointing a trustee, accused of wrongdoing by the Petitioner, with conflicts of interest and interests adversarial to the Petitioner, to defend the interests of the Petitioner.

This process has resulted in years of stonewalling of Petitioner's attempts to gather evidence through the legal process and has undermined the safeguards built into the system to protect him.

One of these safeguards, involving the conflict of interest issue, is so uniquely important that in bankruptcy cases by statute, specific parameters are set up that involve full disclosure. See 11 U.S.C. Rule 2014(a). This disclosure requires the applicant to declare his connection with other parties in the bankruptcy, which was not done in this case.

The safety net of last resort to the Appellant is the Ninth Amendment to the United States Constitution. In this case, the Appellant has been told that he must submit his motions directly to chambers and that the Clerk of Courts shall decline to accept any filings from Appellant unless such filing has first been presented to Chambers and specifically authorized by the Court for filing. Appellant, in good faith, has sought to operate within the confines of the rules set up by the Court and submitted a proposed Motion to Clarify to chambers, with no response from the Court. It appears as if any interested party in the case could file an Objection or Response to the billing Application, except Appellant, thus creating a situation where Appellant is being denied due process as guaranteed by the Fifth Amendment to the U.S. Constitution as well as equal protection under the law as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

## C. FINALITY OF JUDGMENT

In the interests of finality, the concept of void judgments is narrowly construed. See **United States v. Berenguer**, 821 F.2d 19, 1st Cir. 1987 at 22 and **Lubben v. Selective service System Local Board No. 27**, 453 F.2d 645, 1st Cir. 1972. A judgment is not void merely because it is or may be erroneous. See **V.T.A., Inc. v. Airco, Inc.**, 597 F.2d at 224 and **Lubben** at 649. Yet, in this case, there can be little doubt that the protected power to

seek redress of grievance, due process, equal protection under the law and basically the ability of Petitioner to defend himself, has been usurped.

## D. ARGUMENT:

"When Rule 60(b) is in play, we [circuit court] ordinarily defer to the trial judge's more intimate knowledge of the case." **Anderson v Cryovac, Inc.** page 923. "For us to act, there must be an abuse of discretion." **U.S.v. Ayer**, 857 Fed 881, 886 (1st Cir 1988.) Under this standard, we reverse only if it plainly appears that the court below committed a meaningful error in judgment. See **In re: San Juan Dupont Plaza Hotel Fire Litigation**, 859 F2d 1007, 1019 (1st Cir. 1988)(delineating standard)

When the court seeks to restrict Appellant's participation, requiring Appellant to file motions directly to chambers and then not respond to these motions, the court has abused its discretion and Appellant is denied due process.

Furthermore, when virtually every party in the case is given an option to object or respond to a motion or not, and where only Appellant is being denied the ability to respond or object, Appellant is being denied equal protection under the law to respond and or object.

However, Appellant has a duty to protect his own interests, especially when it appears as if the Trustee does not represent his interests at all and the court is not being fair and impartial.

> "In our adversary system of justice, each litigant remains under an abiding duty to take the legal steps that are necessary to protect his or her own interests." **Cotto v. United States**, 993 F.2d. 274, 1st Cir. 1993 at 278.

Although Appellant failed to appeal the November 3, 2004, decision because at that time he felt overwhelmed with the situation subsequent to the Supreme Court not granting certiorari, Appellant now appeals to this Honorable Court

because of a change in the circumstances with the governing of this case. Strictly using a "reasonable man" standard, Appellant cannot obtain a fair hearing and obtain due process when the court refuses to respond to Appellant.

> "Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." **28 U.S.C. §§455(a).**

There is little doubt that a "reasonable man" would respond to Appellant. The well established test in the first circuit is an objective one. See **U.S. v Cowden**, 545 F2d. 257, 265, 1st Cir., 1976. According to Cowden,

> "Whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judges impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. §455, but rather in the mind of a reasonable man."

In reviewing the transcripts of the March 27, 2008 and the May 7, 2008 Hearings there can be little doubt that Judge Votolato lacks impartiality.

**E. CONCLUSION:**

Appellant cannot obtain a fair and just hearing before this judge, who has stated that, Appellant has obstructed the case, acted in bad faith and has done "intentional harm to this estate". (See EXHIBIT B-3.) Judge Votolato should be recused because of his abuse of discretion and his lack of impartiality towards Appellant in the eyes of a "reasonable man" as well as his "meaningful errors in judgment".

Appellant is being denied fair treatment and is being denied equal protection under the law in accord with the guarantees of the Fourteenth Amendment to the Constitution of the United States.

Furthermore, the previous rulings of the Bankruptcy Court and the fairness of the criminal trial, should be questioned in light of the information contained in the four arguments presented to this court.

Respectfully submitted,

Harold F. Chorney

Harold F. Chorney
16 Spring Drive
Johnston, R.I. 02919
401 934-0536

**CERTIFICATION**

On this 19th day of August, 2008, Appellant Harold F. Chorney mailed by first class mail a copy of the Motion and Memorandum to Appeal and/or Amend Bankruptcy Orders, dated November 3, 2004 and May 8, 2008, with Exhibits to the following:

Arthur N. Votolato, Judge
380 Westminster Mall
6th Floor
Providence, R.I. 02903

Jason D. Monzack
Kirshenbaum & Kirshenbaum
888 Reservoir Avenue
Cranston, R.I. 02910

United States Trustee
Thomas P. O'Neill, Jr.
Federal Office Bldg.
10 Causeway Street Room 472
Boston, MA 02222-1043

Leonard DePasquale, AUST
Office of the U.S. Trustee
10 Dorrance Street
Providence, R.I. 02903

Edward J. Bertozzi, Jr.
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, R.I. 02903

John F. Cullen
Law Office of John F. Cullen, PC
17 Accord Park Drive, Ste 103
Norwell, MA 02061

John Boyajian, Esq.
Boyajian, Harrington & Richardson
182 Waterman Street
Providence, R.I. 02906

Matthew J. McGowan, Esq.
Salter McGowan, Sylvia & Leonard
321 South Main Street
Providence, R.I. 02903

Harold F. Chorney

Harold F. Chorney
16 Spring Drive
Johnston, R.I. 02919
401 934-0536